## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JARED FISHMAN, 2703 O St. NW, Washington, DC,<br><br>   Plaintiff,<br><br>  v.<br><br>THE DISTRICT OF COLUMBIA; LIETENANT PATRICK LOFTUS, of the Metropolitan Police Department of the District of Columbia, in his individual capacity; OFFICER MARCK JAEGER, of the Metropolitan Police Department of the District of Columbia, in his individual capacity; and OFFICERS JOHN DOE 2, 3, and 4, currently unidentified officers of the Metropolitan Police Department of the District of Columbia, in their individual capacities,<br><br>   Defendants. | Case No. 21-CV-1847<br>Jury Trial Demanded |

## COMPLAINT

1.      On February 17, 2020, Plaintiff Jared Fishman took his two daughters to a restaurant. When they left, Fishman's younger daughter was acting up in a way familiar to almost every parent of a toddler: refusing to get in the car. So Fishman picked the child up and put her in the car. A passerby called the police and, based on that call, Officer Marck Jaeger, who was at a nearby 7-11, drove to Fishman's house. There Jaeger encountered Fishman sitting on the front stoop, shoeless, playing Bob Dylan's "Simple Twist of Fate" on an acoustic guitar.

2.      When Jaeger asked Fishman to clear up what was going on, Fishman sighed, stood up, said "hang on a sec," and walked into his house, leaving his door mostly open. Jaeger pushed Fishman's door further open, took two steps into his house, took him to the ground, dragged him out onto the street, and handcuffed him. At that moment, Officers John Doe 2–4 arrived, and two young girls appeared at the front door, which was still open. The older girl immediately explained that her sister had been misbehaving and her father had done nothing wrong, as the younger girl begged the officers to release her father. Moments later, the girls' mother appeared and explained that the girls are her children and Fishman is their father. But the Defendants, instead of immediately releasing Fishman, walked him to the end of his block and held him there, handcuffed and shoeless, as his neighbors gawked at him, for more than 25 minutes.

3.      Throughout his detention, Fishman protested that Jaeger had no right to enter his house and, therefore, that Jaeger had illegally searched and seized him. In retaliation, Defendant Lieutenant Patrick Loftus, above his official title, and using

his official address and email address, filed two ethics complaints against Fishman that contained false, misleading, and unsupportable contentions.

4.     Because no reasonable officer could have thought the circumstances permitted him to barge into Fishman's home without a warrant, because no reasonable officer could have believed that there was any justification for detaining Fishman after his wife and children confirmed that he did nothing wrong, and because a government official used his office to retaliate against Fishman's protected speech, Defendants violated Fishman's constitutional rights. And because the individual officer defendants violated the common law of the District of Columbia in the course of their employment, they and the District are liable to Fishman. He brings this action seeking compensation for the harms he suffered.

## **Parties**

5.     Jared Fishman is a 44-year-old father of two daughters. He is a civil-rights lawyer. For 14 years, he worked for the Civil Rights Division of the United States Department of Justice, and he now runs a non-profit initiative dedicated to developing data-based solutions for a more equitable criminal justice system.

6.     Officer Marck Jaeger is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action he was wearing an Axon body-worn camera labeled X81012311. Jaeger initially approached Fishman, barged into his home, and, within view of girls who were obviously his children, handcuffed him on apparent suspicion of kidnapping.

7.     Officer John Doe 2 is a police officer with the Metropolitan Police Department of the District of Columbia. He is a light-skinned man in his twenties or

thirties, and during the incident giving rise to this Action he was wearing a yellow vest and an Axon body-worn camera labeled X6039B1P8. He initially interviewed Fishman's wife and daughter and refused to effect Fishman's release or even to tell other officers what he knew despite acknowledging that the girls were Fishman's daughters and that they reported no concerns other than that they wanted to see their father released.

8.      Officer John Doe 3 is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action, he was wearing an Axon body-worn camera labeled X81014714. Based on body-worn-camera footage of the incident giving rise to this Action and a police report generated the same day, his name is likely Michael Tong. He interviewed Fishman on the corner at the end of his block and unreasonably kept him in handcuffs after Fishman voluntarily explained the events of the day in a manner that perfectly matched his wife's and daughters' accounts and evinced no improper behavior whatever, let alone a crime.

9.      Officer John Doe 4 is a police officer with the Metropolitan Police Department of the District of Columbia. During the incident giving rise to this Action he was wearing an Axon body-worn camera labeled X81137651. He interviewed Fishman's family alongside Doe 2 and continued to participate in his detention despite acknowledging that the girls were Fishman's daughters and that they reported no concerns other than that they wanted to see their father released and despite hearing Fishman confirm that the two girls were his daughters.

10.    Lieutenant Patrick Loftus is the commanding officer of the Second District of the Metropolitan Police Department of the District of Columbia. He arrived towards the end of the incident giving rise to this Action, told Fishman and his wife that Jaeger's actions were justified and that Fishman should be thankful that officers responded as they did, and retaliated against Fishman's protected speech by filing bar and ethics complaints against him under color of his office as a government official.

11.    Jaeger, Does 2–4, and Loftus are sued in their individual capacities for actions taken under color of law.

12.    The District of Columbia is sued under the doctrine of *respondeat superior* for claims based on D.C. common law only.

## Jurisdiction and Venue

13.    Fishman brings this Action under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights to be free from unreasonable entry into his home without a warrant, seizure without reasonable suspicion, arrest without probable cause, and retaliation in violation of the First Amendment; and under the common law of the District of Columbia, alleging trespass and negligence. This Court has subject-matter jurisdiction over Fishman's § 1983 claims under 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over Fishman's common-law claims under 28 U.S.C. § 1367. Venue is proper in this district because all of the events complained of occurred in this district.

