## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

        Plaintiff,

    v.

THE DISTRICT OF COLUMBIA; and
LIETENANT PATRICK LOFTUS,
OFFICER MARCK JAEGER, OFFICER
JEREMY BRADY, OFFICER
MICHAEL TONG, and OFFICER
CHRISTOPHER TODARO, all of the
Metropolitan Police Department of the
District of Columbia, each in his
individual capacity,

        Defendants.

Case No. 21-cv-1847
Jury Trial Demanded

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES....................................................................iii

PRELIMINARY STATEMENT..................................................................1

I.    FACTS ............................................................................................. 3

II.   ARGUMENT ................................................................................... 8

       A.    Jaeger Violated Clearly Established Law by Seizing Fishman in
             His Home Without a Warrant or Valid Exception. ................. 9

             1.    The Well-Pleaded Facts of The Complaint Show That no
                   Reasonable Officer Could Have Believed That Fishman
                   Was Outside His Home When He Was Seized........................... 10

             2.    The Well-Pleaded Facts of The Complaint Show That no
                   Reasonable Officer Could Have Believed That Exigent
                   Circumstances Existed................................................................ 12

       B.    The Individual Defendants Violated Clearly Established Law by
             Continuing Fishman's Seizure Long After Any Reasonable
             Officer Could Have Entertained Reasonable Suspicion....................... 15

             1.    The Relevant Legal Inquiry Is When Reasonable
                   Suspicion Dissipated, Not Whether Reasonable Suspicion
                   Existed in The First Place. ......................................................... 16

             2.    No Reasonable Officer Could Have Suspected That
                   Fishman Had Kidnapped His Own Children After They
                   And Their Mother Appeared at The Door And Confirmed
                   His Version of Events.................................................................. 18

             3.    Even if Reasonable Suspicion Were Not Immediately
                   Dissipated, no Reasonable Officer Could Have
                   Entertained it After Fishman And His Older Daughter
                   Independently Explained Exactly What Happened And
                   She Said That He Had Done "Nothing Wrong." ......................... 20

       C.    The District of Columbia is Liable For False Arrest or
             Negligence And For Trespass. ............................................................. 25

             1.    Privilege Under D.C. Law, Unlike Qualified Immunity,
                   Depends on Defendants' Subjective State of Mind.................... 26

        2.      Individual Defendants Subjectively Knew There Was No
Reasonable Suspicion to Continue Fishman's Detention........... 27

        3.      In The Alternative, The Officers Were Negligent And
Their Negligence Harmed Fishman. .......................................... 28

   D.    Loftus Filed a False and Defamatory Complaint in Retaliation
for Fishman's Protected Speech ............................................. 30

        1.      Loftus Is Not Entitled to Any Immunity, Such As Noerr–
Pennington, That Derives From the First Amendment............. 31

        2.      Fishman Plausibly Alleged Retaliatory Motive......................... 35

        3.      A Reasonable Attorney Would be Chilled by False
Allegations of Child Abuse and Abuse of Office. ....................... 37

III.    CONCLUSION.................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016 ........................................................ 30, 37

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................................................. 10

*Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) .............................................. 36

*Barham v. Salazar*, 566 F.3d 844 (D.C. Cir. 2009) ................................................... 20

*Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197 (D.D.C. 2010) ................... 19

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) ...................................................... 36

*California v. Hodari D*, 499 U.S. 621 (1991) ............................................................ 11

*Campbell v. Pa. School Boards Ass'n*, 972 F.3d 213 (3d Cir. 2020) ......................... 32

*Christopherson v. Poutsch*, No. 14-cv-152, 2015 WL 13662707 (D.N.M. Apr. 30, 2015) ................................................................................................................. 37

*Corrigan v. District of Columbia*, 841 F.3d 1022 (D.C. Cir. 2016) .......................... 12

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ................... 33

*Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15-cv-2028, 2017 WL 3821469 (D.N.J. Aug. 31, 2017) ...................................................... 37

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) .................................................... 26

*District of Columbia v. Murphy*, 631 A.2d 34 (D.C. 1993), *aff'd on rehearing*, 635 A.2d 929 .......................................................................................................... 26, 27

*Florida v. Bostick*, 501 U.S. 429 (1991) .................................................................... 10

*Florida v. Jardines*, 569 U.S. 1 (2013) ........................................................................ 9

*Florida v. Royer*, 460 U.S. 491 (1983) ...................................................................... 16

*Ford v. D.C.*, No. 13-cv-1960, 2016 WL 4379038 (D.D.C. Aug. 16, 2016) .............. 13

*Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102 (D.C. 1983) ................................... 26

*Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963) ...................................... 31

*Goldstein v. Galvin*, 719 F.3d 16 (1st Cir. 2013) ...................................................... 36

*Greisen v. Hanken*, 925 F.3d 1097 (9th Cir. 2019) ...................................................... 36

*Groh v. Ramirez*, 540 U.S. 551 (2004) ................................................................. 9, 12

*Hall v. District of Columbia*, 867 F.3d 138 (D.C. Cir. 2017) ...................................... 16

*Henderson v. District of Columbia*, 493 A.2d 982 (D.C. 1985) ................................. 26

*Herr v. Pequea Twp.*, 274 F.3d 109 (3d Cir. 2001) ...................................................... 32

*Hutchins v. Clarke*, 661 F.3d 947 (7th Cir. 2011) ........................................................ 36

*Illinois v. Wardlow*, 528 U.S. 119 (2000) .................................................................. 15

*Lee v. Gregory*, 363 F.3d 931 (9th Cir. 2004) ............................................................. 29

*Liser v. Smith*, 254 F. Supp. 2d 89 (D.D.C. 2003) ................................................... 9, 26

*Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005) .......................................................... 38

*Mincey v. Arizona*, 437 U.S. 385 (1978) ..................................................................... 12

*Mulligan v. Nichols*, 835 F.3d 983 (9th Cir. 2016) ..................................................... 36

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ................................................................. 35

*Ohio v. Robinette*, 519 U.S. 33 (1996) ....................................................................... 24

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) ..................................................... 36

*Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70 (D.D.C. 2011) .......................... 23

*Payton v. New York*, 445 U.S. 573 (1980) ................................................................. 8, 9

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49
     (1993) ................................................................................................................... 33

*Robinson v. District of Columbia*, No. CV 15-100 (RJL), 2019 WL 498741
     (D.D.C. Feb. 8, 2019) ........................................................................................... 24

*Rodriguez v. United States*, 575 U.S. 348 (2015) ....................................................... 23

*S.H. v. District of Columbia*, 270 F. Supp. 3d 260 (D.D.C. 2017) .............................. 10

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 862 (D.C. 1982) ................................... 26

*Schneck v. Saucon Valley School Dist.*, 340 F. Supp. 2d 558 (E.D. Pa. 2004) ........... 32

*Scott v. District of Columbia*, 493 A.2d 319 (D.C. 1985) ............................................ 26

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ...................................................... 31

*Silverman v. United States*, 365 U.S. 505 (1961) ..................................................... 9, 12

*Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1990) ................................................ 13

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................. 15

*Toolasprashad v. Bureau of Prisons,* 286 F.3d 576 (D.C. Cir. 2002) ........................ 37

*United States v. Abdus-Price*, 518 F.3d 926 (D.C. Cir. 2008) ................................. 8, 17

*United States v. Bey*, 911 F.3d 139 (3d Cir. 2018) ...................................................... 17

*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003) ............................................ 17

*United States v. Drayton*, 536 U.S. 194 (2002) ..................................................... 10, 11

*United States v. Glover*, 957 F.2d 1004 (2d Cir. 1992) ............................................... 17

*United States v. Hutchinson*, 408 F.3d 796 (D.C. Cir. 2005) ..................................... 16

*United States v. Jones*, 584 F.3d 1083 (D.C. Cir. 2009) ............................................. 11

*United States v. Santana*, 427 U.S. 38 (1976) ............................................................ 10

*United States v. Sharpe*, 470 U.S. 675 (1985) .................................................. 16, 18, 24

*United States v. Va Lerie*, No. 8:03CR23, 2003 WL 21956437 (D. Neb. Aug. 14, 2003) ................................................................................................................... 15

