UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JARED FISHMAN,<br><br>    *Plaintiff*,<br><br>v.<br><br>DISTRICT OF COLUMBIA, PATRICK LOFTUS, MARCK JAEGER, JEREMY BRADY, MICHAEL TONG, & CHRISTOPHER TODARO,<br><br>    *Defendants*. | 1:21-cv-01847-RJL |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants the District of Columbia, Lt. Patrick Loftus, Officer Marck Jaeger, Officer Jeremy Brady, Officer Michael Tong, and Officer Christopher Todaro reply in support of their pending Motion to Dismiss [22], and in response to Plaintiff's opposition brief [23].

**I.**     **Officer Jaeger is Entitled to Qualified Immunity and Qualified Privilege.**

Plaintiff did not respond to Defendants' motion by providing the Court with a copy of the Body Worn Camera ("BWC") video that depicts Officer Jaeger's interaction with Plaintiff. Nor did Plaintiff cross-move to amend the Complaint for a second time. Therefore, for the purposes of this motion, the parties agree about the operative facts. "Fishman does not dispute that the 9-1-1 calls that lead Jaeger to Fishman's house gave rise to reasonable suspicion to stop him in the first instance[.]" Pl. Br. [23], page 3. The dispute is whether Officer Jaeger's actions in momentarily entering Fishman's home and then detaining him for "more than 25 minutes" violated a "clearly established" Fourth Amendment right. Plaintiff argues that Officer Jaeger entered Fishman's home and detained him before triggering the *Terry* stop. The facts pleaded in

the Amended Complaint [18] demonstrate that Jaeger triggered a *Terry* stop when he entered Fishman's home, and therefore Fishman's rights were not violated by the minimal intrusion into his home to detain him after he fled, as explained below.

> A. **The Cases that Plaintiff Relies Upon for his Claim Against Jaeger are Inapposite.**

Plaintiff's opposition brief fails to identify any case law that would have placed a reasonable officer in Officer Jaeger's position on notice that his conduct was unconstitutional. In October 2021, the Supreme Court twice reiterated this basic principle. In *Daniel Rivas-Villegas v. Ramon Cortesluna*, 595 U. S. ____ (2021) (per curiam)[1], the Court held that prior cases that were "materially distinguishable" are "insufficient to have made clear to every reasonable officer" that conduct violates the Fourth Amendment. *Id.* (quoting *Cortesluna v. Leon*, 979 F.3d 645, 664 (9th Cir. 2020) (Collins, dissenting)). Thus, Plaintiff must cite to a case that is, effectively, materially indistinguishable from this one. He must locate "existing precedent" that has placed the constitutional question "beyond debate," and this precedent must place the officer on notice that his "specific conduct" was unlawful. *Rivas-Villegas* at *2. "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (alterations and internal quotation marks omitted)). In *City of Tahlequah, Oklahoma v. Bond*, 595 U. S. ____ (2021),[2] the Supreme Court also reiterated this principle. Quoting *District of Columbia v. Wesby,* 583 U.S. __, 590, 138 S. Ct. 577 (2020), the Court wrote that the "'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was

---

[1]   2021 WL 4822662 at *1.
[2]   2021 WL 4822664 at *2.

unlawful in the situation he confronted.'" *Id.* Plaintiff has failed to locate such cases to support any of his constitutional claims.

Here, Plaintiff relies on a series of inapposite cases to support his claim that Officer Jaeger violated clearly established law by entering Fishman's home. First, he relies upon *Payton v. New York*, 445 U.S. 573, 576 (1980) for the general proposition that "the Fourth Amendment to the United States Constitution . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Pl. Br., page 8. But *Payton* is of no assistance to Plaintiff because it is neither "specific" nor "materially indistinguishable" from the facts alleged here. In *Payton*, officers assembled evidence against a suspect that amounted to probable cause for a murder arrest, and, without a warrant, went to and then entered the suspect's home to effectuate the arrest and seek further evidence. *Id.*, 577. The Supreme Court held that the officers violated the Fourth Amendment by failing to obtain a warrant. *Id.*, 588. But the Court also noted that this rule differed where "exigent circumstances" were present, as they were here. Further, *Payton* did not involve a *Terry* stop. As Plaintiff concedes, the *Terry* stop of Fishman was initiated lawfully. Pl. Br. at 8.[3] *Payton* is therefore of no use to Plaintiff.