### A Mistaken 9-1-1 Call

14.     On February 17, 2020, Fishman took his two daughters to Cactus Cantina on Wisconsin Avenue in the District of Columbia.

15.     During their meal, Fishman's younger daughter was bothering his older daughter by kicking her under the table. The two girls argued, and when the family left the restaurant, Fishman's younger daughter refused to get in the car.

16.     Fishman and the older daughter let the younger daughter walk around for a few minutes, figuring that she would eventually relent and get in the car.

17.     She didn't, and so Fishman did what any good parent would do in the situation: He picked up his younger daughter and put her in her car seat in the back of his car. And the younger daughter did as many recalcitrant young children would do in the situation: She vigorously protested.

18.     Moments after Fishman secured his younger daughter and got into the driver's seat, a man in his late fifties came to Fishman's window and asked if everything was alright. Fishman told the man that his "daughter was being a pain in the ass," that everything was fine, and that he was taking her home.

19.     The man walked away and Fishman, irritated but calm, drove south on Wisconsin Avenue towards his home in Georgetown. As the family was driving home, Fishman's younger daughter calmed down. When they got home, the family went inside and Fishman's daughters asked their mother if they could watch TV, which she said they could, and which they did.

20.     Sometime after Fishman left the restaurant, though, a woman called 9-1-1.

21.     She said she saw an "incident." "I don't know if it was an abduction, or

a father manhandling his child . . . . I saw this little girl walking by herself, she was

probably six or seven, so I pulled over to see if she was by herself or with an adult.

Then I saw this guy pull up, and he tried to talk to her, then he started screaming at

her, and she pushed him, and he just threw her into the car . . . . Then this other guy

pulled over and tried to help, and he said 'it's my daughter,' but the other guy wasn't

convinced."

22.     The woman then described her location and explained that although she

did not get Fishman's license plate, the other passerby had. The woman gave the 9-

1-1 operator a description of Fishman and Fishman's car, and read out his license

plate.

23.     After collecting identifying information, the 9-1-1 operator responded

"there's not much we can do with the information you gave, but I'm still gonna send

an officer to the location . . . . It looked like she was just walking down the street?"

24.     The woman responded that the girl looked "sad" and that she was "way

too young to be by herself," and so the woman explained that she pulled over to see

"if there was a parent walking behind her, or something."

25.     At 2:33 PM, the 9-1-1 operator put out a radio run for nearby police

officers reporting the call and listing a code "KIDUNK-KIDNAP/ABDUCT-

STRANGER OR RELATIONSHIP UNKOWN." The radio run listed Fishman's

license plate and described him as a bald white male, possibly in his 40s. Based on

the registration of Fishman's car, the dispatcher found Fishman's address and put out a radio run to respond to that address.

## **Jaeger Responds**

26.     Jaeger heard the call with Fishman's address while he was parked in a police car in front of the 7-Eleven on 27th and P St, Northwest, which is a block away from Fishman's house.

27.     Jaeger drove to Fishman's block, finding Fishman's car parked on the street.

28.     "I'm in the block of that vehicle," Jaeger told the dispatcher. "The person is sitting on the front steps at that address. I'm going to go up and speak to him."

29.     On the radio, others were speaking. The radio traffic made it clear that multiple police officers were on the way to Jaeger's location. One person said, "we are overhead and have a visual on the officer." A helicopter was audibly hovering overhead.

30.     Jaeger parked his car and walked up to Fishman, who was sitting on his front steps, calmly playing an acoustic guitar, wearing white socks and no shoes. Jaeger heard a few bars of "Simple Twist of Fate," by Bob Dylan. Fishman stopped playing as Jaeger approached.

31.     "Hey how are you doing, sir?," Jaeger asked from the foot of Fishman's steps.

32.     "How's it going," Fishman calmly responded.

33.     "You don't drive an Audi, do you?," Jaeger asked.

34.     "I do," Fishman calmly responded.

7

35.    "Did you just get home?," Jaeger asked.

36.    "I did just get home," Fishman responded, slightly irritated but fully calm. "And that guy who called in has no idea what's going on."

37.    "Maybe you can help me with what's going on," Jaeger said.

38.    Fishman sighed, exasperated but calm. "Hold on one sec," he said. He then quietly said to himself "you've gotta be kidding me," slowly stood up, and walked into his house.

39.    "Hey," Jaeger said, a bit firmer than earlier, but still calm, "hang tight for a second, don't go inside."

40.    As Fishman stepped over the threshold of his doorway, Jaeger walked up the steps and said "don't go inside."

41.    Fishman, at least three full steps inside his home, past the bottom of the stairs leading to the second floor, said "you don't have the right to enter my house."

### Jaeger Enters Fishman's Home and Arrests Him

42.    After Fishman had stepped inside his home, Jaeger pushed the door, which had been mostly open, all the way open.

43.    Jaeger, with his feet in Fishman's home, screamed "step out."

44.    Jaeger grabbed Fishman by his arms (twisting his left arm and holding his right), dragged him onto his front steps, and took him to the ground as Fishman was shouting "You do not have the right to enter my house. I am not doing anything, and you do not have the right to enter my house."

45.    Jaeger shouted at Fishman, demanding that he put his hands behind his back, which Fishman did.

8

46.     At least three other officers, including Does 2, 3, and 4, arrived at Fishman's house as Jaeger was handcuffing him.

### Jaeger Detains Fishman Even Though Any Suspicion Immediately Dissipated

47.     As Jaeger was putting handcuffs on Fishman, with at least three other officers on the scene and a helicopter overhead, two girls appeared in Fishman's doorway.

48.     The younger girl shrieked and cried, asking the officers to stop what they're doing.

49.     The older girl said that her father had done nothing wrong, and that instead "it is my sister, she was misbehaving."