*United States v. Vinton*, 594 F.3d 14 (D.C. Cir. 2010) ............................................... 17

*United States v. Williams*, 354 F.3d 497 (6th Cir. 2003) ............................................ 13

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns Corp.*, 858 F.2d 1075 (5th Cir. 1988) ......................................................................................................... 31

*Wade v. District of Columbia*, 310 A.2d 857 (D.C. 1973) (en banc) ......................... 26

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) .......... 31

*Weise v. Colorado Springs, Colorado*, 421 F. Supp. 3d 1019 (D. Colo. 2019) ........... 37

*Williamson v. Curran*, 714 F.3d 432 (7th Cir. 2013) ................................................. 29

*X-Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) ............................................... 36

**Statutes**

D.C. Code § 16-2301(23)(B) ......................................................................................... 23

**Rules**

Fed. R. Civ. P. 8(d)(3) .................................................................................................. 29

# PRELIMINARY STATEMENT

On February 17, 2020, Plaintiff Jared Fishman took his two daughters to a restaurant. When they left, Fishman's younger daughter was acting up in a way familiar to almost every parent of a toddler: she was refusing to get in the car. So Fishman picked the child up and put her in the car. Unbeknownst to Fishman, a passerby called the police evidently to say that the passerby thought a child abduction was occurring and, based on that call, Defendant Officer Marck Jaeger, who was at a nearby 7-11, drove to Fishman's house.

Jaeger encountered Fishman sitting on the front stoop, shoeless, playing an acoustic guitar. When Jaeger asked Fishman to clear up what was going on, Fishman sighed, stood up, said "hang on a sec," and walked into his house, leaving his door mostly open. Jaeger pushed Fishman's door further open, took two steps into his house, took him to the ground, dragged him out onto the street, and handcuffed him. At that moment, Defendants Officers Brady, Tong, and Todaro arrived, and two young girls appeared at the front door, which was still open. The older girl immediately explained that her sister had been misbehaving and her father had done nothing wrong, as the younger girl begged the officers to release her father. Moments later, the girls' mother appeared and explained that the girls are her children and Fishman is their father. But the Defendants, instead of immediately releasing Fishman, walked him to the end of his block and held him there, handcuffed and shoeless, as his neighbors gawked at him and as more and more exculpatory evidence piled up, for more than 25 minutes.

The Complaint reciting these facts set out a plausible case that, among other things, Defendants violated Fishman's constitutional rights and committed D.C.-law torts. But rather than addressing the facts of the illegal detention (and later consequences), Defendants have moved to dismiss a different case than the one Fishman pleads. In particular, Defendants spend nine pages arguing that Jeager had reasonable suspicion to stop Fishman in front of his home (Doc. 22 at 1–9), but Fishman has not alleged otherwise. Fishman pleaded, in detail, that Jeager *did not* stop him in front of his home, instead following him *into* his home, and that all the officer defendants *persisted* in detaining Fishman even though the initial suspicion generated by the 9-1-1 calls was immediately put to rest when the two supposedly kidnapped children immediately identified Fishman as their father and emphatically said that he did nothing wrong. The law requires that reasonable officers end Fishman's detention right then.

Defendants also ignore the legal standard for the D.C.-law claims alleged. Even if the officers somehow could have reasonably believed that Fishman had kidnapped a young girl in front of a restaurant, in the space of a few minutes convinced her that she was really his daughter and that she should protest the moment police arrived, and that he thought the best way to proceed after such criminal wizardry was to play an acoustic guitar in his socks on the front steps, the facts show that the officers *did not* believe this story: they said that they subjectively believed that Fishman was the girls' father. Although this subjective belief is irrelevant to federal Fourth Amendment and qualified-immunity doctrine, it is dispositive of Fishman's common-

law claims against Defendant the District of Columbia as *respondeat superior*, which require that an officer subjectively believe the story he tells in court to justify his actions, a distinction Defendants wholly ignore.

Finally, throughout his arrest, Fishman protested his treatment, alleging to Defendant Lieutenant Patrick Loftus that Jaeger had illegally entered his home. In retaliation for this protected speech, Loftus filed a materially false and obviously defamatory complaint with the Maryland State Bar in violation of the First Amendment. Loftus's attempt to dismiss this claim because a reasonable attorney would not be chilled by the mere filing of a bar complaint defies logic, because a reasonable attorney would be chilled by a high-ranking police official's allegation of child abuse and abuse of office. Loftus also argues that the claim must be dismissed because the ethics complaint accurately quoted some of Fishman's words, but Loftus ignores the fact that he falsely (and obviously falsely) alleged malicious intent on Fishman's part. And Loftus is not entitled to *Noerr-Pennington* immunity, since that doctrine has not been applied to government defendants by the D.C. Circuit.

## I.     FACTS

Because Fishman does not dispute that the 9-1-1 calls that lead Jaeger to Fishman's house gave rise to reasonable suspicion to stop him in the first instance, the core facts of this case proceed in three phases: Jaeger's unlawful entry into Fishman's house; the officers' unlawful continued detention of Fishman in circumstances where no reasonable officer could have believed (and where they in fact did not believe) that there was evidence of any crime; and Fishman's release and Loftus's bar complaint. Although the facts are pleaded in detail because almost all

relevant events were captured on camera, Fishman briefly summarizes them here to dispel a few mischaracterizations in Defendants' motion.

When Jaeger arrived at Fishman's house in response to the 9-1-1 call, he initiated a consensual discussion. (Doc. 18 ¶¶ 31–36.) Fishman, who could have refused to speak to him at that time, volunteered that the "guy" who, Fishman surmised, had called the police "has no idea what's going on." (*Id.* ¶ 38.) Jaeger asked Fishman whether he could "help . . . with what's going on." (*Id.* ¶ 39.) Fishman, who again could have simply said "no" or remained silent, attempted to comply with Jaeger's request: he said "[h]ang on a sec," and calmly began walking into his home. (*Id.* ¶ 40.) Jaeger then calmly, and without commanding, said "hold on a sec, don't go inside" (*id.* ¶ 41), and only "[a]s Fishman stepped over the threshold of his doorway" did Jaeger clearly say "don't go inside" (*id.* ¶42). Fishman was already in his house when Jaeger stopped him.

Jaeger then stepped into Fishman's home, shouted "step out,"[1] twisted Fishman's arm, took him to the ground, and dragged him out of his house. (*Id.* ¶¶ 44–47.) At that moment, the other officer defendants arrived, and two girls appeared in Fishman's doorway as he was being handcuffed on his steps. (*Id.* ¶ 49). The younger girl shrieked and cried within earshot of Jaeger, Brady, and Tong, asking the officers to stop what they're doing. (*Id.* ¶ 50.) The older girl said that her father had done nothing wrong, and that instead "it is my sister, she was misbehaving." (*Id.* ¶ 51.)

---

[1] Defendants incorrectly contend that Fishman shouted "step out." (Doc. 22 at 11.) Jaeger shouted that. (Doc. 18 ¶ 45.)

The younger girl frantically pleaded with the officers, saying "he hasn't done anything wrong, please, please." (*Id.* ¶ 52.) Jaeger, Brady, and Tong all heard and saw all of this. (*Id.* ¶ 57.) Todaro arrived moments later, and immediately spoke with the children, both of whom *again* said that Fishman was their father and that he had done nothing wrong. (*Id.* ¶¶ 61 ("Please don't arrest him, he hasn't done anything wrong."), 62 ("He did not take my sister. My sister was misbehaving, and he brought her into the car.").)

Defendants are thus wrong to contend that the officers could reasonably have held Fishman to "complete an investigation of potential kidnapping" (Doc. 22 at 16 (emphasis removed and capitalization altered)), and that Fishman's children had not sufficiently "expla[ined]" what had happened to dispel reasonable suspicion immediately (Doc. 22 at 18 & n.3). The officers arrived at Fishman's house in response to a suspected kidnapping and discovered within seconds two girls who called the suspect their father, protested that he had done nothing wrong, and begged the officers to release him. The officers should have taken Fishman out of handcuffs and let him return to his home in peace, asking any questions that they wanted to ask consensually, and if Fishman and his family refused, investigating any other suspicion that they may have had—and they had no *reasonable* suspicion of any other crime—through ordinary policework.