Next, Plaintiff relies on *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) for the same generalized proposition. But the *Groh* Court again noted that "exigent circumstances" could justify the warrantless entry into a suspect's home. *Id.*, 559. Further, the facts in *Groh* have no similarity to those at issue here. *Groh* involved a highly defective search warrant, not a *Terry* stop. *Id.* Plaintiff has again failed to identify a case standing for the proposition that Officer

---

[3]     "Defendants spend pages arguing they legally could initiate a Terry stop based on the 9-1-1 call. But that's uncontested." *Id.*

3

Jaeger could not momentarily enter Fishman's home when the latter fled a lawful *Terry* stop. This is because no such case exists. However, cases to the contrary do exist. The District relies on many of them in its motion, including *United States v. Santana*, 427 U.S. 38 (1976) (The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not.") and *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."), and Plaintiff has not distinguished them. The *Terry* stop comported with the Fourth Amendment.

    **B.**  **The *Terry* Stop Began Before Plaintiff Fled Into his Home.**

Plaintiff argues that the *Terry* stop did not begin until after Fishman had already retreated into his home:

> Defendants contend that Fishman was "stopped" when officer Jaeger said "hang tight a second, don't go inside." (Doc. 22 at 10 (quoting Doc. 18 ¶ 41).) This is incorrect. As a matter of clearly established law, Fishman was not stopped until he was already in his home.

Pl. Br., page 10. Plaintiff has thus resorted to arguing that Fishman did not flee a *Terry* stop because a *Terry* stop had not yet occurred when Officer Jaeger pursued Fishman into his home. In furtherance of this argument, Plaintiff makes the claim that Officer Jaeger's contact with Fishman began as "a fluid situation that began as a calm, consensual encounter." Pl. Br., 11. Mr. Fishman's efforts to appear "calm" (no shoes, playing "Simple Twist of Fate" on the guitar) were not evidence of a "calm" encounter to an objectively reasonable officer in the circumstances that Officer Jaeger confronted. Plaintiff argues that the District's position is that is "'inherently suspicious' not to be evasive enough when police arrive." Pl. Br., page 14. The District's position is not, of course, that Plaintiff should have been more evasive. The District's

4

position is that Fishman's faux-casual behavior raised a reasonable officer's suspicions. Per the Amended Complaint [18], "[a] helicopter was audibly hovering overhead." *Id.*, ¶ 29. Even if Plaintiff somehow failed to realize that this "police helicopter" was looking for him as the suspect in a possible kidnapping / abduction, Officer Jaeger knew. *Id.*, ¶¶ 25, 29, 127. Then this supposedly "calm" encounter led to Fishman realizing that "someone near Cactus Cantina must have called the police, and Fishman figured it must have been the man he spoke to." *Id.*, ¶ 37. Then Fishman effectively identified himself as the suspect: "And that guy who called in has no idea what's going on…. " *Id.*, ¶ 38. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Fishman's behavior was suspicious in this context, and Courts may "not separately scrutinize each factor relied upon by the officer conducting the search.[…] [a]n officer on the beat does not encounter discrete, hermetically sealed facts." *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001).

Plaintiff then began to stand up from his front porch and egress. *Id.*, ¶ 40. <u>Before Fishman entered his home</u>, Officer Jaeger stated to him a bit more firmly: "'Hey,' . . . hang tight for a second, **don't go inside**.'" *Id.*, ¶ 41 (emphasis added). As Plaintiff admits, "Fishman does not dispute that the 9-1-1 calls that lead Jaeger to Fishman's house gave rise to reasonable suspicion to stop him in the first instance[.]" Pl. Br. [23], page 3. Therefore, Officer Jaeger had a reasonable suspicion to conduct a *Terry* stop and issued a lawful order to maintain that *Terry* stop, which Plaintiff ignored.