50.     The younger girl frantically pleaded with the officers, saying "he hasn't done anything wrong, please, please."

51.     Fishman asked "who is in charge here?"

52.     The officers began to walk Fishman away from his house.

53.     Fishman, concerned for his younger daughter, who was shrieking inconsolably, said "I would like to do this in front of my kids."

54.     One of the officers said "no."

55.     Doe 3 walked with Fishman, who did not resist, and at least one other unidentified officer, down O Street to the corner of 27th Street.

56.     At the same time, Doe 4 began speaking with Fishman's children through the front door of Fishman's home.

57.   Jaeger then walked back to the house, stood at the bottom of the steps and observed the scene silently, as Doe 2 stood at the top of the stairs with Fishman's daughters and wife.

58.   Fishman's younger daughter was still very upset. She screamed "Please don't arrest him, he hasn't done anything wrong."

59.   Fishman's older daughter then said "He did not take my sister. My sister was misbehaving, and he brought her into the car."

60.   The officers saw Fishman's wife, and the mother of their children, in the doorway holding the younger daughter as the younger daughter said "It was my fault, he didn't do anything wrong." The mother quickly retreated to console the younger daughter, who was screaming and crying. The officers could hear Fishman's wife consoling their younger daughter, describing Fishman as "daddy" and explaining that there had merely been a misunderstanding.

61.   Within seconds of handcuffing Fishman, no reasonable person—let alone a reasonable law-enforcement officer with any level of training and experience—could possibly have believed that he possessed any evidence of a crime, let alone of a kidnapping: Jaeger and John Does 2–4 immediately saw two girls who identified themselves as Fishman's children in Fishman's home, both of whom said that Fishman had done nothing wrong and both of whom quickly explained exactly what happened. The officers saw a woman who was obviously the children's mother, also in Fishman's home, comforting her screaming child. And Fishman told them that

he would like to stay with *his* kids. The law required that Fishman be immediately released. He was not.

### Jaeger and Does 2 and 4 Continue Fishman's Detention Despite Conclusive Evidence that he Did Nothing Wrong

62. As Doe 3 held Fishman in handcuffs at the end of his block, Does 2 and 4 interviewed Fishman's family through the front door of their home and Jaeger watched, periodically walking up and down the block and talking to other officers.

63. As described above, Fishman's wife immediately came to the doorway and picked up Fishman's younger daughter, who was still shrieking "no" and "please don't," begging the officers not to arrest her father. And Fishman's older daughter explained that her father "did not take my sister," that "she was misbehaving [and] he brought her to the car."

64. Fishman's older daughter was calm, and her body language appeared to indicate that she was baffled by the police response.

65. Fishman's wife carried Fishman's younger daughter into the home, attempting to calm her down, but both could still be seen from the street and the steps.

66. Doe 4 told Fishman's older daughter: "We got a call that a male picked up a child and put her over his shoulder and took her in a car, and abducted her, so of course we take that very seriously and so . . . we're just investigating." He asked her whether "she [was] there the whole time."

67. The older daughter told Doe 4 "I was in the car in the front seat, my sister was misbehaving and she wouldn't get into the car and come home. We didn't

want her to get taken or anything. And she wasn't listening and my dad had to put her over his shoulder and get her into the car. He did nothing wrong."

68.     A few seconds later, Fishman's younger daughter reappeared, again protesting that her father had done nothing wrong. Doe 2 asked for the younger daughter's name, which she gave him.

69.     Moments later, Fishman's wife, in full view and earshot of Does 2 and 4, told the younger daughter "what happened was that someone misunderstood, someone saw daddy pick you up and didn't know it was daddy."

70.     Fishman's wife and younger daughter came to the door as his wife was still trying to explain to her daughter what was happing.

71.     Doe 2 asked for Fishman's older daughter's name, which she gave him. Fishman's wife, kneeling to comfort Fishman's younger daughter, told Doe 2 "I think what would help is if you could bring him back here so she can see him." Doe 2 then explained that he would not do that because he needed to speak to everyone separately, but attempted to comfort Fishman's younger daughter by telling her that her father was right at the end of the block.

72.     Meanwhile, as Doe 2 spoke with Fishman's family at his house, Jaeger and Doe 4 walked between Fishman, who was in handcuffs and the end of the block, and Fishman's house. Jaeger's body-worn camera was blocked for some of this time, but he can be heard saying "I'm trying to get a sergeant out here," and he can hear another person saying that a sergeant is on his way.

73.     When the footage came back on, Jaeger slowly walked back to Fishman's house, where he could see Doe 2 interviewing Fishman's older daughter.

74.     Jaeger then went to speak with another officer (not a party here), who is Black and in his 20's or 30's. Both were speaking very quietly. They were in front of Fishman's house.

75.     Jaeger said: "So concerned citizen stopped bald man who grabbed a girl, put her, girl over his shoulder, put her in a car and drives off."

76.     The other officer asked: "And it's his daughter?"

77.     Jaeger said: "That's what it looks like now."

78.     Meanwhile, within earshot of Jaeger, Doe 2 was speaking with Fishman's wife and younger daughter and Doe 4 went between Fishman's home and the corner where Fishman was detained. Doe 4 saw Doe 2 calmly interviewing Fishman's family and heard Fishman give Doe 3 identifying information for himself and his daughters.

79.     Doe 2, attempting to calm Fishman's younger daughter, said "Can I tell you what's going to happen with your daddy. We're just going to talk to him. And if nothing happened, we're just going to bring him right back home. Nothing bad is going to happen to him."

80.     Doe 2 said to Fishman's wife "So we got a call for a child abduction and . . . they described the vehicle, and was that your husband and your daughter?"

81.     Fishman's wife said "yes" to both questions.

82.     After Doe 2 explained how he arrived at the same, Fishman's wife said: "I would like to go to where my husband is right now." Doe 2 responded that they had to keep everybody separated.