The officers did not do that. Instead, as the exculpatory evidence kept piling up, the officers kept Fishman in handcuffs, in his socks, for 25 minutes. The officers saw a woman consoling the younger daughter, who said "[i]t was my fault, he didn't

do anything wrong" (*id.* ¶ 63), and heard the woman refer to Fishman as "daddy" (*id.*). Todaro heard from *both* children, *again*, and they again protested that their father had done nothing wrong. (*Id.* ¶¶ 70, 71.) The older daughter explained exactly what happened: "I was in the car in the front seat, my sister was misbehaving and she wouldn't get into the car and come home. We didn't want her to get taken or anything. And she wasn't listening and my dad had to put her over his shoulder and get her into the car. He did nothing wrong." (*Id.* ¶ 70.) And, three minutes later, Fishman separately told exactly the same story[2]: "I went to lunch with my two children. . . . We left. My younger daughter refused to get in the car. . . . I picked her up, I put her in the car." (*Id.* ¶¶ 115, 117.) Brady spoke to Fishman's wife, who explained that Fishman and the girls were her husband and daughters. (*Id.* ¶¶ 83, 84.) Despite all this evidence—two independent statements that perfectly matched, two girls saying that the officers had it wrong and that they were Fishman's children, a woman who was obviously their mother identifying them as Fishman's, all in front of a house that the officers knew to be Fishman's—the officers detained Fishman for *19 minutes* after the *last* of these pieces of evidence was observed. (*Id.* ¶ 158.)

---

[2] Defendants protest that "Plaintiff's 'explanation' predated the officers' interviews with the children, as Officer Tong's [body-worn camera] plainly shows." (Doc. 22 at 18 n.3.) This is wrong, and reflects a core misunderstanding of this case. Although Fishman's explanation of what happened occurred before Brady had successfully convinced Fishman's wife—by reminding her that he would continue to detain her husband if she did not agree (Doc. 18 ¶ 97)—to allow him to formally interview the younger daughter, Fishman's explanation came after both children had referred to him as their father and said that he did nothing wrong, and after the older daughter's detailed explanation of what happened.

Throughout, the officers made it very clear that they subjectively knew that Fishman was the father and that no crime had been committed. Within mere minutes of Fishman's detention, Jaeger said that it "looks like" the kids are Fishman's daughters (*id.* ¶ 80), and later that it "it definitely sounds like it was his daughter" (*id.* ¶ 135). Brady referred to Fishman as the daughters' "daddy" (*id.* ¶ 82), and said "nothing happened, we're going to take a report of what we got a call for, what our actions were, and then we're going to get you guys back together" (*id.* ¶ 86). Tong referred to the children as Fishman's kids. (*Id.* ¶ 106.)

Loftus arrived on the scene shortly before Fishman was released. When he arrived, he expressed concern that Fishman was insufficiently grateful for the police response that morning, finding it "concerning" that Fishman had not immediately "thank[ed]" them and "apologize[d]." (*Id.* ¶ 143.) Loftus, after hearing several complaints from Fishman and his wife regarding the officers' illegal conduct that day, said that he would

> be the one doing the investigations for any type of complaint or anything like that. Everything is justified, I know you might be frustrated at the situation. But again you should feel good at the response if this was a legitimate kidnapping your daughter would be safe. We take calls very seriously . . . . Again, this was 100% justified, I do all the investigations. Your husband has no right to refuse when we're investigating something like that we're going to detain him based on the information that we're dealing with a kidnapping . . . . Everything's all on camera.

(*Id.* ¶ 160.)

The only reasonable inference to be drawn from these protestations is that Loftus was preparing to respond to complaints that the police had behaved illegally

that day (they had, and Fishman indeed filed this lawsuit). And so, on April 29, 2020, Loftus filed a grievance with the Maryland Bar in which he falsely alleged that Fishman abused his children and abused his office. These allegations (explained in more detail below) are defamatory.

## II. ARGUMENT

Defendants move to dismiss on several grounds. All lack merit. With respect to the initial entry, they do not dispute that Jaeger's entry across the door threshold and into Fishman's doorway would typically require a warrant. Instead, they argue it is lawful for officers to pursue suspects who flee *Terry* stops into their homes. But in this case Fishman was already in his home when he was stopped, rendering Jaeger's entry a clear violation of decades-old black-letter law. *Payton v. New York*, 445 U.S. 573, 576 (1980) ("[T]he Fourth Amendment to the United States Constitution . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest.").

Next, Defendants spend pages arguing they legally could initiate a *Terry* stop based on the 9-1-1 call. But that's uncontested. The legal violation occurred because they instantly should have known that their suspicions were misplaced, and so black-letter law says they should have released Fishman immediately. *E.g.*, *United States v. Abdus-Price*, 518 F.3d 926, 932 (D.C. Cir. 2008) (explaining that suspect must be released after reasonable suspicion dissipates). Their attempt to set a timer and say that all *Terry* stops of roughly 25 minutes are "plainly lawful" (Doc. 22 at 17) conjures up a bright-line rule that does not exist in any caselaw.

Defendants' treatment of the common-law claims casually ignores binding law. They argue that Fishman's common-law claims should be dismissed because the "five Defendant officers are each entitled to qualified immunity" (Doc. 22 at 33), but they ignore D.C.'s qualified-privilege standard, which requires consideration of the officers' subjective intent. *E.g.*, *Liser v. Smith*, 254 F. Supp. 2d 89, 104 (D.D.C. 2003) ("In contrast to the subjective 'good faith' standard that governs false arrest claims under D.C. law . . ., the federal qualified immunity standard is an objective one.").

Finally, Loftus moves to dismiss the First Amendment case against him by misstating what the defamatory complaint said and claiming that *he* enjoys a First Amendment right to defame Fishman while acting under color of law. These arguments fail.

### A. Jaeger Violated Clearly Established Law by Seizing Fishman in His Home Without a Warrant or Valid Exception.

It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton*, 445 U.S. at 586). "[W]hen it comes to the Fourth Amendment," after all, "the home is first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). And while a suspect who is lawfully stopped *outside* the home does not have an unqualified right to run inside, officials must have a valid exception to the warrant requirement to enter in the first instance. *See, e.g.*, *United States v. Santana*, 427 U.S. 38, 42

(1976). None applies here. Rather, the facts, as pleaded, give rise to a reasonable inference that no reasonable officer could have believed that Fishman was outside his home when he was first seized and that no reasonable officer could have believed that an exigency justified such an entry. And although the doctrine of qualified immunity protects officers from reasonable on-the-scene mistakes of fact or law, *e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011), at the pleading stage, all reasonable factual inferences are drawn in the plaintiff's favor. *See S.H. v. District of Columbia*, 270 F. Supp. 3d 260, 273 (D.D.C. 2017) ("[B]ecause the defendant officers seek to invoke their qualified immunity at the motion to dismiss stage, the Court must accept Plaintiffs' allegations as true and must draw all reasonable inferences derived from those allegations in Plaintiffs' favor.").

     *1.    The Well-Pleaded Facts of The Complaint Show That no Reasonable Officer Could Have Believed That Fishman Was Outside His Home When He Was Seized.*

Defendants contend that Fishman was "stopped" when officer Jaeger said "hang tight a second, don't go inside." (Doc. 22 at 10 (quoting Doc. 18 ¶ 41).) This is incorrect. As a matter of clearly established law, Fishman was not stopped until he was already in his home.

An officer stops someone when, through "physical force or show of authority" he "restrains a person's liberty." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). The core inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* The question whether an officer's actions constitute a stop is, therefore, nuanced and fact specific. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[F]or the most part per se rules are inappropriate

in the Fourth Amendment context. The proper inquiry necessitates a consideration of all the circumstances surrounding the encounter." (internal quotation marks and citation omitted)). Among the factors courts consider are whether there was "application of force, . . . intimidating movement, . . . overwhelming show of force, . . . brandishing of weapons, . . . blocking of exits, . . . threat[s], . . . command[s], . . . [and] an authoritative tone of voice." *Id.* at 204. Although someone is seized only if a reasonable person would believe that he is not free to leave, the person is not seized whenever a reasonable person would believe he is not free to leave. *California v. Hodari D*, 499 U.S. 621, 628 (1991) ("It says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a necessary, but not a sufficient, condition for seizure").