Then, "[a]s Fishman stepped over the threshold of his doorway, Jaeger walked up the steps and said '**don't go inside**.' " *Id.*, ¶ 42 (emphasis added). A reasonable person in Fishman's circumstances would have known that he was not free to leave: per the Complaint,

5

Fishman (and Jaeger) knew that Fishman was a suspect in a crime and that police were searching for him. *Id.*, ¶ 37. Per the Complaint, "as Fishman stepped over the threshold of his doorway," Officer Jaeger again said, "don't go inside." Yet instead of complying, Fishman continued "retreating" and "screamed 'step out.' " *Id.*, ¶¶ 161, 45. Officer Jaeger therefore exercised a "show of authority" that would have conveyed to a reasonable person that "he was being ordered to restrict his movement." *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (relying on *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (stating the test for whether a *Terry* stop has occurred).

Plaintiff attempts to nullify his admission of "retreating" from Officer Jaeger (¶ 161) by arguing that "retreating" and "fleeing" are not synonyms. Pl. Br., page 12, footnote 5. But in either case, Fishman resorted to "unprovoked flight," and "[a]llowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent" with the Fourth Amendment. *Wardlow*, 528 U.S. at 125. "Headlong flight" is suggestive of wrongdoing. *Id.*, 124. So, even if the *Terry* stop commenced only when Officer Jaeger physically detained Fishman, as Plaintiff alleges, the stop is lawful under the Fourth Amendment.

In sum, when Plaintiff's "retreating" began, Officer Jaeger instructed Fishman to "don't go inside," thereby again placing a reasonable person on notice that a *Terry* stop was underway. Plaintiff's conclusory argument that a *Terry* stop had not yet commenced is not consistent with the pleaded facts and finds no support in any caselaw. The case law on point would have indicated to a reasonable officer that his conduct *was* lawful. For example, in *Rice v. District of Columbia*, 774 F. Supp. 2d 18, 24 (D.D.C. 2011), an officer told Plaintiff (Mr. Rice) "**to freeze, thereby conducting a lawful *Terry* stop.** Mr. Rice admits that he continued to flee. Because he continued to flee, Officer Stathers then had probable cause to arrest him." (emphasis added). If

telling a suspect "to freeze" commences a *Terry* stop, then telling a suspect "don't go inside" commences a *Terry* stop too.

Further, even if Officer Jaeger had not invoked a *Terry* stop before Fishman crossed from his outdoor porch into his vestibule, he is still entitled to qualified immunity because he would have reasonably believed that he had invoked a *Terry* stop.  Plaintiff fails to identify a single case where a police officer was liable under the Fourth Amendment for mistakenly believing that he had made an investigative stop and where, as here, that investigative stop was justified.  Plaintiff simply makes the conclusory argument that "[t]he pleaded facts give rise to a reasonable inference that no reasonable officer could have believed that Fishman was not stopped until he was inside his home."  Pl. Br., 11-12.  This is not enough to overcome qualified immunity because Plaintiff has no controlling authority to support it.  In 2018, a D.C. Federal District Court wrote, "at the very least, a reasonable officer could have believed that he could permissibly temporarily detain [plaintiff] since he matched the suspect from a 911 call seeming to report criminal activity and fled when ordered to stop by the police."  *Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 592 (D.D.C. 2018).  Therefore, no case placed Officer Jaeger on notice that he had not performed a *Terry* stop when Fishman began his retreat and Officer Jaeger told Plaintiff for a second time to not go inside.  Officer Jaeger's actions comported with the Fourth Amendment and he is therefore entitled to qualified immunity.

Plaintiff nonetheless argues that exigent circumstances did not exist to enter Plaintiff's home.  Pl. Br., Point II(A)(2), pages 12-15.  But Plaintiff cites to no cases on point and instead cites to the general proposition that warrantless searches of the home require exigency.  *Id.*, page 12.  Plaintiff relies on *Corrigan v. District of Columbia*, 841 F.3d 1022, 1025 (D.C. Cir. 2016), but that case involved a "top-to-bottom search by the Explosive Ordnance Disposal Unit