83.     Doe 2 then said: "As I mentioned to your daughter, nothing happened, we're going to take a report of what we got a call for, what our actions were, and then we're going to get you guys back together."

84.     Fishman's wife said: "My number one priority is my daughter, could you bring him back just so she can see him and see that he's okay, and then you can question him?" Doe 2 said no.

85.     Fishman's wife asked Doe 2 to pass the message on to his colleagues that her daughter is obviously traumatized and that it would really help her just to see her father. Doe 2 said "they know that—they know she is very upset, they were the first two here, but this is our procedure. We don't want to keep you separated any longer than we have to."

86.     Throughout his conversation with Fishman's wife, Fishman's younger daughter was visible periodically, crying but beginning to calm down.

87.     Doe 2 did not pass the message along, and instead decided to ask some questions himself. He took identifying information from Fishman's wife, and she confirmed that she and Fishman are married and that they are the parents of the children.

88.     Doe 2 asked Fishman's wife if the younger daughter was upset about anything or if "anything was going on," or if there were "any issues." Fishman's wife

said she had no information about what happened that morning because she wasn't there, but said "did she refuse to get in the car and he put her in the car? Yeah, that sounds possible . . . . If you need to do more questioning—and I can't imagine why, you got here and he's playing guitar with the two kids in the house—but if you need to, could you please bring him back here? This is scary."

89.    Doe 2 said that Fishman was in handcuffs and that Fishman's wife probably didn't want her daughter to see her father in handcuffs. Fishman's wife said that was right, but said "for obvious reasons, he should not be in handcuffs." To this, Doe 2 responded: "we have certain protocols, based on the allegations, that we have to follow, until we can rule it otherwise."

90.    Doe 2 asked if he could interview Fishman's younger daughter.

91.    Fishman's wife said: "Absolutely not."

92.    Doe 2 said: "We just want to talk to her to make sure everything is okay," to which Fishman's wife responded, "What did you hear her saying just now, what did you hear her expressing?"

93.    Doe 2 then said: "She said nothing happened, but I would like to actually talk to her."

94.    After some more back and forth, Doe 2 said he could not conclude his investigation and release Fishman until he had spoken to all the people involved, including Fishman's younger daughter. Fishman's wife asked what her rights were, and Doe 2 told her "you can deny speaking with us, but that may delay everything. If

you don't want your daughters to speak to us, I'll speak to my officials," who he said were on their way.

95.     Fishman's wife initially refused again to let Doe 2 speak to her younger daughter, concerned that the daughter was already traumatized by the experience and that she would be further scared. Doe 2 explained that he would be asking only straightforward questions about whether anything was wrong.

96.     Fishman's wife picked up the younger daughter and explained that part of a police officer's job is "to keep everybody safe." Fishman's wife asked her daughter to step inside for a second and continued to ask Doe 2 about the questions he would ask the younger daughter, concerned that he would further frighten and traumatize her. Once they had confirmed that Doe 2 would ask only where they were and whether the younger daughter was hurt, and that Doe 2 would turn down the noise on his radio and would smile when he spoke to the younger daughter, Fishman's wife agreed to let her daughter speak to Doe 2, who again had said "we have to do our diligence before we can wrap this up."

97.     After a few minutes, Fishman's wife came to the door with her younger daughter and instructed the daughter to answer Doe 2's questions. Doe 2 asked Fishman's younger daughter what happened, and she explained that she had a fight with her sister, ran away from the car, and that her father picked her up and put her in the car. She said she was not hurt. Doe 2 asked if there was any yelling or if it was difficult for her father to pick her up. Fishman's younger daughter said that she may have yelled but that her father picked her up gently and easily.

98.     Jaeger and Does 2 and 4 had, so far, done nothing to cause Fishman to be released despite not only knowing that there was no evidence of any impropriety, let alone any crime, but *saying* that there was no evidence of a crime. Instead, Doe 2 appeared to believe that he was required by some "protocol" to continue to handcuff Fishman and separate him from his family.

### Does 3 and 4 Do Nothing Despite Conclusive Evidence that Fishman is Wrongly Detained

99.     Doe 3 arrived on the scene shortly after Fishman was handcuffed. When he first arrived, he saw Fishman on the ground in front of his steps, and two girls in the doorway of the house, one of them screaming "please, no."

100.    While Jaeger and Does 2 and 4 were interviewing Fishman's family, Doe 3 took Fishman to the corner of 27th Street NW.

101.    When Doe 3 encountered Fishman, his glasses were askew on his face.

102.    As Doe 3 began taking Fishman down the block, Fishman said "I would like to do this in front of my kids."

103.    Doe 3 responded "No, no, no, we're not going to do this in front of your kids. If you want to talk to a supervisor, we can do that later but let's just walk around the corner here."

104.    Fishman said: "That guy entered my house without probable cause . . . so he entered, I told him I did not want to speak with him. I went into my house, and he entered my house without probable cause." Fishman asked if Doe 3 would remove the handcuffs, and Doe 3 said no.

105.   Doe 3 asked Fishman if he was injured at all, and Fishman responded "Yeah I'm injured, the guy threw me to the fucking ground. Can you straighten my glasses?" Doe 3 straightened Fishman's glasses and asked Fishman what injuries he had. Fishman said he had injured his left arm, but said "Can we move on? I want to move on because I know what happened" and refused Doe 3's offer of medical attention.

106.   Fishman then asked if he could go back to his house, to which Doe 3 responded "Okay, I don't know who you are. Could you give me your name, date of birth, all that information?" Fishman said: "I would like to know why I'm being stopped," to which Doe 3 responded "Listen, I'm asking you for information."