Here, in a fluid situation that began as a calm, consensual encounter, Defendants argue that Fishman was definitively seized the moment Jaeger calmly said "don't go inside." (Doc. 22 at 9–10.) In support of this proposition, Defendants cite only *United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009) and contend that "[a] *Terry* stop can be effectuated merely by telling a suspect to 'come here'" (Doc. 22 at 10). Defendants say nothing else about why the pleaded facts show a *Terry* stop here, and they do not. Drawing all factual inferences in Fishman's favor (as this Court must), a reasonable person faced with a police officer calmly chatting, who—without any of the factors identified in *Drayton*, 536 U.S. at 201—says "hang tight, don't go inside," would (as Fishman did) believe himself free to end the encounter and go anywhere he pleased. The pleaded facts give rise to a reasonable inference that no

reasonable officer could have believed that Fishman was not stopped until he was inside his home.[3]

> ### 2. The Well-Pleaded Facts of The Complaint Show That no Reasonable Officer Could Have Believed That Exigent Circumstances Existed.

Defendants next argue that Jaeger was entitled to enter Fishman's home because, even if he was not fleeing from a valid *Terry* stop, exigent circumstances nonetheless existed justifying the entry. Defendants again rely on facts other than the ones pleaded here.

The warrantless entry into a home is presumptively unreasonable. *Groh*, 540 U.S. at 559. To be sure, "the exigencies of the situation can make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment," *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978), but the standard for exigency is a demanding one, *see, e.g.*, *Corrigan v. District of Columbia*, 841 F.3d 1022, 1033 (D.C. Cir. 2016) ("Supreme Court precedent has revered the sanctity of the home, condemning warrantless searches absent an actual

---

[3] Defendants also contend in passing that "[b]y Plaintiff's *own admission*, he fled *the stop* for a possible child abduction by attempting to enter his home" (Doc. 22 at 9 (emphases added) because he said, later in his encounter with the police, "I know that I was retreating into my house and then [Jaeger] slammed me to the stairs" (Doc. 18 ¶ 161). This contention is frivolous. The word "retreat," in general and in the Fourth Amendment context, is not synonymous with the word "flee." *See, e.g.*, *Silverman*, 365 U.S. at 511 (explaining "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" without also explaining that he is entitled to flee police officers). Fishman was "retreating" into his home from a consensual encounter with a police officer—exactly what the "core" of the Fourth Amendment is meant to protect, *id.*—not from, and surely not "by his own admission" from, a *Terry* stop. And even if all of that were not true, Fishman is entitled to all reasonable inferences from the pleaded facts, and one of those is that after 25 minutes in handcuffs and no shoes on a street corner he did not, in fact, admit to a legal conclusion fatal to his case.

exigency based on objective facts."). No exigency existed here, and no reasonable officer could have believed one existed.

One exigency obviating the need for a warrant Defendants' cite is the need to assist individuals who are seriously injured or threatened with serious injury. (Doc. 22 at 11.) But this exception does not give police broad license to enter homes based on a mere possibility of danger. *Ford v. D.C.*, No. 13-cv-1960, 2016 WL 4379038, at *3 (D.D.C. Aug. 16, 2016) ("The mere possibility of danger does not meet the definition of an exigency that justifies a warrantless entry." (citing *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1990)). Instead, "safety-based exigent circumstances necessitate 'true immediacy' or confrontation of 'real danger that serious consequences would *certainly occur* to the police or others.'" *Id.* (quoting *United States v. Williams*, 354 F.3d 497, 504 (6th Cir. 2003) (emphasis added)).

The well-pleaded facts of this case show that no reasonable officer could have believed that "real danger . . . would certainly occur" if he did not barge into Fishman's home.[4] For one thing, Jaeger knew that Fishman was in front of his own home, and when Jaeger arrived Fishman was calmly playing the guitar in his socks, with the

---

[4] Defendants contend that Fishman "effectively acknowledges" that the report of a "potential kidnapping" was "credible" because Fishman pleads that *his* child was "refusing to get in the car" and that he therefore "picked the child up an put her in the car." (Doc. 22 at 11.) This is a startling, and revealing, contention, as explained in more detail below. According to Defendants, a father who puts an objecting young child in a car seat *ought* to worry that someone will mistake him for a kidnapper. Fishman surely did not. Although he acknowledges that Jaeger had reasonable suspicion to stop him based on the 9-1-1 call, that is only because Jaeger could not have known of the specifics of that call, which, as explained in detail in the Amended Complaint, resulted in an exasperated 9-1-1 dispatcher telling the caller that "there's not much we can do with the information you gave." (Doc. 18 ¶ 23.)

door open. (Doc. 18 ¶¶ 28, 30, 32.) Jaeger was calm too. (*Id.* ¶ 41.) In response to Jaeger's questioning, Fishman said "hang on a sec," which would lead any reasonable officer to believe he was intending to come right back (*id.* ¶ 40), and he muttered "you gotta be kidding me" (*id.*), indicating that he was irritated with the intrusion—not fearful, enraged, or otherwise in an agitated state. No reasonable officer could have believed that he was in the presence of a deranged kidnapper preparing to go inside his own home and harm a child (whom he had abruptly kidnapped off the street) with a police officer standing out front.

Defendants barely attempt to defend the unreasonable series of inferences needed to sustain an objectively reasonable belief that danger was afoot here, instead fixating on whether Jaeger had reasonable suspicion to stop Fishman at all, which is both undisputed and subject to a much lower standard. The best Defendants offer is the following remarkable passage:

> Plaintiff had just had an extended public altercation with his daughter that resulted in a police response, and Plaintiff knew that Officer Jaeger had come to his home because someone had called the police. . . . When the officers encountered Plaintiff, he was sitting on his front porch in socks and playing guitar. A reasonable police officer would see Plaintiff's behavior as a possible attempt to "manage" the situation by trying to appear nonchalant. Plaintiff's conduct was inherently suspicious for someone who knew he had just been identified by a civilian as a potential child abductor and could reasonably expect to soon face the police.

(Doc. 22 at 8–9.) According to Defendants, then, it is "inherently suspicious" not to be evasive *enough* when police arrive; the adverb "inherently" is crucial here because Defendants offer no authority for this proposition. And, of course, only pages later,

Defendants also remind this Court that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and that Fishman's supposed evasiveness was evidently enough to support continued detention (Doc. 22 at 14). Defendants may not have it both ways, as courts have specifically pointed out. *Cf., e.g.*, *United States v. Va Lerie*, No. 8:03CR23, 2003 WL 21956437, at *5 (D. Neb. Aug. 14, 2003) ("This court has heard every imaginable basis for searching so-called 'suspicious' luggage: it is old, it is new; it had a handwritten identification tag or it did not; . . . the possessor is too nervous, too self-assured, too calm, too jittery."), *rev'd on other grounds* 424 F.3d 694 (8th Cir. 2005) (en banc). Worse, Defendants' explanation here makes no factual sense: Fishman had no idea the police were coming when he started playing the guitar (Doc. 18 ¶ 1 ("*[u]nbeknownst to Fishman*, a passerby called the police . . . ." (emphasis added))), and he did not know (how could he?) that he was suspected of *kidnapping* for almost 21 minutes after his arrest (Doc. 18 ¶ 146). This does not meet the standard for qualified immunity on exigency.

**B.     The Individual Defendants Violated Clearly Established Law by Continuing Fishman's Seizure Long After Any Reasonable Officer Could Have Entertained Reasonable Suspicion.**

In addition to the unlawful entry, Defendants also violated clearly established law by detaining Fishman well past the time when the justification for a warrantless stop based merely on reasonable suspicion dissipated. In *Terry v. Ohio*, 392 U.S. 1, 27 (1968), the Supreme Court first officially approved of the idea that, although officers must have probable cause to make an arrest, a limited exception exists to seize suspects briefly in public for investigatory purposes. Because *Terry* stops are

the exception to the rule, such a "stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). Defendants do not contend that they ever had probable cause to arrest Fishman, nor could they: it was immediately clear that he was not guilty of kidnapping. For the same reason Defendants cannot adequately justify the length of Fishman's detention: it was immediately clear that Fishman had not kidnapped his children, and the lengthy detention was not justified by any investigatory need.