7

("EOD") after the MPD had been on the scene for several hours." Here, by contrast, Officer Jaeger was inside Fishman's home (in the vestibule) for seconds, performed no search, and left as soon as he gained control of Fishman to sustain the *Terry* stop. Pl. Am. Compl., ¶ 46. Plaintiff argues that Officer Jaeger lacked "real danger" to justify entering Fishman's home, but the danger that Fishman may have posed to whoever was in the house (meaning the possible abduction victim) is *in addition to* the exigent circumstances posed by Fishman's "retreat." In February 2021, the Supreme Court issued an opinion that should dispose of Plaintiff's claim against Officer Jaeger. *Lange v. California*, 549 U.S. \_\_\_, 141 S. Ct. 2011 (2021) noted that "Courts are divided over whether the Fourth Amendment always permits an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect." Therefore, even if Fishman had been a suspect of a *misdemeanor* instead of a felony (kidnapping), it was not "clearly established" that warrantless entry of his home was not permitted. *Id.*, 2020. The Court assumed that its earlier opinion *United States v. Santana*, 427 U.S. 38 (1976) held that fleeing-felon cases categorically presented exigent circumstances allowing for warrantless entry, and cited three Supreme Court cases that made the same assumption, including *Stanton v. Sims*, 571 U.S. 3, 8 (2013) ("hot pursuit of a fleeing felon justifies an officer's warrantless entry."). Given this jurisprudence, that remains unsettled but strongly favors the officer, Plaintiff cannot come forward with any cases that placed the constitutional question here "beyond debate." Officer Jaeger is entitled to qualified immunity.

Because Fishman fled a lawful *Terry* stop, Officer Jaeger's momentary entry into Plaintiff's home to detain him is privileged, and Plaintiff's trespass claim (Count V) must fail. *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) (A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not "in

8

excess of those which the actor reasonably believes to be necessary.") (citation omitted). As Plaintiff admits, his trespass and false arrest claims are "are identical under D.C. Law." Pl. Br., page 25. Therefore, if the detention was privileged, then the trespass claim fails along with the false arrest claim. Plaintiff offers no response to this argument except to claim that officers are not entitled to qualified privilege unless they show subjective good faith. Pl. Br., page 9. Plaintiff's interpretation of the common law is false. Of course, a *lawful* detention is privileged, regardless of the officer's subjection intention. Just as a lawful detention entitles an officer to qualified immunity, so does it entitle him to qualified privilege. *See, e.g., Cooper v. District of Columbia*, Civil Action No. CV 19-1449 (JEB) [2021 WL 2894644], at *7 (D.D.C. July 9, 2021) ("Largely analogous to the qualified-immunity defense above, officers may invoke a 'qualified privilege' to tort liability."). The officer's subjective intention of good faith is an alternative, affirmative defense which he needs not invoke to defeat Plaintiff's common law claims:

> To prove false arrest and imprisonment, [plaintiff] was required to demonstrate that the police acted without probable cause, in an objective constitutional sense, to effectuate his arrest. Our case law **also** permits police officers to defend against a false arrest charge on the basis of a subjective test, that "the officers had a good faith reasonable belief that they were acting lawfully.

*Taylor v. Dist. of Columbia*, 691 A.2d 121, 125 (D.C. 1997) (emphasis added; citations omitted). Therefore, where Plaintiff has failed to plead that he was unlawfully detained, the question of "good faith" need not be reached.

**II.     The Officers are Entitled to Qualified Immunity for the Length of the *Terry stop.*__**

Plaintiff's effort to pursue Fourth Amendment claims against Lt. Loftus and Officers Jaeger, Brady, Tong, and Todaro for merely *sustaining* the admittedly lawful *Terry* stop for "more than 25 minutes" (¶ 154) also lacks legal support. Plaintiff contends that they violated Fishman's Fourth Amendment rights by not terminating the *Terry* stop sooner. Pl. Br., Point