107.   "I understand," Fishman said, "and I am asking you, I have the right to know why I'm being stopped, detained, and handcuffed in front of my own house."

108.   Doe 3 said: "I don't have enough information to answer your question." Fishman asked again why he was being detained and why an officer illegally entered his house, and Doe 3 responded again that he did not have enough information to answer the question.

109.   Fishman asked if Doe 3 was under arrest, and another officer said "you're being detained."

110.   Doe 3 then asked Fishman for identifying information, which he reluctantly provided, noting throughout that he wanted to know why he was being detained and asking whether he needs to contact a lawyer. Fishman asked that Doe 3 run a check for his identifying information "in NCIC"—Fishman had already given

his name, date of birth, and address, and Doe 3 was asking him how tall he was and how much he weighed—so that "I can get out of handcuffs and get back to my family." Doe 3 persisted in asking for more identifying information.

111.   Doe 3 then asked Fishman what happened in the past hour or so.

112.   Fishman responded, calmly and fully cooperatively: "I went to lunch with my two children. During that lunch, my youngest daughter kept irritating her older sister. Refusing to stop kicking her. We left. My younger daughter refused to get in the car. Walked down 36th street. Started to walk up towards Wisconsin. She refused."

113.   Doe 3 interjected to ask where the family was having lunch.

114.   Fishman continued: "At Cactus Cantina. She refused to get in the car. I was trying to get her in the car safely. It took us about twenty minutes trying to get her in the car. She didn't. I picked her up, I put her in the car. That was the time that big car stopped in front of me. Asked me if there was a problem. I said there was none other than my kid was being a shit. And then we came home. My daughter calmed down in the car and we're now in the house. Both of my kids are now in the house, moving on with our day."

115.   Doe 3 then asked for identifying information for Fishman's daughters, which he provided.

116.   After he was done providing identifying information for his daughters, Fishman asked if Doe 3 would remove the handcuffs and said: "I'm not going

anywhere." Doe 3 refused. Fishman asked if Doe 3 would scratch Fishman's face, which another officer at the scene said they could not do.

117.   "Mother of God," Fishman said, "I'll do it over the damn fire hydrant." He then bent down and rubbed his face along a nearby fire hydrant.

118.   Doe 3 then left Fishman in the custody of Doe 4 and another officer at the corner and walked back to Fishman's house.

119.   At Fishman's house, Doe 3 encountered another officer, who asked him what happened. Doe 3 told the other officer: "So he's saying he was dining with his family. It was Cactus Cantina, the only one there is Wisconsin and Macomb. And the two daughters were irritating each other. So then he picked up the older daughter, put her in the car. And then a car stopped in front of him and asked him if there was an issue. He said there was no issue. He drove home and that was it."

120.   Yet another officer then approached Doe 3, and Doe 3 repeated the same version of events that Fishman had told him, except that he again switched the age order of Fishman's daughters.

121.   One of the other officers then told Doe 3 that Lieutenant Loftus was going "up to 36th street," which is near Cactus Cantina, "and then here."

122.   Does 3 and 4 so far had done nothing to secure Fishman's release, even though they knew from the moment he arrived on the scene that the children in question were Fishman's, even though Fishman had just fully explained the events of the morning in a manner consistent with how his daughters had independently

done so, and even though the officers had no evidence whatever that Fishman had committed any crime.

## Fishman is Finally Released

123.   After Doe 3 returned to Fishman's home, Fishman stood silently on the corner in the custody of Doe 4 and another officer for several minutes.

124.   As Fishman stood handcuffed in his socks in the physical custody of two uniformed police officers—one of them held Fishman's arm throughout—and a police helicopter circled overhead, several pedestrians walked past and observed the scene, which was also visible from the windows of all of the houses on the east side of 27th street and many of the windows on the west side of the street too. One of Fishman's neighbors walked out of a house on the west side of 27th street and saw the scene, walking by slowly to gawk at it. A few cars drive by slowly as well.

125.   A few minutes after Doe 3 left Fishman, the officer who had him in custody moved him a bit by pushing him on his handcuffed arms. This officer told Fishman that someone was taking a picture of him.

126.   About nineteen minutes after Fishman was initially tackled and arrested in his home, a Metropolitan Police Department sergeant, whose name (based on body-worn-camera footage and a police report) is likely Adam Bray, arrived on the scene.

127.   Jaeger immediately told the sergeant his version of events: "So basically, the whole call comes out, you heard that part. I get here, I see him matching the description, playing a guitar on the steps. I go up to talk to him. I ask him is this your car, did you just get home all that stuff. And then he goes I'm done talking to you,

tries to go in the house and then I grab him, pull out the handcuffs. Now I guess he said his shoulder hurts but he doesn't want any medical attention."

128.    The sergeant asked Jaeger where Fishman is and asked "what's the issue?"

129.    Jaeger responded "I don't know. I kinda stepped back cause they all seem kinda mad at me for putting him in handcuffs." When the sergeant asked who was mad at him, Jaeger responded, but the recording of his response is not audible.

130.    Jaeger then said "The guy in handcuffs not talking to anybody. And the wife's kind of upset about it because she said it's scary."

131.    This was false: Fishman had explained what happened to Doe 3 within minutes of being brought to the corner.

132.    The sergeant then asked Jaeger "Where's the kid?," and Jaeger responded that "the kid's inside—it definitely sounds like it was his daughter." "And who's the guy?," the sergeant asked. "She's saying it's biological mother and father of the daughter inside," Jaeger responded. "Well why is the guy not talking?," the sergeant asked, to which Jaeger responded "I think he's upset because I stepped into the house to grab him." The sergeant asked why Fishman was stepping into the house, and Jaeger said "because he didn't want to talk to me."