1. *The Relevant Legal Inquiry Is When Reasonable Suspicion Dissipated, Not Whether Reasonable Suspicion Existed in The First Place.*

Although there is "no rigid time limitation on *Terry* stops," the Supreme Court has cautioned that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Sharpe*, 470 U.S. at 685 (quotation marks omitted). Thus, courts have routinely engaged in fact-specific inquiries to ensure that *Terry* stops last "no longer than is necessary to effectuate the purpose of the stop." *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)); *Sharpe*, 470 U.S. at 685 (the Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes"). Enforcing this line is crucial, for if officers could extend *Terry* stops even after reasonable suspicion dissipates, then they would be *de facto*

permitted to detain suspects so long as reasonable suspicion existed at any single moment in time.

Importantly, the purpose and the necessity of the stop are evaluated based on the information officers possess at each relevant time before and during the stop. *E.g. United States v. Brown*, 334 F.3d 1161, 1165 & n.2 (D.C. Cir. 2003). "Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment." *United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018). "An investigative stop must therefore cease once reasonable suspicion dissipates." *Id.*; *see also Abdus-Price*, 518 F.3d at 932 (explaining dissipation cases); *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992) ("If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause.").

Defendants misunderstand the law in two crucial ways. *First*, they focus not on what officers in fact knew as the detention dragged on, but rather on whether they *ever* had reasonable suspicion and how long they detained Fishman as a result. (Doc. 22 at 16–21.) But the law is clear that officers may not simply check a box labeled "reasonable suspicion," lock someone in handcuffs, and blind themselves to any subsequent developments; they must remain reasonable *throughout* the encounter. *E.g.*, *Bey*, 911 F.3d at 147. To be sure, Defendants began the investigation "in a manner 'likely to confirm or dispel their suspicions quickly.'" (Doc. 22 at 18 (quoting *United States v. Vinton*, 594 F.3d 14, 24 (D.C. Cir. 2010)). But they ignore

that they *did* dispel their suspicions quickly—as explained below, their suspicions were dispelled either instantly or, at most, six minutes from their first encounter with Fishman. Reasonable suspicion must have been reassessed at that time.

*Second*, they point to cases where stops of 25 minutes or more survived constitutional scrutiny, and from those claim there is essentially a bright-line rule that *all Terry* stops of 25 minutes, or even somewhat longer, are constitutional. (Doc. 22 at 17, 16–21). But the Supreme Court has expressly rejected the proposition that there is any "*per se* rule" for the proper length of time of a *Terry* stop because setting such a limit is "clearly and fundamentally at odds with [the Court's] approach in this area." *Sharpe*, 470 U.S. at 686. Instead, officers must be attentive to the purposes of the stop and the evidence and information they receive, and they must end the stop whenever reasonable suspicion dissipates. As explained below, that is what happened here.

2.     *No Reasonable Officer Could Have Suspected That Fishman Had Kidnapped His Own Children After They And Their Mother Appeared at The Door And Confirmed His Version of Events.*

The facts in the Amended Complaint show clearly that the moment that Jaeger handcuffed Fishman and Brady and Tong arrived, it became immediately obvious that there had been no kidnapping. Reasonable suspicion to maintain the *Terry* stop thus dissipated almost immediately, and Fishman should have released quickly.

Upon arrival to Fishman's house, Brady, Tong, and Jaeger immediately saw two children who identified the suspect as their father and said, specifically, and without prompting, that he had done nothing wrong. (Doc. 18 ¶¶ 50, 51.) Todaro arrived moments later, and immediately spoke with the children, both of whom *again*

18

said that Fishman was their father and that he had done nothing wrong. (*Id.* ¶¶ 61 ("Please don't arrest him, he hasn't done anything wrong."), 62 ("He did not take my sister. My sister was misbehaving, and he brought her into the car.").) If that evidence (well pleaded in the Amended Complaint) is *not* enough to dissipate reasonable suspicion that Fishman had kidnapped two children, it is hard to imagine what would be.

Defendants do not respond to these allegations. Instead, they argue that Brady, Tong, and Todaro could rely on Jaeger's decision to stop Fishman, and that the information "broadcast via police radio . . . armed the other officers with a basis for maintaining the *Terry* stop during their investigation." (Doc. 22 at 15, 16 (citing *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010)). That is true but irrelevant, because Fishman has never argued that Defendants could not constitutionally investigated the situation. The problem with Defendants' continuing to harp on the basis of the initial investigation is that it fails to recognize the facts that all the officers, *including Jaeger*, saw when they arrived at Fishman's house: all the officer defendants here personally saw evidence that would lead any reasonable officer to conclude that the children were Fishman's and that there was no evidence whatever of any wrongdoing. Defendants' cases confirm this uncontroversial principle of law. *Barnhardt*, 723 F. Supp. 2d at 216 (noting that defendant officer was not alleged to have seen fellow officer planting drugs and therefore could not be held liable, and noting that one officer's reliance on another's order "'must be objectively reasonable for him to be clothed with qualified immunity'" (quoting *Barham v.*

*Salazar*, 566 F.3d 844, 850 (D.C. Cir. 2009) (Henderson, J., concurring))). Thus, although it is surely true that officers may justifiably rely on each other's assessments of the situation, they may not do so when they themselves observe information conclusively rebutting those assessments.

> 3. *Even if Reasonable Suspicion Were Not Immediately Dissipated, no Reasonable Officer Could Have Entertained it After Fishman And His Older Daughter Independently Explained Exactly What Happened And She Said That He Had Done "Nothing Wrong."*

Even assuming that officers could somehow reasonably believe that a kidnapping was afoot after seeing everything described in the previous subsection, what happened in the next five minutes extinguished whatever tiny ember of reasonable suspicion could even conceivably have remained. Within five minutes of stopping Fishman, officers heard Fishman's older daughter describe the events of that morning, and then heard *Fishman himself* do the same. Thus, at the very latest, reasonable suspicion dissipated approximately six minutes after the officers arrived, and Fishman was held unconstitutionally for approximately 19 minutes.

First, the older daughter explained exactly what happened: "I was in the car in the front seat, my sister was misbehaving and she wouldn't get into the car and come home. We didn't want her to get taken or anything. And she wasn't listening and my dad had to put her over his shoulder and get her into the car. He did nothing wrong." (*Id.* ¶ 70.) And, three minutes later, Fishman separately told exactly the same story: "I went to lunch with my two children. . . . We left. My younger daughter refused to get in the car. . . . I picked her up, I put her in the car." (*Id.* ¶¶ 115, 117.)

If all that were not enough, Brady spoke to Fishman's wife, who explained that Fishman and the girls were her husband and daughters. (*Id.* ¶¶ 83, 84.)

Defendants minimize this evidence and instead contend that the officers were justified in detaining Fishman for 19 minutes after his daughters had confirmed at least three times that they were his and done nothing wrong, after he himself had independently offered an identical version of events, and after his wife had identified the children too, because "Plaintiff's Amended Complaint acknowledges that the officers told Plaintiff that the delay in releasing Plaintiff was due to their inability to speak to the child about her possible 'kidnapping'" (Doc. 22 at 19), which "delay" Defendants contend "was caused by Plaintiff's wife's refusal to allow the officers to speak to the child" (*id.*). This misstates the facts as pleaded in the Amended Complaint. Fishman's wife initially refused to let officers (who had just traumatized her child by arriving in bulletproof vests, with guns and loud radios, to drag the child's father from her home) interview her child *because they already knew everything they needed to*, which Brady *acknowledged*. "Brady said: 'We just want to talk to her to make sure everything is okay,' to which Fishman's wife responded, 'What did you hear her saying just now, what did you hear her expressing?' Brady then said: 'She said nothing happened, but I would like to actually talk to her.'" (Doc. 18 ¶¶ 95–96.)