9

II(B).  But no case supports this contention.  Instead of citing to specific cases holding that a "more than 25 minute" *Terry* stop is unlawful, Plaintiff resorts to general principles: "[a]n investigative stop must therefore cease once reasonable suspicion dissipates." *United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018).  But Plaintiff's Complaint demonstrates that this is exactly what happened: the officers waited only until the possible kidnapping victim was interviewed.  Only then did their reasonable suspicion dissipate.  Right after Fishman's wife finally let the officers interview the child, the *Terry* stop ended.  Plaintiff would impose a duty on the officers that is not recognized by the Courts: he claims that the officers had a duty to accept the statement of the possible kidnapping victim ("Fishman's younger daughter"), who was "shrieking 'no' and 'please don't,' begging the officers not to arrest her father."  Pl. Am. Compl. [66], ¶ 66.  Then this "toddler" protested "that her father had done nothing wrong." *Id.*, ¶ 71.  Per the Complaint, this happened about six minutes into the *Terry* stop. *Id.*, ¶ 152.  The toddler's statements were not inconsistent with coercion or worse.  Fishman described his two daughters as "my good child" and "my pain in the ass child." *Id.*, ¶ 151.  The latter is the toddler and potential kidnapping victim, who improbably told police that "[i]t was my fault, he [Fishman] didn't do anything wrong." *Id.*, ¶ 63.  She said this despite not knowing what was happening, per her mother. *Id.*, ¶ 73.  The officers were unable to question her.  Plaintiff would impose § 1983 liability on the officers because they did not accept the "traumatized" child's "shrieking" and "begging" at face value and persisted in their request to to the mother to interview her: "Brady said he could not conclude his investigation and release Fishman until he had spoken to all the people involved, including Fishman's younger daughter." *Id.*, ¶ 97.  Then Plaintiff's wife delayed this interview by repeatedly refusing to let the officers interview the toddler. *Id.*, ¶¶ 98, 100.  Brady wanted to ask the child if she had been hurt. *Id.*, ¶ 99.  No case

placed Brady or the other officers on notice that continuing the *Terry* stop to allow for this interview to take place would violate Fishman's Fourth Amendment rights.

As noted above, the child was under duress— Plaintiff describes her as "traumatized" (¶ 183), and the officers wanted to speak to her and determine if she was injured. Plaintiff's baseless interpretation of the Fourth Amendment is dangerous. Officers must be able to conduct investigatory stops without an arbitrary clock ticking. Of similar importance, Officer Jaeger summoned a sergeant, who did not arrive until "about nineteen minutes after" Fishman was handcuffed. Id., ¶¶ 75, 129. From the time the sergeant arrived, Fishman was detained for only six minutes. Id. Lt. Loftus did not arrive until minutes after that. Id., ¶ 137. The officers were able to persuade Fishman's wife to let them speak to the child and were unable to do so in a shorter time frame. The officers had to know what the child would say before they could be sure that she was safe. Her mother did not possess the necessary information because she was not present at Woodley Road, N.W. when Fishman threw his child into his Audi. *Id.*, ¶ 91 ("Fishman's wife said she had no information about what happened that morning because she wasn't there[.]").

Plaintiff's claim that the officers were obliged by the Fourth Amendment to end the *Terry* stop after the older daughter and Fishman "explained exactly what happened" (Pl. Br., page 20) – and before either a Lieutenant or Sergeant arrived — is not supported by any case law. If this triggered a constitutional duty to end the *Terry* stop despite the officers not having been able to interview the potential kidnapping victim, then Plaintiff must, at the very least, identify a case stating this proposition. Plaintiff has failed to do this because no such case exists. Therefore, the officers who did not end the *Terry* stop earlier are entitled to qualified immunity. *Mitchell v.*

11

*Forsyth*, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took).

Finally, Plaintiff distorts the holding in *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Pl. Br., page 18. It holding aids only the officers. The Supreme Court stated that courts "should not indulge in unrealistic second-guessing" and it rejected "a *per se* rule that a 20-minute detention is too long to be justified under the Terry doctrine." *Id.*, 686. *Sharpe* held that a 20-minute detention "meets the Fourth Amendment's standard of reasonableness." *Id.*, 683. Even if Plaintiff was correct that the officers had collected some potentially exonerative information before they were able to interview Fishman's younger daughter, neither *Sharpe* nor any other case holds that the officers were therefore obliged to end the *Terry* stop before questioning the child and asking her if she was injured.