133.    This too was false: Fishman had not said he did not want to talk to Jaeger when he walked into the house, and although he later told Doe 3 that he had not wanted to talk to Jaeger, he had said that only because Jaeger illegally entered

22

his house. In fact, Fishman had said "hold on one sec," indicating that he would be back, and Fishman's door was mostly open when Jaeger entered.

134.    The sergeant then walked away from Jaeger and, after a couple minutes of waiting, encountered Lieutenant Patrick Loftus, who arrived in a police car with a woman who appeared to be in her 20's and was wearing civilian clothes.

135.    Loftus explained through the rolled-down window of his car that the incident had begun with a report from a passerby that a man had picked up a girl and put her in a car.

136.    The sergeant then told Loftus: "So Jaeger went up and he saw a guy that matches the description playing the guitar sitting on the steps. And he went up and talked to him. And started talking to him and the guy said I'm done, I don't want to talk to you anymore and he went to go step inside the house. And as he went to go step in the house Jaeger grabbed him and said no you're not free to go." To this Loftus nodded and said "Good! Absolutely!"

137.    False again: Fishman was already well inside his house when Jaeger stepped inside to remove him, as Jaeger himself had just said.

138.    The sergeant continued: "And he put him in handcuffs and walked him around the corner and now the woman in the purple, who I haven't spoken to is speaking to [an officer whose name was redacted from body-worn-camera footage] appears to be the mother and she's claiming she's the biological mother. She's also claiming the person around the corner is the biological father. The child is in the house, but she's not allowing us to talk to the kid. That's where I'm at right now."

139.    False yet again: although Fishman's wife had initially protested when Doe 2 asked to interview the younger daughter, the younger daughter had in fact spoken to Doe 2, and she had already said that Fishman had done nothing wrong about fifteen minutes before the sergeant arrived. And even before doing that, Fishman's younger daughter had protested that her father had done nothing wrong the moment he was being handcuffed.

140.    Lieutenant Loftus then explained that he was concerned that Fishman was insufficiently grateful for the police presence that day: "I definitely want to see this kid . . . make a notification to youth division, just to let them know, especially if they're not trying to be cooperative. Like if it was a complete misunderstanding, yeah sure check them out, they're okay, I apologize, thanks for, I'm glad you guys did this if this was a legit kidnapping, I appreciate . . . . So that makes me a little concerned."

141.    After this exchange, the sergeant walked over to the corner, where he found Fishman still in handcuffs.

142.    After Fishman explained that Jaeger had barged into his house and handcuffed him, the sergeant told Fishman that the police are investigating a kidnapping.

143.    This was the first time—more than 21 minutes after he was initially arrested—that anyone explained to Fishman that anyone suspected a kidnapping.

144.    Fishman laughed, and the sergeant said "It might seem silly to you, but we take it pretty seriously." Fishman explained that "It's my children. They're my

children. They live in this house. I'm sure they've told you that. Or told whomever they've spoken to."

145.   The sergeant responded: "We haven't spoken to anybody. That's kind of why like you're still in cuffs and I want to get you out of cuffs and that's why you're, I don't know who the woman is in the purple."

146.   Fishman then attempted to explain why it would not be suspicious if his children and wife refused to speak to police officers, not knowing at the time that both of his children and his wife had, in fact, spoken to the officers and confirmed that Fishman had done nothing wrong: "The woman is my wife," Fishman said. "I'm a Department of Justice Civil Rights Attorney [which Fishman was at the time of the incident], I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child."

147.   The sergeant then said: "Okay, well the reason we're responding the way we're responding is because the way it was conveyed to the police is that you grabbed, somebody matching your description, grabbed a kid, threw the kid into the car, which then alerted us to say well we have a lookout for the car. Officers canvassing for the car, they see the car, they see someone who matches your description, the description of the lookout that we have, we stop you. Then all of a sudden, you don't want to talk, so it just starts raising flags, like we want to make sure the kid is okay. . . . [T]he only thing that we need to do is make sure that the child is okay and is yours and then

that's why. And I see you standing here in your socks. I understand that you were sitting on your own steps."

148.    Fishman responded: "I would appreciate the cuffs being removed. I can show you the child, she will tell you that I am her father. That she was being a pain in the ass, refusing to get into my car. But I'm going to need to get the cuffs off my hands and I'm happy to tell my child. My older daughter was there, will tell you that her sister was being a pain in the ass. My good child was in the car, my pain in the ass child was refusing to get in the car. We gave her about fifteen minutes to walk around the block. She was getting up to Wisconsin, I said it was getting unsafe, so I picked her up and I put her in my car."

149.    Fishman did not know that his children had already said that quite some time ago, and that the sergeant's only stated reason for detaining him—to "make sure that the child is okay and is yours"—had already been accomplished.

150.    The sergeant then ordered an officer to take Fishman out of handcuffs, which the other officer did.

151.    Fishman had been in handcuffs for a little more than 25 minutes.

152.    He still did not have shoes on.

153.    After Fishman was taken out of handcuffs, he, the sergeant, and other officers walked back to his house.

154.    Loftus then argued with Fishman's wife about whether, in fact, Fishman's detention was justified and whether Jaeger permissibly entered Fishman's home, ending the conversation by noting that he would "be the one doing the

investigations for any type of complaint or anything like that. Everything is justified, I know you might be frustrated at the situation. But again you should feel good at the response if this was a legitimate kidnapping your daughter would be safe. We take calls very seriously . . . . Again, this was 100% justified, I do all the investigations. Your husband has no right to refuse when we're investigating something like that we're going to detain him based on the information that we're dealing with a kidnapping . . . . Everything's all on camera."

155.   Fishman said to Loftus, discussing Jaeger, "The guy kicked down my door after I . . .," and Loftus interjected "your door is working fine" and contended that Fishman "can't tell [Jaeger] that [Fishman didn't want to speak to him] when we're investigating a kidnapping." Fishman said: "I know that I was retreating into my house and then he slammed me to the stairs."