Contrary to Defendants' assertions, then, the well-pleaded facts of the Amended Complaint give rise to the reasonable inference that Brady no longer needed to investigate, because he acknowledged the daughter said "noting happened." (Doc. 18 ¶ 95–96.) Instead, the best inference from the facts is that he was fishing for

evidence of any "problems" in the family—which was not the reason for the stop, and about which he had no reason for suspicion whatsoever. (*Id.* ¶ 91 ("Brady asked Fishman's wife if the younger daughter was upset about anything or if 'anything was going on,' or if there were 'any issues.'"); ¶ 100 ("Brady asked if there was any yelling or if it was difficult for her father to pick her up.")).

Relatedly, Defendants also imply that Fishman admitted to something suspicious when he pleaded that he brought his child into his car against her will. (Doc. 22 at 19 ("As Sgt. Bray knew, the officers were not required to credit Plaintiff's claims—or his wife's—that the child he had admittedly taken against her will and 'threw' into his automobile was actually Plaintiff's child, or that Plaintiff's wife was actually the person she purported to be.").) Another misstatement. Fishman never "admitted[]" that he "threw" the child into the car. The Amended Complaint quotes the 9-1-1 caller—whom even the 9-1-1 dispatcher evidently found to be overstating the matter significantly—as saying this, but Fishman never did. (Doc. 18 at ¶ 20.) Anyway, there is simply no conceivable argument that it's even a little bit outside the ordinary—let alone *criminal*—for a parent of a young child to put that child into a car when the child does not want to get into the car. In fact, it would have been irresponsible to let a young child run around on the street unattended for an extended time, which was the alternative Fishman faced.

Taken as a whole, Defendants' argument would give police officers unlimited license to detain someone wrongly suspected of a kidnapping until officers can fully double check that his children are happy with his parenting skills (which, not that it

matters, Fishman's children were). This is contrary to clearly established law. Having stopped Fishman for kidnapping, the officers were not permitted to detain him until they were able to interview his children and ask questions about his general parenting when they *knew* (and any reasonable officer would have known) that the children were his. The law is clear that officers are not permitted to extend a *Terry* stop to search for additional potential crimes without independent reasonable suspicion of those additional crimes. *E.g.*, *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) ("An officer . . . may not [conduct unrelated checks] in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"); *Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 94 (D.D.C. 2011) ("[T]he police may lawfully inquire into matters unrelated to the justification for the stop so long as those inquiries do not measurably extend the duration of the encounter.").[5] Defendants' argument that it was reasonable to detain Fishman while they waited to "interview" his daughter is equivalent to contending that parents create reasonable suspicion of some unstated crime whenever they put their child into a car against the child's will. That the District of Columbia interprets its laws this way—which, by the way, allow parents to inflict pain on their children for punishment, *e.g.*, D.C. Code § 16-2301(23)(B), let alone to put them in a car for their own safety—ought to frighten any parent who lives here.

---

[5] *Rodriguez* and *Olaniyi* both discuss unlawful extensions of traffic stops, which courts recognize are "analogous to a so-called '*Terry* stop.'" *Rodriguez*, 575 U.S. at 354 (quotation marks omitted).

Finally, Defendants contend that it was lawful to detain Fishman until a supervisor could arrive. This argument flies in the face of clear law that the *only* thing that may prolong a *Terry* stop is investigative, not administrative, need. *See Ohio v. Robinette*, 519 U.S. 33, 50 n.8 (1996) ("An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." (quotation marks omitted)). In support of this remarkable proposition, Defendants misinterpret this Court's decision in *Robinson v. District of Columbia*, No. CV 15-100 (RJL), 2019 WL 498741, at *4 (D.D.C. Feb. 8, 2019) (Leon, J.). There, unlike here, officers were *not* confronted with immediate evidence that the suspect was not guilty. *Id.* ("Given the multiple *potential offenses*, suspects, and investigations at issue, [Defendants'] decision to wait for their supervisors was a 'diligent[ ] . . . means of investigation' likely to resolve all issues in an efficient manner." (quoting *Sharpe*, 470 U.S. at 686 (alterations in *Robinson*)) (emphasis added)). To make *Robinson* analogous to this case, the off-duty police officer suspected of trespassing and unlawful weapons possession in *Robinson* would have had to produce three witnesses identifying him and forcefully declaring that he was lawfully entitled to enter the premises, declaring that he was in fact a police officer entitled to carry a weapon, and then he would have had to confirm that same story separately from the witnesses. *Compare id.*, *with* (Doc. 18 ¶¶ 44–62). That did not happen in *Robinson*. And regardless, the additional *investigative* circumstances rendering it reasonable to wait for a supervisor— multiple, related suspects, one of whom was ultimately convicted of a crime, *Robinson*, 2019 WL 498741 at *4—are not present here. If Defendants had confirmed

Fishman's innocence and merely needed to wait for a supervisor, the Fourth Amendment required they release Fishman before finishing up the paperwork, not wait for a supervisor while Fishman is handcuffed shoeless in front of his neighbors.

### C. The District of Columbia is Liable For False Arrest or Negligence And For Trespass.

Fishman alleges, in addition to his Constitutional claims, that the District of Columbia is liable under the doctrine of *respondeat superior* for (a) Jaeger's trespass into his home and (b) false arrest/imprisonment (the two are identical under D.C. law) or, in the alternative, negligence. The District concedes that it is liable if the officers' conduct was tortious but moves to dismiss Fishman's common-law claims because "[t]he five Defendant officers are each entitled to qualified immunity" and, "[j]ust as qualified immunity is a shield against liability in 42 U.S.C. § 1983 claims, qualified privilege protects officers in derivative common law claims." (Doc. 22 at 33.) Fishman agrees that the claim for trespass, which alleges that Jaeger unlawfully entered his home, rises and falls with his Fourth Amendment claims on the same facts. But, for the remaining claims, the District ignores a crucial distinction: qualified privilege requires that defendants *believe* their explanations.[6] Because the well-pleaded facts of the Amended Complaint give rise to the conclusion that Jaeger,

---

[6] The District's ignorance on this point is inexplicable. For one thing, the District is the defendant in all of the relevant cases on this point. For another, Fishman's counsel sent counsel for the District a letter explaining the relevant distinction here (and explaining that Fishman does not challenge initial reasonable suspicion in this case) so that the parties could spare the Court pointless briefing on this and other subjects. (*See* Exhibit A, Sept. 7, 2021, Letter from Charles Gerstein to Benjamin Bryant.) Evidently Defendants ignored most of this letter.

Brady, Tong, and Todaro all subjectively believed that the children were Fishman's, the District's motion to dismiss based on qualified privilege should be denied.

### 1. Privilege Under D.C. Law, Unlike Qualified Immunity, Depends on Defendants' Subjective State of Mind.

To plead false arrest or imprisonment under D.C. law, plaintiffs must allege that defendants wrongfully arrested or imprisoned them. *See, e.g.*, *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C. 1985) ("In actions for false arrest and false imprisonment, the central issue is 'whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails.'" (quoting *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977))). Just as with federal qualified-immunity doctrine, an officer's arrest or imprisonment may not be tortious even if it is, in fact, unconstitutional; in D.C., this doctrine is known as "qualified privilege." *E.g.*, *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993), *aff'd on rehearing*, 635 A.2d 929. But, unlike qualified-immunity doctrine, qualified-privilege doctrine exculpates an officer only where "the officer can demonstrate that (1) he or she 'believed, in good faith, that his [or her] conduct was lawful,' *and* (2) this 'belief was reasonable.'" *Id.* (emphasis added) (quoting *Scott*, 493 A.2d at 322, and citing *Wade v. District of Columbia*, 310 A.2d 857, 862 (D.C. 1973) (en banc); *Henderson v. District of Columbia*, 493 A.2d 982, 994 (D.C. 1985); *Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102, 1104 (D.C. 1983); *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982)); *see also Liser*, 254 F. Supp. 2d at 104 ("In contrast to the subjective 'good faith' standard that governs false arrest

claims under D.C. law . . ., the federal qualified immunity standard is an objective one.").