### III.   Lt. Loftus is Entitled to Qualified Immunity.

Plaintiff's allegation against Lt. Loftus for allegedly violating his First Amendment rights (Count VIII) is equally meritless. Lt. Loftus brought Fishman's actions during the *Terry* stop to the attention of the Maryland bar. Plaintiff admits that "the grievance complaint contained some accurate quotations, including those that Defendants list at length by quoting from the grievance." Pl. Br., page 34. Fishman, a (now former) DOJ attorney, should be able to answer to the bar for his actions. An attorney of ordinary firmness would not have been deterred from complaining about his *Terry* stop by the bar referral. The bar referral therefore did not violate Fishman's First Amendment rights. Plaintiff's opposition brief implausibly argues that Lt. Loftus wanted to retaliate against Fishman for complaining "about the unlawful entry into his home" during the *Terry* stop. Pl. Am. Compl., ¶ 228. This conclusory allegation will forever lack a factual basis.

Plaintiff has failed to identify any case that would have placed Lt. Loftus on notice that his actions violated the First Amendment, even if an attorney of ordinary firmness would be deterred by the bar referral. Plaintiff believes that the First Amendment is implicated because "Loftus both omitted that crucial sentence and failed to include the body-worn-camera evidence even after a specific request that he provide it." *Id.*, page 36. The "crucial sentence" being the most surprising statement by a (then) DOJ attorney, "My family doesn't trust police and so that is probably why she doesn't want to speak." *Id.*, page 35. But Plaintiff has failed to produce a First Amendment retaliation case that holds that a non-lawyer like Lt. Loftus must invoke these allegedly exonerative words when he makes a bar referral or thereby violate the referred attorney's First Amendment rights. Plaintiff has also failed to provide a case that would have placed Loftus on notice that not providing Body Worn Cameras ("BWC") footage with a bar referral would violate the First Amendment. No such case exists.

Further, Plaintiff's allegation of "bad faith" will never have evidentiary support and is illogical because Lt. Loftus knew that the entire sequence of events was recorded by officer BWCs, as the District's motion argued. Plaintiff argues that if "Loftus were genuinely willing to vouch for the accuracy of what he wrote in a grievance complaint, he would have provided the body-worn-camera footage as evidence of what occurred." *Id.*, 34. This is not correct. Plaintiff cannot avoid dismissal by pleading non-facts, which are by their nature conclusory. Lt. Loftus had to make a FOIA request for the BWC footage because he lacked the authority to extract the BWC footage from MPD's database and hand it over to the Maryland bar. Attachment "A" is MPD's initial response to Lt. Loftus's FOIA request for the BWC footage. Lt. Loftus then wrote to the Maryland bar on September 2, 2020:

> Please note, this response was based on my recollection, and to the
> best of my knowledge, of the events that transpired several months

>ago. Furthermore, for several months, **I have not reviewed, nor have I had the opportunity to review, Body Worn Camera (BWC) footage**, Office of Unified Communications audio recordings, or reports in connection with this matter.

Attachment "B", 9/22/2020 Lt. Loftus letter to the Maryland Bar, ¶ 38 (emphasis added).

Unlike Lt. Loftus, Fishman had the right to the BWC footage because he was its subject, yet Fishman did not provide the BWC footage to the Maryland bar. Perhaps he did not do so because the BWC footage confirmed, as Plaintiff admits, the core factual allegation: that Fishman had invoked his job as DOJ attorney during the *Terry* stop. Pl. Compl., ¶ 149. When the Maryland bar closed its investigation, it specifically stated, "I note that you [Loftus] have indicated that you are making efforts to obtain the Body Worn Camera footage of the incident described in your complaint. Should you obtain the footage, you may send it to us, and we can revisit your complaint at that time." Attachment "C", 6/7/2021 Maryland Bar letter to Lt. Loftus. Fishman was copied on this letter and Plaintiff referred to in the Complaint (¶ 182), but the operative language about Loftus "making efforts to obtain the Body Worn Camera footage" was left out of both Plaintiff's Complaint and his opposition brief. The District's three attachments are unnecessary for the District's motion to be granted, and the District need not rely on them, but they do demonstrate that Plaintiff's arguments in opposition to the District's motion regarding the First Amendment claim are nonfactual and are therefore not entitled to a presumption of truth.