156.   Loftus then tells the family that he and his colleagues are mandatory reporters to the Youth and Family Services Division and, therefore, that a child-abuse investigation would be opened.

157.   Loftus and the rest of the officers then left.

158.   On March 26, 2020, a detective with the Youth and Family Services Division confirmed to Fishman that the investigation into Fishman's conduct had been closed as "unfounded": MPD had concluded that Fishman had not abused either of his children.

### Fishman Seeks Records and Alleges Constitutional Violations

159.   On March 6, 2020, Fishman filed a formal request for records under the District of Columbia's Freedom of Information Act.

160.   That request reads, among other things, that Fishman "was the victim of police misconduct."

## Loftus Files Materially False Ethics Complaints Against Fishman in Retaliation for Fishman's Complaints Against Does

161.   On April 29, 2020, Loftus filed a grievance complaint with the Maryland State Bar, of which Fishman is a member.

162.   On the complaint, Loftus listed as his address "Metropolitan Police Department Second District 3320 Idaho Ave. NW." He lists his official MPD email address, and refers to himself in the signature block as "Lt. Patrick Loftus."

163.   Loftus's complaint indicates that he had filed another complaint with the United States Department of Justice Office of Professional Responsibility and Office of Inspector General on February 17, 2020, the day Fishman was arrested.

164.   Loftus's complaint alleges that Fishman made "deceitful and intentional misrepresentations regarding being slammed to the ground and his door being broken." These statements, Loftus's complaint alleges, are "extremely concerning for an officer of the court." Loftus contends that "Body Worn Camera footage . . . clearly capture[s] . . . Mr. Fishman lower[ing] himself to a seated position on his stairs."

165.   This is false. Jaeger pulled Fishman to the ground, twisting Fishman's arm.

166.   Loftus's complaint alleges that Fishman "spontaneously stated on Body Worn Camera 'I'm a Department of Justice Civil Rights attorney. I prosecute police officers who violate the constitution.' Mr. Fishman's career was not material to our investigation into a kidnapping. Further, Mr. Fishman intentionally, knowingly, and

voluntarily identified his employer and made the subsequent statement 'I prosecute police officers who violate the constitution' to use his official position as an attorney with the United States Government to intimidate the officers, to influence the officers, or to gain preferential treatment."

167. This is false. Fishman explained his position in direct response to the sergeant's false statement to Fishman that Fishman's family was not speaking to the police. Fishman said nothing about his employer for more than 20 minutes, and only after it had become clear that he was in no legal jeopardy. Fishman was not attempting to use his official position to intimidate anyone or gain any preferential treatment; he wanted only to dispel whatever suspicion may have arisen—and none in fact had—from Fishman's family's supposed silence (which was false anyway) by explaining that silence would not indicate wrongdoing because his family had a reason not to trust police officers.

168. Loftus's complaint evinces that he had watched the body-worn-camera footage of the incident giving rise to this Action.

169. Loftus's complaint then adds two paragraphs outlining the supposed evidence against Fishman (arising from Loftus's reported conversations with witnesses near Cactus Cantina) and stating that MPD's "Youth and Family Services Division conducted an investigation into allegations of physical abuse," without noting that this investigation concluded that there had been no physical abuse, which of course there had not been.

170.    These paragraphs add nothing to the complaint because whether there was evidence as Loftus cites has nothing to do with the subject of the complaint, which is whether Fishman misrepresented the facts or misused his authority.

171.    Loftus does not, and cannot, contend that these supposed facts have any bearing on Fishman's capacity to practice law because all the investigations into Fishman's conduct on February 17, 2020, concluded that he had done nothing wrong.

172.    Loftus added these paragraphs to damage Fishman's reputation in retaliation for Fishman's statements that Jaeger illegally entered his home.

173.    Loftus's filed his complaints against Fishman in retaliation for Fishman's statements to him that Jaeger had violated the Constitution and Fishman's allegations in his FOIA requests.

174.    Fishman responded to Loftus's complaint a few weeks later.

175.    On June 6, 2021, Fishman emailed disciplinary counsel for the Maryland State Bar to ask about the status of Loftus's complaint.

176.    On June 7, 2021, disciplinary counsel sent Fishman and Loftus a letter noting that the complaint had been dismissed without prejudice. The letter did not provide substantive reasoning, but it noted that Loftus mentioned that body-worn-camera footage captured the incident but had not yet provided it.

### **The Harm to Fishman**

177.    Fishman was thrown to the ground and dragged out of his own home in front of his shrieking, traumatized child. This caused him physical pain and emotional distress.

178. He was separated from his family against his will, unable to comfort his child and assure her that he was okay. This caused him emotional distress.

179. He was held, in handcuffs and socks, for 25 minutes despite protesting that this was unnecessary and uncomfortable. This caused him physical pain and emotional distress.

180. His neighbors saw him surrounded by police officers, on a block full of police cars, as a police helicopter hovered audibly overhead for almost half an hour. This caused him emotional distress and harmed his reputation.

181. He was forced to spend hours of his time responding to meritless ethics complaints.

182. He was made to worry that Loftus would damage his professional reputation, with his employer and others, causing him emotional distress.

## Claims for Relief

### *Count One*: Warrantless Entry into Fishman's Home in Violation of the Fourth Amendment (Against Jaeger) Under 42 U.S.C. § 1983

183. Fishman incorporates all prior paragraphs here.

184. Jaeger entered Fishman's home without a warrant and without permission to do so after Fishman had slowly and calmly walked inside his home.

185. No exigent circumstances justified Jaeger's entry.

186. Because Jaeger entered Fishman's home without a warrant or any valid exception to the warrant requirement, Jaeger is liable to Fishman under 42 U.S.C. § 1983.