The subjective component of qualified privilege means that the District is not liable only where officers subjectively hold reasonable beliefs. *E.g.*, *Murphy*, 631 A.2d at 36 ("[I]t will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable." (quotations omitted)). But both components are necessary: the doctrine requires both objective and subjective reasonableness to justify seizures that (as the seizure here does) violate the Constitution. *Id.* Thus, even if the officer Defendants are entitled to qualified immunity because it was somehow objectively reasonable to believe that Fishman had kidnapped a young girl off the street, convinced her in the space of a few minutes to protest vigorously that he was her father, lined up a woman to pretend to be her mother and a girl to pretend to be her sister (and also to convincingly protest his innocence), and that he preternaturally predicted the police arriving and chillingly decided to keep them off his trail by playing guitar on his porch in his socks, they would not be entitled to qualified privilege under D.C. law if they *subjectively* did not believe Fishman this story. That is the case here.

> 2.   *Individual Defendants Subjectively Knew There Was No Reasonable Suspicion to Continue Fishman's Detention.*

The pleaded facts of the complaint give rise to the reasonable (indeed nearly unassailable) inference that Defendants subjectively knew that the children in Fishman's house were his and that he had not committed the crime of kidnapping. Within mere minutes of Fishman's detention, Jaeger said that it "looks like" the kids

are Fishman's daughters (*id.* ¶ 80), and later that it "it definitely sounds like it was his daughter" (*id.* ¶ 135). Brady referred to Fishman as the daughters' "daddy" (*id.* ¶ 82), and said "nothing happened, we're going to take a report of what we got a call for, what our actions were, and then we're going to get you guys back together" (*id.* ¶ 86). Tong referred to the children as Fishman's kids. (*Id.* ¶ 106.) Add to this all the objective evidence and the absence of any reason to believe that these officers subjectively held unreasonable beliefs, and the only reasonable inference—let alone *a* reasonable inference—from the pleaded facts is that the officers knew the children were Fishman's.

And the pleaded facts show that they knew he had not kidnapped his own child, which is technically possible where, for example, a biological parent lacks legal custody over a child: The officers immediately saw a woman identifying herself as the child's mother, and at no point did they indicate the least suspicion that the family was in fact an elaborate ruse.

      3.     *In The Alternative, The Officers Were Negligent And Their Negligence Harmed Fishman.*

To the extent that any of the officer defendants did not intentionally detain Fishman—and, indeed, the pleaded facts are sufficient at least to give rise to the reasonable inference that they did—they were negligent, and the District would be liable. The District correctly states that negligence claims are inconsistent with false-arrest and false-imprisonment claims (Doc. 22 at 35), but the pleaded facts cannot anticipate defendants' defenses, and so the federal rules specifically allow plaintiffs to plead inconsistent theories of liability so that defendants may not hopscotch their

way out of a lawsuit. *See, e.g.*, Fed. R. Civ. P. 8(d)(3). Fishman pleads negligence in case Jaeger, Brady, and Todaro try to defend the false-arrest claim by contending that they did not intentionally continue Fishman's detention, but instead merely neglected to inform Tong of the information they learned. (Tong would have a very difficult time with this defense: he saw both girls the moment he arrived at the house, heard Fishman's explanation of the events of that morning, and personally ensured that Fishman remained in handcuffs.) If the District agrees that its officers intentionally detained Fishman for 25 minutes, Fishman agrees that the negligence claim should be dismissed. Until then, however, it remains a possibility from the pleaded facts and possible defenses.

The District nonetheless flatly contends that "no . . . duty exists" to "reasonably communicate the information they knew to each other to expeditiously secure Fishman's release when (at the latest) they had learned that his children had confirmed his version of events." (Doc. 22 at 35.) The District offers no support for this (again quite remarkable) proposition, and there is none. Police officers who know that they are wrongly effecting an arrest have an affirmative duty to communicate that fact and ensure the detained person's release. *See, e.g.*, *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013) ("[A] facially valid warrant will pose no bar to a claim of false arrest when the officers responsible for effectuating the arrest knew that the warrant was issued without probable cause."); *Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004) ("Knowingly arresting the wrong [person] pursuant to a facially

valid warrant issued for someone else violates rights guaranteed by the Fourth Amendment.").

### D. Loftus Filed a False and Defamatory Complaint in Retaliation for Fishman's Protected Speech

Finally, after the encounter, Loftus filed grievance complaints with both the Maryland State Bar and the United States Department of Justice's Office of Professional Responsibility. (Doc. 18 ¶¶ 167, 169.) The complaints, which are rife with false statements and unsupported by any evidence—Loftus failed to include the body-worn-camera footage even upon request from the Maryland State Bar (Doc. 18 ¶ 182)—required substantial time and resources to respond to, and could have damaged Fishman's reputation. This states a First Amendment retaliation claim, because Fishman alleged that "(1) he engaged in conduct protected under the First Amendment; (2) [Loftus] took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) [there is] a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (emphasis added; citation and internal quotations omitted). Defendants do not dispute the first prong here, which is that Fishman was exercising his First Amendment rights in speaking to the officers and Loftus during the incident. Instead, they argue that Fishman's claim is shielded by the *Noerr-Pennington* doctrine or some other type of immunity; that there is no retaliatory motive sufficient to prove a causal link; and that attorneys of ordinary firmness would not be deterred by Loftus's conduct. These arguments are without merit.

*Loftus Is Not Entitled to Any Immunity, Such As Noerr–Pennington, That Derives From the First Amendment.*

Loftus seeks to avoid liability for retaliation at the threshold by claiming that the *Noerr–Pennington* doctrine applies and prevents this Court from finding liability based on Loftus's "exercising his right under the First Amendment to petition the Government . . . for a redress of grievances." (Doc. 22 at 28). Because Loftus is alleged to have been acting under color of law—that is, as a state actor—and because he does not contest that he was acting under color of law, this is an incongruous notion. As the Fifth Circuit has held in rejecting the doctrine's application to government defendants, "*Noerr–Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the First Amendment." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns Corp.*, 858 F.2d 1075, 1086 (5th Cir. 1988). That reasoning is correct and should end the matter. Put simply, "[a]s our Constitution is written, governments have 'powers' but no 'rights.'" *Silveira v. Lockyer*, 328 F.3d 567, 574 (9th Cir. 2003); *Gibson v. Florida Legislative Comm.*, 372 U.S. 539, 562 (1963) (Black, J., concurring) ("[I]t misses the whole point of our constitutional history to assume that 'government,' or any branch of government, somehow has rights and powers of its own apart from those necessarily attending the proper performance of its constitutional functions."). Indeed, Government speech is a power, not a right; thus, government speech can be restricted by other provisions of the Constitution, but it is not *protected by* the First Amendment. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015) (when the government speaks, it "represents its citizens and it carries

out its duties on their behalf", but "[t]hat is not to say that a government's ability to express itself is without restriction").

To be sure, although the D.C. Circuit has not yet considered the question, other courts have applied *Noerr–Pennington* to government defendants in § 1983 cases. Those cases are wrongly decided and should not be followed because "*Noerr–Pennington* immunity applies to private parties—not governmental entities—seeking redress from the government." *Herr v. Pequea Twp.*, 274 F.3d 109, 129 (3d Cir. 2001) (Garth, J., dissenting). As one judge dissenting from the application of *Noerr–Pennington* to a municipal defendant put it, "[t]t is axiomatic that government entities, unlike private citizens, are limited by the Constitution from certain conduct in ways that individuals are not." *Id.* at 129 n.5. One of those ways is that government entities may not violate plaintiffs' rights by retaliating in violation of the First Amendment. It thus makes no sense to permit government defendants to use the First Amendment to shield their retaliatory conduct, because that would mean that the very same Amendment simultaneously prohibits a state defendant from violating a plaintiff's First Amendment rights but also grants a defendant judicial immunity for that very violation.