Plaintiff's claim that Lt. Loftus cannot invoke the *Noerr-Pennington* doctrine because he was acting "under color of law" (Pl. Br., page 31) is also incorrect. Plaintiff's citation to support this is proposition is: "*Noerr–Pennington* protection does not apply to the government, of course, since it is impossible **for the government to petition itself** within the meaning of the First Amendment." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns Corp.*, 858 F.2d 1075,

14

1086 (5th Cir. 1988) (emphasis added). Here, the government did not petition itself. Loftus is a *District of Columbia* police officer. He petitioned the *Maryland* bar. Therefore, the government did not petition itself. The two governments are separate. In *Video Int'l Prod., Inc.*, by contrast, the issue was whether "the city" could petition itself. Further, as Attachments A, B, and C demonstrate, Lt. Loftus had to make a FOIA request to one of these governments for the BWC footage to provide to the other government. Plaintiff's entire argument against the application of the *Noerr-Pennington* doctrine here is based on this false understanding of what the "government" is.

But the *Noerr-Pennington* doctrine is not even necessary to dispose of Plaintiff's First Amendment claim because the claim is not well-pleaded. This is because Plaintiff has failed to identify a case holding that an attorney of ordinary firmness would be deterred from by a bar referral. Plaintiff relies on a *September 30, 2019* Colorado District Court decision, *Weise v. Colorado Springs, Colorado*, 421 F. Supp. 3d 1019 (D. Colo. 2019). Pl. Br., page 37. Even if this decision could have somehow filtered back to Lt. Loftus by April 29, 2020, when he made the bar referral, and even if a District Court decision could "clearly establish" a right in another Circuit,[4] *Weise* is of no aid to Plaintiff. In *Weise,* the "time and expense required to defend against [three] bar complaints . . . would be enough to chill a person of ordinary firmness from engaging in protected First Amendment activity." *Id.*, 146. But Fishman faced a single bar referral and the "time and expense" of defending it amounted to him sending a single letter of denial to the Maryland bar. The allegation was not even investigated. Attachment "C".

---

[4] This question is unsettled. *See Daniel Rivas-Villegas v. Ramon Cortesluna*, 595 U. S. ____ (2021) (per curiam).

The other cases that Plaintiff relies upon are equally inapposite. In the unpublished New Mexico District Court decision *Christopherson v. Poutsch*, Civil Action No. 14-00152 JCH/SCY, [2015 WL 13662707], at *19 (D.N.M. Apr. 30, 2015), a teacher faced the loss of her teaching license when a school superintendent "filed an ethics complaint against Plaintiff and asked the New Mexico Public Education Department to revoke Plaintiff's teaching licenses." *Id.* Lt. Loftus, who is not an attorney, did not ask the Maryland bar to revoke Fishman's attorney license. *Poutch* therefore hardly meets the standard of "specificity" required by *Mullenix* and *Wesby* to clearly establish a constitutional right.

Plaintiff also relies (p. 37) on *Danchuk v. Mayor & Council of the Borough of Mount Arlington*, Civil Action No. 2:15-CV-2028 (CLW) [2017 WL 3821469], at *6 (D.N.J. Aug. 31, 2017), but this case is also unhelpful to Plaintiff because it involved a complaint against a local Councilwoman to "the Local Finance Board for allegations of violations of the Local Government Ethics Law." *Id.*, *1. Plaintiff also relies (p. 37-8) on *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002), where a *prisoner* faced the loss of tutoring jobs, a fact pattern having nothing in common with this case. Finally, Plaintiff argues that "attorneys need their bar licenses to earn a living. Loftus's actions put that in jeopardy." Pl. Br., page 45. But Fishman's bar license would only be placed in jeopardy if Loftus's allegations were substantiated by the Maryland bar and found to warrant discipline. Plaintiff's lack of faith in the Maryland bar to discharge its core function of fairly adjudicating ethics complaints is unfortunate, but it does not transform Lt. Loftus's referral into an actionable First Amendment retaliation claim. Lt. Loftus is entitled to qualified immunity.