**_Count Two_: Illegal Warrantless Arrest in Fishman's Home in Violation of the Fourth Amendment (Against Jaeger) Under 42 U.S.C. § 1983**

187.    Fishman incorporates all prior paragraphs here.

188.    Jaeger entered Fishman's home without a warrant and without permission to do so after Fishman had slowly and calmly walked inside his home.

189.    No exigent circumstances justified Jaeger's entry.

190.    Jaeger physically seized Fishman within his home.

191.    Because Jaeger arrested Fishman in his home without a warrant or any valid exception to the warrant requirement, Jaeger is liable to Fishman under 42 U.S.C. § 1983.

**_Count Three_: Seizure of Fishman Without Reasonable Suspicion in Violation of the Fourth Amendment (Against All Individual Officer Defendants) Under 42 U.S.C. § 1983**

192.    Fishman incorporates all prior paragraphs here.

193.    Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

194.    Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

195.    Individual Officer Defendants therefore seized Fishman without reasonable suspicion in violation of the Fourth Amendment, and they are liable to Fishman under 42 U.S.C. § 1983.

*Count Four*: **Arrest of Fishman Without Probable Cause in Violation of the Fourth Amendment (Against All Individual Officer Defendants) Under 42 U.S.C. § 1983**

196.    Fishman incorporates all prior paragraphs here.

197.    Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Officer Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

198.    Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

199.    Individual Officer Defendants' prolonged detention of Fishman constituted an arrest.

200.    Individual Officer Defendants therefore detained Fishman without probable cause in violation of the Fourth Amendment, and they are liable to Fishman under 42 U.S.C. § 1983.

*Count Five*: **Trespass (Against Jaeger and the District of Columbia) Under the Common Law of the District of Columbia**

201.    Fishman incorporates all prior paragraphs here.

202.    Jaeger entered Fishman's property without Fishman's permission.

203.    Because Jaeger had not secured a warrant and was not protected by any exception to the constitutional warrant requirement, his entry onto Fishman's property was not privileged, and, therefore, constituted a trespass under the common law of the District of Columbia.

204.    And because Jaeger acted within the scope of his employment as an Officer of the Metropolitan Police Department of the District of Columbia, the District is liable under the doctrine of *respondeat superior*.

205.    On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Jaeger had committed, among other violations, trespass to property.

### *Count Six*: False Imprisonment (Against Individual Officer Defendants and the District of Columbia) Under the Common Law of the District of Columbia

206.    Fishman incorporates all prior paragraphs here.

207.    Individual Officer Defendants handcuffed Fishman and restrained his physical liberty for more than 25 minutes even though within seconds of seizing him Individual Officer Defendants were presented with evidence that dissipated any suspicion that the prior 9-1-1 call may have given them.

208.    Individual Officer Defendants continued to restrain Fishman's physical liberty as more and more evidence appeared conclusively showing that Fishman had done nothing improper, let alone criminal.

209.    Individual Officer Defendants' words, as captured on body-worn-camera footage, indicate that they all subjectively knew that the children were Fishman's and that there was no evidence of criminal child abuse, and to the extent that the officers did not subjectively know those things their states of mind were unreasonable.

210.   Individual Officer Defendants acted within the scope of their employment as Officers of the Metropolitan Police Department of the District of Columbia, and so the District is liable under the doctrine of *respondeat superior*.

211.   On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Individual Defendants had committed, among other violations, false imprisonment.

### *Count Seven*: Negligence (Against Individual Officer Defendants and the District of Columbia) Under the Common Law of the District of Columbia, Pleaded in the Alternative to Counts One, Two, Three, and Six

212.   Fishman incorporates all prior paragraphs here.

213.   Individual Officer Defendants had a duty as police officers to reasonably communicate the information they knew to each other to expeditiously secure Fishman's release when (at the latest) they had learned that his children had confirmed his version of events.

214.   Individual Officer Defendants breached that duty by failing to communicate necessary information to each other.

215.   To the extent any Individual Officer Defendants did not intentionally cause Fishman to be jailed after it was obvious that there was no evidence of any crime, those Individual Defendants failed to exercise reasonable care in alerting their fellow officers that there was no evidence of any crime.

216.   Individual Officer Defendants' failure to alert each other that there was no evidence of any crime caused Fishman to be detained longer than he would have

been had Individual Officer Defendants acted as a reasonably prudent police officer should have under the circumstances.

217.   Fishman's prolonged detention harmed him by causing him emotional distress and damaging his reputation among his neighbors.

218.   On July 21, 2020, Fishman's prior counsel noticed the Mayor of the District of Columbia that Individual Defendants had committed, among other violations, negligence.

### *Count Eight*: Retaliation in Violation of the First Amendment (Against Loftus) Under 42 U.S.C. § 1983

219.   Fishman incorporates all prior paragraphs here.

220.   Fishman complained to Loftus, the sergeant, and other Officer Defendants that Jaeger's entry into his home had been unlawful.

221.   This speech is protected by the First Amendment.

222.   Loftus, acting under color of law, filed a bar complaint that lacked a reasonable basis in fact and law because Fishman complained about Jaeger's unlawful entry into his home.

223.   Loftus added gratuitous and misleading allegations against Fishman in an attempt to damage his reputation.

224.   Being the subject of a meritless bar complaint would deter a person of ordinary firmness from engaging in constitutionally protected criticism of police officers' conduct.

225.   Loftus therefore violated Fishman's First Amendment rights.

### Prayer for Relief

Plaintiff Jared Fishman respectfully requests:

- An award of compensatory damages;
- An award of one dollar in nominal damages for unlawful entry into Fishman's home;
- An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and
- All other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
611 Pennsylvania Ave SE, No. 317
Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293