Further, the cases applying the doctrine to state defendants, including those on which Defendants rely, at least do so in the context where a defendant is potentially responsive to citizens, such as a school board or district. *Campbell v. Pa. School Boards Ass'n*, 972 F.3d 213 (3d Cir. 2020); *Schneck v. Saucon Valley School Dist.*, 340 F. Supp. 2d 558 (E.D. Pa. 2004). Not so here, where the state actor is a lone

police official acting under color of law. If the *Noerr–Pennington* doctrine applied, he could violate any right he wished of any plaintiff, so long as he did so under the guise of some sort of protected petitioning activity. That would be a bizarre and unjustified twisting of the First Amendment, which protects *citizens* against infringement of their rights to free speech; it does not shield government actors from liability when those actors in fact violate the First Amendment (or any other right, for that matter).

In any event, even if *Noerr–Pennington* applied, the "sham litigation" exception would apply to allow this case to go forward. That exception applies where the petitioning activity is "'objectively baseless'" and where the defendant subjectively wishes to further wrongful conduct through the use of a governmental process. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)). Here, both prongs are met.

Two key facts show conclusively both that the suit was objectively baseless and that it was subjectively motivated by a desire to retaliate. *First*, Loftus does not dispute that his grievance included irrelevant and deeply misleading statements that Fishman had been investigated for physical abuse without stating that the investigation concluded that there had been no abuse. (Doc. 22 at 31.) Such an obviously misleading and incendiary statement is good evidence of Loftus's bad-faith subjective intent. Defendants do not dispute this inference but then bizarrely claim that, *assuming* Loftus's malicious intent, it "does not follow . . . that the two alleged

paragraphs are objectively baseless," but they offer no objective justification for those statements. (Doc. 22 at 31.) They are both objectively and subjectively baseless.

*Second*, Loftus does not dispute that he failed to include as evidence the body-worn-camera footage that he used to cherry-pick statements from the incident, and that he then refused to provide the footage when the Maryland Bar asked for it to continue their investigation. (Doc. 18 at ¶ 182.) This is objectively and subjectively improper: if Loftus were genuinely willing to vouch for the accuracy of what he wrote in a grievance complaint, he would have provided the body-warn-camera footage as evidence of what occurred. That Loftus did not do so reveals that the best inference of his motivation in filing the complaint was to make Fishman's life difficult, not to enable the Maryland Bar (or the DOJ) to hear the truth about an officer of the court. This omission also renders Loftus's hair-splitting defense in his Motion beside the point. Fishman does not dispute that the grievance complaint contained *some* accurate quotations, including those that Defendants list at length by quoting from the grievance. (Doc. 22 at 30–31.) But those quotations, such as Fishman's invocation of his employment, were not only taken out-of-context; their circumstances and important were actively misrepresented. If the encounter were accurately recited, Loftus would have had no problem showing the investigators the actual body-warn-camera footage from which those statements were derived. That he did not do so shows just how objectively baseless, and how malicious, the grievance complaints were.

## 2.    *Fishman Plausibly Alleged Retaliatory Motive*

The allegation that Loftus's primary motivation was retaliatory is similar to the two-pronged inquiry above for determining whether the grievance filing was really a sham motivated by malicious intent. The inquiry likewise has two prongs: that the retaliatory action was motivated by "subjective animus" and that it was "objectively unreasonable." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019). Thus, the same evidence, recited above, that supports the inference that this was sham litigation also supports retaliatory motive.

Defendants' claim to the contrary is meritless. They focus on what they call the "core factual allegation in the bar referral" which they say is Fishman's statement that he was a DOJ civil rights attorney who "prosecute[s] police officers." (Doc. 22 at 25.) They then argue that because Fishman admits to having said that, "[n]o amount of discovery can disprove the reasonableness of Lt. Loftus's belief" that Fishman uttered the statement "to use his official position" to "intimidate," to "influence," or "to gain preferential treatment." (Doc. 22 at 25.) This is absurd. Looking at Fishman's actual, complete statement in context reveals immediately that Loftus's supposed belief was unreasonable. Fishman was told (falsely) by an officer that the police hadn't spoken to anyone in his family and that the officer didn't know who the woman who turned out to be Fishman's wife was, and that these facts were suspicious. (Doc. 18 ¶ 148.) Fishman responded:

> The woman is my wife. I'm a Department of Justice Civil Rights Attorney, I prosecute police officers who violate the Constitution as a job. *My family doesn't trust police and so that is probably why she doesn't want to speak*. I did not kidnap anyone. The girl I put in my car is my child.

(Doc. 18 ¶ 149.) Fishman's next sentence after what Defendants call the "core allegation" dispels any possible notion that Fishman was trying to intimidate or gain preferential treatment; rather, he was mentioning his position to explain why his family apparently did not want to speak to officers. As relevant here, Loftus both omitted that crucial sentence *and* failed to include the body-worn-camera evidence even after a specific request that he provide it. Thus, the inference that Loftus's complaint was both objectively unreasonable and his motive subjectively driven by animus is more than plausible. It is nearly compelled.

With this inference well-pleaded, the question of qualified immunity is easy: Loftus concedes that the law clearly establishes that filing bad-faith complaints of misconduct in retaliation for protected speech is unconstitutional, contending only that he is entitled to qualified immunity because he did not file such a complaint. (Doc. 22 at 27–28.). And the law indeed is clear that where, as here, a government official's response to speech 'intimat[es] that some form of punishment or adverse regulatory action would follow.'" *See Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (alterations omitted), and citing *Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016); *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003); *Goldstein v. Galvin*, 719 F.3d 16, 30–31 (1st Cir. 2013); *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011); *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999)). Nor would enforcing the Constitution here force future officers to have a "deep understanding" of state bar rules or deter "citizens who wish to make

bar referrals." (Doc. 22 at 26.) Rather, it would simply require that, when bar referrals are made, they have some objective basis and not be made for improper purposes.

### 3. A Reasonable Attorney Would be Chilled by False Allegations of Child Abuse and Abuse of Office.

Finally, Fishman need only allege "some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again" to make out a valid claim. *Aref*, 833 F.3d at 258. Defendants contend that Fishman has not stated a claim for retaliation because Loftus's bar referral would not deter an attorney of ordinary firmness. Not so. Dealing with not one but two grievance complaints, both of which can jeopardize an attorney's livelihood, is no small consequence. Accordingly, courts have repeatedly held that being forced to defend against bar complaints, audits, and similar governmental processes are sufficient to make out a complaint for retaliation. *Weise v. Colorado Springs, Colorado*, 421 F. Supp. 3d 1019, 1046 (D. Colo. 2019) (the "time and expense required to defend against [three] bar complaints . . . would be enough to chill a person of ordinary firmness from engaging in protected First Amendment activity."); *Christopherson v. Poutsch*, No. 14-cv-152, 2015 WL 13662707, at *19 (D.N.M. Apr. 30, 2015) (filing an ethics complaint against the plaintiff and asking the licensing authority to revoke plaintiff's licenses "would chill a person of ordinary firmness"); *Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15-cv-2028, 2017 WL 3821469, at *6 (D.N.J. Aug. 31, 2017) (no viable claim where legislative censure was adopted "in lieu of an ethics complaint" because, unlike here, the censure "expressly disavow[ed] any pursuit of formal process"); *cf. Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (adverse

consequence to prisoner including loss of "tutoring jobs" at a correctional facility met standard for alleging retaliation in prisoner case).

Defendants cite only one case in support of their contention that ordinary attorneys would not be deterred, but that case did not involve an ethics complaint that could have jeopardized the plaintiff's entire career. Rather, the alleged harm there was from motions filed publicly with the court in an ongoing case, and the harm was mostly related to defamation, not professional discipline. *Mezibov v. Allen*, 411 F.3d 712, 721–23 (6th Cir. 2005). In any event, because *Mezibov* held that the plaintiff's speech was not protected by the First Amendment, its discussion of adverse consequence is dicta that, to the extent applicable, is unpersuasive. The bottom-line is that attorneys need their bar licenses to earn a living. Loftus's actions put that in jeopardy. Most reasonable lawyers would be deterred from exercising constitutional rights if they knew law enforcement officials would put their right to earn a living in jeopardy as a result.

### III. CONCLUSION

The Motion to Dismiss should be denied.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
(D.C. Bar No. 1033346)
GERSTEIN HARROW LLP
611 Pennsylvania Ave SE, No. 317
Washington, DC 20003
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293