## IV. Plaintiff's Derivative Common Law Claims of False Arrest and Negligence are Also Meritless.

Plaintiff's derivative common law claims of false imprisonment (Count VI) and negligence (Count VII) must fail because the officers are entitled to a qualified privilege that is analogous to their qualified immunity. Plaintiff's attempts to avoid this doctrine rely on his invocation of the "subjective 'good faith' standard" for false arrest claims. Plaintiff's resort to this argument demonstrates how weak his common law claims are. As noted in Point I, above, subjective good faith is an affirmative defense that is *more generous* to officers than what the Constitution affords: even if an arrest is unlawful, an officer may avoid liability if he can show that he had a subjective good faith belief that his conduct was justified, and that subjective belief was reasonable. *Scott v. District of Columbia*, 101 F.3d 748, 753–55 (D.C. Cir. 1996); *District of Columbia v. Murphy*, 631 A.2d 34, 37 (D.C. 1993), *adhered to on reh'g*, 635 A.2d 929 (D.C. 1993) (the issue is whether the officers "had probable cause to arrest him, or at least a reasonable, good faith belief that they were acting lawfully in doing so."). At common law, "even if an objectively unlawful arrest occurs, an officer may justify that arrest and defeat plaintiff's action by recourse to a subjective test, i.e. that the officer had a reasonable good faith belief that his or her conduct was lawful." *Liser v. Smith*, 254 F. Supp. 2d 89, 96 (D.D.C. 2003). The District has demonstrated that the officers' actions during the *Terry* stop were objectively reasonable. Plaintiff argues that "the District ignores a crucial distinction: qualified privilege requires that defendants *believe* their explanations." Pl. Br., page 25 (emphasis original). But Plaintiff is mistaken as a matter of law. The District demonstrated that the length of the *Terry* stop was lawful under the Fourth Amendment. Being lawful under the Fourth Amendment, the stop cannot give rise to a viable false arrest claim because a stop that comports with the Fourth

17

Amendment is, by definition, "objectively lawful" at common law.  The officers actions are privileged because they were lawful.

Defendants note that Plaintiff pleaded no facts that if, proven, would demonstrate an absence of good faith by the officers.  Plaintiff's argument "that Jaeger, Brady, Tong, and Todaro all subjectively believed that the children were Fishman's" minutes before the *Terry* stop ended (p. 25-6), and are therefore exposed to liability for false arrest as well as negligence, lacks any factual support.  If such evidence existed, it would be in the BWC footage that Plaintiff reviewed when he prepared the Complaint.  Yet the Complaint's narrative of the *Terry* stop, based on the BWC footage, shows repeated manifestations of good faith.  For example, Officer Brady's attempts to interview the potential kidnapping victim:

> 96. Brady then said: "She [Fishman's younger daughter] said nothing happened, but I would like to actually talk to her."
>
> 97. Brady said he could not conclude his investigation and release Fishman until he had spoken to all the people involved, including Fishman's younger daughter.
>
> 98. […] Brady explained that he would be asking only straightforward questions about whether anything was wrong.
>
> 99. […] Brady, who again had said "we have to do our diligence before we can wrap this up."

Pl. Am. Compl.

Officer Tong's role in the *Terry* stop was to question Fishman.  *Id.*, ¶¶ 103-121.  Todaro's role was, allegedly, to detain Fishman while the other officers performed their investigation.  *Id.*, ¶¶ 121, 126.  After Fishman was handcuffed, Jaeger apparently played no role in the investigation, but summoned a sergeant, who arrived and participated in the investigation.  *Id.*, ¶¶ 75, 129.  Lt. Loftus, who arrived only minutes before Fishman was released, was apparently apprised of the situation just before the Sergeant ordered Fishman's release.  *Id.*, ¶ 153.  Subjective bad faith is

absent from Plaintiff's factual proffer.  In sum, Defendants are not required to show good faith when, as here, their actions during the *Terry* stop were objective reasonable and therefore lawful. Plaintiff's derivative common law claims must fail.

## CONCLUSION

For these reasons, Plaintiff's Amended Complaint [18] should be dismissed in its entirety, with prejudice.

October 22, 2021

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ *Michael K. Addo*
MICHAEL K. ADDO [1008971]
Chief, Civil Litigation Division Section IV

/s/ *Benjamin E. Bryant*
BENJAMIN E. BRYANT [1047632]
Assistant Attorney General
Civil Litigation Division Section IV
400 6th St. N.W.
Washington, D.C. 20001
202-717-1269 (phone)
202-730-0624 (fax)
benjamin.bryant@dc.gov

Counsel for Defendants