# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JARED FISHMAN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 21-1847 (RJL)** |
| | ) | |
| **THE DISTRICT OF COLUMBIA,** and | ) | |
| **LIEUTENANT PATRICK LOFTUS,** | ) | |
| **OFFICER MARCK JAEGER,** | ) | |
| **OFFICER JEREMY BRADY,** | ) | |
| **OFFICER MICHAEL TONG,** and | ) | |
| **OFFICER CHRISTOPHER TODARO,** | ) | |
| of the **Metropolitan Police Department** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

## MEMORANDUM OPINION
February 2, 2023 [Dkt. # 22]

On February 17, 2020, officers of the Metropolitan Police Department ("MPD") investigating a report of a child kidnapping conducted a *Terry* stop of Jared Fishman outside Fishman's Washington home. Fishman sued the District of Columbia and five individual police officers, alleging that the MPD stop and a subsequent bar referral made by the on-scene police lieutenant violated Fishman's rights under the First Amendment, Fourth Amendment, and District law. The District and officers moved to dismiss. Because Fishman has pleaded sufficient facts to make out a violation of his clearly established rights as to some, but not all, of his claims, I will **GRANT in part** and **DENY in part** the defendants' Motion to Dismiss [Dkt. # 22].

# BACKGROUND

## I.    Factual Background

On February 17, 2020, Fishman and his two young daughters were eating lunch at a restaurant in Washington, DC.   Am. Compl. ("Compl.") [Dkt. # 18] ¶ 14.   Fishman's younger daughter began misbehaving during the meal, and, after leaving the restaurant, refused to get in Fishman's car.   *Id.* ¶ 15.   After several minutes, when Fishman realized that his daughter did not intend to cooperate, he picked her up and placed her in her car seat inside his vehicle.   *Id.* ¶ 17.   Moments later, an unidentified man knocked on Fishman's window to ask whether there was any problem.   *Id.* ¶ 18.   Fishman responded that his daughter was misbehaving and he was taking her home.   *Id.*   He then drove to his Georgetown home.   *Id.* ¶ 19.

Shortly thereafter, an unidentified woman called 9-1-1, *id.* ¶ 20, and told MPD that she had observed a man pull up to a six or seven year old girl, "scream[] at her," and throw her into the car after "she pushed him," leading the caller to believe that she had witnessed a child kidnapping, *id.* ¶ 21.   The woman provided a description of Fishman's car and his license plate to the dispatcher.   *Id.* ¶ 22.   The dispatcher then put out a call to nearby MPD officers, using a code to indicate a possible child kidnapping.   *Id.* ¶ 25.   The call included Fishman's license plate and, based on his vehicle registration, his home address.   *Id.*

Responding to the call, Officer Marck Jaeger was the first to arrive at Fishman's house.   *Id.* ¶ 26–29.   Jaeger parked, observed Fishman on the front steps, identified himself, and asked to speak with Fishman.   *Id.* ¶¶ 30–39.   Fishman, who "realized that someone near Cactus Cantina must have called the police," *id.* ¶ 37, sighed, told Jaeger to "hold on

one sec," muttered under his breath, and stood up to enter his home, *id.* ¶ 40.  But before Fishman stepped over the threshold of his doorway, Officer Jaeger told him "Hang tight for a second, don't go inside." *Id.* ¶¶ 41–42.  Fishman disregarded Jaeger and entered the house.  *Id.* ¶ 42–43.  Jaeger immediately followed him inside, seized Fishman, and handcuffed him.  *Id.* ¶ 44–48.  Three other MPD officers—Jeremy Brady, Michael Tong, and Christopher Todaro—arrived while Jaeger was handcuffing Fishman.  *Id.* ¶ 48.

While Officer Jaeger was handcuffing Fishman, Fishman's two daughters appeared in the doorway of the home.  *Id.* ¶ 49.  The younger girl—the alleged victim—"shrieked and cried …, asking the officers to stop what [they were] doing." *Id.* ¶ 50.  She "frantically pleaded with the officers" to release Fishman, "saying 'he hasn't done anything wrong, please, please.'" *Id.* ¶ 52.  Her older sister told the officers that Fishman had done nothing wrong and that "it is my sister, she was misbehaving." *Id.* ¶ 51.  As he was led away, Fishman asked the officers if they could "do this"—resolve the situation—"in front of my kids," but was turned down.  *Id.* ¶¶ 54–56.  Jaeger then turned Fishman over to Officer Tong, who walked Fishman down the block and out of sight.  *Id.* ¶ 58; *see generally id.*

While Tong steered Fishman away from the home, Officers Brady and Todaro stayed at the Fishmans' front steps and spoke with Fishman's wife and children.  *Id.* ¶ 59–63.  Both Fishman's wife and his older daughter explained to the officers that the girl whom the witness had observed being placed in the car was Fishman's younger daughter.  *Id.* ¶¶ 66, 70, 72.  The officers insisted that they needed to speak with the alleged kidnapping victim herself.  *Id.* ¶¶ 97–99.  After initially expressing some reservations, Fishman's wife agreed to let Officer Brady interview her younger daughter.  *Id.* ¶¶ 97–100.  The girl told

Brady that she had had a fight with her older sister, ran from the car, and was picked up by her father. *Id.* ¶ 100. She stated that she was not hurt and that her father had picked her up gently. *Id.*

Approximately 15 minutes after Fishman's daughter told Officers Brady and Todaro what had happened, Sergeant Adam Bray arrived on the scene. *Id.* ¶ 129. Bray first spoke with Officer Jaeger, learning that "it definitely sounds like [the alleged victim] was his daughter." *Id.* ¶ 135. Bray then waited "a couple minutes" until the arrival of Lieutenant Patrick Loftus. *Id.* ¶ 137. After briefly conferring with Loftus, *id.* ¶¶ 138–43, Bray walked over to where Fishman was being held and began speaking with him, *id.* ¶¶ 144–48. This conversation was the first time any of the officers on the scene told Fishman that he was suspected of child kidnapping. *Id.* ¶ 146. When Bray asked Fishman why his family would be reluctant to speak with them, Fishman responded that he was a DOJ civil rights attorney and "I prosecute police officers who violate the Constitution as a job. My family doesn't trust police and so that is probably why she doesn't want to speak. I did not kidnap anyone. The girl I put in my car is my child." *Id.* ¶ 149. At the time of the events in question, Fishman was a Department of Justice Civil Rights Division attorney. *Id.* Bray explained the nature of the 9-1-1 call, *id.* ¶ 150, and ordered another unidentified officer to remove Fishman's handcuffs, *id.* ¶ 153. Fishman and Bray returned to Fishman's house, and, after a short argument between the Fishmans and Lieutenant Loftus about the appropriateness of the MPD officers' actions, the police departed. *Id.* ¶¶ 159–63.

Fishman was detained for approximately 25 minutes, *id.* ¶ 154, including approximately 21 minutes *after* Officer Brady elicited a description of the day's events

from Fishman's younger daughter. *See id.* ¶¶ 129, 142, 146. Neither Officer Brady nor Officer Todaro informed Officer Tong that Fishman's daughter had identified him as her father and provided an explanation for the events witnessed by the 9-1-1 caller. *Id.* ¶¶ 101, 103. But Brady and Jaeger made several comments in Tong's presence suggesting they believed Fishman to be the father of the alleged victim, implying that no crime had occurred. *See, e.g., id.* ¶¶ 79–80, 96, 100.

About two months later, on April 29, 2020, Lieutenant Loftus filed a bar complaint with the Maryland State Bar and a separate complaint with the DOJ Office of Professional Responsibility ("OPR"). Loftus alleged that Fishman's statement to the officers that he was a DOJ civil rights attorney who prosecuted officer misconduct was an improper attempt "to use his official position as an attorney with the United States Government to intimidate the officers, to influence the officers, or to gain preferential treatment." *Id.* ¶ 172. Loftus also implied in this filing that Fishman was the subject of an ongoing investigation by MPD's Youth and Family Services Division into alleged child abuse, *id.* ¶ 175, but somehow failed to note that the investigation had concluded more than a month earlier that there was no basis for any charges, *id.* ¶ 164.

## II.    Procedural background

Fishman filed the operative Amended Complaint on September 7, 2021 against the District of Columbia, Lieutenant Loftus, and Officers Jaeger, Brady, Todaro, and Tong (collectively "Officers" or "Officer Defendants"). *See generally id.* Fishman brings eight counts, including five § 1983 claims and three claims under D.C. law. First, he alleges that Officer Jaeger violated his Fourth Amendment rights by (I) entering his home without a

warrant and (II) conducting a warrantless arrest in his home.  Next, he alleges that, after dispelling any reasonable suspicions they may have originally held, the Officer Defendants (III) maintained their investigatory stop despite the absence reasonable suspicion or, in the alternative, (IV) arrested him without probable cause.  Based on the same underlying facts, Fishman also brings (V) trespass, (VI) false imprisonment, and (VII) negligence claims under District law against both the Officers and the District.  Finally, he alleges that Lieutenant Loftus (VIII) impermissibly retaliated against him by filing the state bar and OPR complaints seeking to retaliate against Fishman for his protected free speech.

The District has moved to dismiss all claims, citing qualified immunity, failure to state a claim, and other defenses under District law.  *See* Defs.' Mot. to Dismiss ("Mot. to Dismiss") [Dkt. # 22].  The motion has been fully briefed.  *See* Pl.'s Memo. of Ps. and Auths. in Opp. to Defs.' Mot. to Dismiss ("Opp.") [Dkt. # 23]; Defs.' Reply in Supp. of Their Mot. to Dismiss ("Reply") [Dkt. # 25].

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In resolving a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint and draws all reasonable factual inferences in favor of the plaintiff. *Bernier v. Allen*, 38 F.4th 1145, 1149 (D.C. Cir. 2022).

The Officers argue that qualified immunity requires dismissal of Fishman's federal claims. Qualified immunity exempts police officers from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, a claimed right must be "particularized" rather than a "broad general proposition" so that the "'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) *and Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In assessing whether a right is "clearly established," our Circuit looks "'to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view,' ... if there is one." *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015) (quoting *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) *as amended* (Mar. 29, 2011) (internal quotations omitted)). A plaintiff is not required to identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). If qualified immunity attaches, the proper remedy is dismissal. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

## DISCUSSION

### I.   Fourth Amendment claims

Fishman brings four claims alleging violations of his Fourth Amendment rights. As to Counts I and II, Fishman has failed to plead facts that would show that Officer Jaeger

violated the Fourth Amendment by entering Fishman's home and seizing him without a warrant. Those claims must be dismissed. However, Fishman's third and fourth claims, which are predicated on his continued detention after the police dispelled the reasonable suspicion that gave rise to the *Terry* stop, survive the Officers' motion to dismiss because each count adequately alleges the violation of a clearly established right.

### A.   Officer Jaeger did not violate Fishman's Fourth Amendment rights by entering his home and seizing Fishman

Fishman argues that Jaeger violated the Fourth Amendment by (1) entering Fishman's home without a warrant and (2) seizing Fishman in his home. Because the Complaint fails to plead any violation of Fishman's rights, much less one that has been clearly established, those claims must be dismissed.

"The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014); *see also Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 592 (D.D.C. 2018) (citation omitted). A police officer can "seize" a person, and thus initiate a *Terry* stop, by "accost[ing] an individual and restrain[ing] his freedom to walk away." *Brown v. Texas*, 443 U.S. 47, 50 (1979). "Whether police action amounts to a 'show of authority' requires the court to ask whether a 'reasonable person' 'in view of all the circumstances surrounding the incident, ... would have believed that he was not free to leave.' " *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)). In assessing whether a reasonable person would believe that to be the

case, courts assess factors including whether the officer "wore a uniform" and "whether the officer's 'use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.'" *Id.* (quoting *Wood*, 981 F.3d at 539) (citations omitted). Once initiated, a suspect cannot terminate a valid *Terry* stop by retreating into his home. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). In assessing whether the facts witnessed by the responding officers constitute exigent circumstances, the court should consider the "gravity of the underlying offense." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). And officers may use reasonable force, including the use of handcuffs, to prevent a suspect's flight during an investigative stop. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

Here, Jaeger initiated a valid *Terry* stop before Fishman stepped over the threshold, and therefore Jaeger did not violate Fishman's Fourth Amendment rights by entering his home and seizing him. First, the 9-1-1 call reporting a suspected child kidnapping, combined with Fishman's acknowledgement that he was the person about whom the report was filed, was more than sufficient to establish the reasonable suspicion required to initiate a *Terry* stop. *See Navarette*, 572 U.S. at 396. And Jaeger had in fact "seized" Fishman before he attempted to end the encounter by retreating into his home. *See Brown*, 443 U.S. at 50. While the Amended Complaint does not specify whether Jaeger was in uniform, Fishman does not suggest that he had any reason to believe that Jaeger was not a police officer. Indeed, Jaeger was driving a marked police car and parked immediately outside Fishman's home. Compl. ¶ 30. In addition, Fishman's complaint concedes that he was subjectively aware that a witness may have called the police after observing him place his

9

daughter in his vehicle. *Id.* ¶ 37. His comment to Officer Jaeger that "that guy who called in has no idea what's going on" implies that he understood the police to have responded specifically to a report about *him*, even though he was correct in believing that the information provided to the police was flawed. *Id.* ¶ 38. These facts, combined with the presence of a police helicopter "audibly hovering overhead," would suggest to a reasonable person that he was not free to disregard the instructions of the officer to whom he was speaking. *See Castle*, 825 F.3d at 632. Most importantly, Fishman could not have reasonably inferred that he was free to leave because Jaeger expressly (1) asked for his help "with what's going on," (2) instructed him to "hang tight for a second, don't go inside," and (3) repeated "don't go inside" as Fishman moved. Compl. ¶¶ 39–42. At a minimum, the first two statements were made before Fishman had entered his home. *Id.* ¶¶ 39–41. The *Terry* stop was initiated at that moment, while Fishman was still outside, because he could not have reasonably believed himself free to leave. *See Castle*, 825 F.3d at 632.

Nor could Fishman escape the stop by retreating into his home. *See Santana*, 427 U.S. at 43. In light of the serious nature of the crime under investigation—child kidnapping—Jaeger's use of force, including handcuffs, Compl. ¶¶ 47–48, to prevent Fishman's attempt to avoid the *Terry* stop and Jaeger's questions was also reasonable and did not transform the stop into an arrest, *see Graham*, 490 U.S. at 396; *Welsh*, 466 U.S. at 753. Under the totality of the circumstances, then, Jaeger did not violate Fishman's rights in this instance by entering Fishman's home and forcibly seizing him despite the absence of a warrant. Because Jaeger did not violate any right protected by the Fourth Amendment in taking either action, he is entitled to qualified immunity on Counts I and II.

**B.     The Officers are not entitled to qualified immunity on Fishman's claims that the *Terry* stop outlasted any reasonable suspicion**

While Officer Jaeger was entitled to initiate the *Terry* stop given his reasonable suspicion that Fishman had committed a crime, that reasonable suspicion was dispelled within minutes.  The Officers' failure to terminate the *Terry* stop and release Fishman violated his clearly established Fourth Amendment rights.  As such, Fishman's third and fourth claims against the Officer Defendants—that the officers lacked reasonable suspicion or probable cause to detain Fishman after his daughter provided Officers Brady and Todaro with information sufficient to show no crime had occurred—can proceed.

Police officers may maintain a *Terry* stop for as long as reasonably necessary while the officers diligently investigate the facts that generated the reasonable suspicion underlying the *Terry* stop in the first place.  *See United States v. Sharpe*, 470 U.S. 675, 686 (1985); *United States v. Vinton*, 594 F.3d 14, 24 (D.C. Cir. 2010).  A reviewing court must engage in a fact-specific inquiry to ensure that *Terry* stops last "no longer than is necessary to effectuate the purpose of the stop."  *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion)).  In making that assessment, a court considers the information available to the officers at each relevant time before and during the stop.  *United States v. Brown*, 334 F.3d 1161, 1165 & n.2 (D.C. Cir. 2003).  However, "a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).  "Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable

suspicion violates the Fourth Amendment." *United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018).

In this case, as discussed, Officer Jaeger had reasonable suspicion to detain and question Fishman. And the other officers on the scene were justified in relying on Officer Jaeger's "assessment of circumstances sufficient to warrant" Fishman's seizure. *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010). But the relevant question to resolve these claims is not whether the officers had a reasonable suspicion sufficient to justify *initiating* the *Terry* stop; it is whether the officers *prolonged* the *Terry* stop after that reasonable suspicion was dispelled. *See United States v. Hutchinson*, 268 F.3d 1117, 1122 (D.C. Cir. 2001) (remanding to consider "whether the temporal duration of the stop was unlawfully extended because the police pursued a means of investigation that was beyond the scope of the purpose of the stop").

The crux of Fishman's argument is that the realization that the alleged kidnapping victim was Fishman's own daughter dispelled any reasonable suspicion they may have held, and that Fishman's continued detention therefore violated his Fourth Amendment rights. *See* Compl. ¶¶ 198–206. It is black-letter law that a *Terry* stop must "last no longer than is necessary to effectuate the purpose of a stop." *Royer*, 460 U.S. at 499 (plurality opinion). In this case, the purpose of the stop was to investigate whether a child had been kidnapped. As Fishman implicitly concedes in his Complaint, *see id.* ¶¶ 7–9, the officers reasonably believed that they needed to speak to Fishman's daughter, the alleged victim, in order to verify that she was not, in fact, the victim of a kidnapping. But even discounting Fishman's suggestion that the innocent nature of the situation should have been obvious to

the officers from the moment the girls appeared in his doorway, the Complaint alleges sufficient facts to establish that Officers Jaeger, Brady, Todaro, and Tong each reached the conclusion that no crime had been committed well before the *Terry* stop was terminated. *See* Compl. ¶¶ 79–80, 82, 86, 92, 95–97, 99, 106, 122–123, 135 (noting instances in which Officer Defendants made statements suggesting that they believed Fishman's version of events to be true).

The critical piece of the officers' investigation was the interview of Fishman's younger daughter, conducted by Officer Brady in which she stated unequivocally that she had not been kidnapped. *Id.* ¶ 142. That information dispelled any remaining reasonable suspicion underlying the stop. *See Hall*, 867 F.3d at 153; *Bey*, 911 F.3d at 147. But Fishman's Amended Complaint suggests that that interview occurred only *four* minutes after Fishman was detained, and more than *twenty-one* minutes before he was released. *See* Compl. ¶ 142 (placing Brady's interview of Fishman's daughter "about fifteen minutes" prior to the arrival of Sergeant Bray); *id.* ¶ 129 (placing Bray's arrival "about nineteen minutes" after Fishman's detention); *id.* ¶ 154 (alleging that Fishman was handcuffed for 25 minutes). As soon as Brady obtained that information, the officers lacked reasonable suspicion to maintain the *Terry* stop. *See Hutchinson*, 408 F.3d at 800; *Bey,* 911 F.3d at 147.[1] Our Circuit Court has held that prolonging an investigative stop by

---

[1] Fishman also alleges that the officers did not even ask Fishman any questions to corroborate his daughter's statement for the first seventeen minutes after receiving that information. *See* Compl. ¶¶ 129, 142, 146. If true, that would constitute an independent basis for finding that the officers' failed to conduct a diligent investigation in the time period after eliciting the daughter's statement. *See Sharpe*, 470 U.S. at 686.

two to five minutes can violate a suspect's Fourth Amendment rights *if* the police lack a valid investigative purpose for doing so. *See Hutchinson*, 408 F.3d at 799. Maintaining a *Terry* stop for twenty-one minutes with no valid purpose, then, violates a clearly established right. *Cf. id.* And even if the police had required additional information from Fishman at that time, they failed to take any diligent measures to obtain that information, despite the fact that Fishman remained in their custody. *See* Compl. ¶ 146 (alleging that the police first asked Fishman about the kidnapping allegations "more than 21 minutes" after he was handcuffed); *Hutchinson*, 408 F.3d at 800 (citing *Sharpe*, 470 U.S. at 686).

The Amended Complaint alleges sufficient facts to find that the police officers effectively seized Fishman after having dispelled any reasonable suspicion as alleged in Count III. *Hutchinson*, 408 F.3d at 800. Moreover, the Complaint alleges sufficient facts for a jury to find that the officers transformed the heretofore permissible *Terry* stop into an arrest despite the absence of probable cause by continuing to detain Fishman absent a valid investigative reason, as alleged in Count IV. *See Hall*, 867 F.3d at 153. For the same reasons that the officers' reasonable suspicions underlying the *Terry* stop could not survive the interview with Fishman's younger daughter, no reasonable officer could have believed that probable cause existed to *arrest* Fishman for child kidnapping. Therefore, the Officers' motion to dismiss is denied as to Counts III and IV.

## II.    First Amendment claim

Fishman has pleaded sufficient facts to establish a claim of unlawful retaliation. However, Lieutenant Loftus is entitled to qualified immunity because he was not on notice

that filing a bar notice in retaliation for Fishman's protected speech would violate a clearly established right.

### A.    Fishman has pleaded the elements of a retaliation claim

To make out a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation and internal quotations omitted).  Loftus concedes the first element is satisfied but contests (2) and (3).  Fishman, however, has alleged sufficient facts to satisfy both.

The second prong of the three-part test requires that retaliatory conduct would have been sufficient "to deter a person of reasonable firmness." *Id.*  While our Circuit Court has not addressed this question, district courts in other circuits have found that the filing of a bar complaint was sufficient to deter a person of reasonable firmness on similar facts.  *See Weise v. Colorado Springs, Colorado*, 421 F. Supp. 3d 1019, 1046 (D. Colo. 2019); *Christopherson v. Poutsch*, No. 14-cv-152, 2015 WL 13662707, at *19 (D.N.M. Apr. 30, 2015); *Danchuk v. Mayor & Council of the Borough of Mount Arlington*, No. 15-cv-2028, 2017 WL 3821469, at *6 (D.N.J. Aug. 31, 2017).  The Court agrees.

Loftus' first argues that a person of reasonable firmness would not be deterred because the attorney "would expect to be exonerated by the bar."  But Loftus ignores the costs and risks associated with defending against a complaint and improperly privileges

bad-faith complaints, which would logically be the most likely to result in exoneration. And Loftus' second argument, that a bar referral "should have no bearing on the speech of an attorney of reasonable firmness," Mot. to Dismiss at 24, relies on a misreading of a Sixth Circuit case, *Mezibov v. Allen*. The Sixth Circuit held that pointed *criticism* of a defense attorney by a prosecutor following a trial—not the filing of a complaint alleging professional misconduct—would not deter an attorney of reasonable firmness from zealously defending his client in court. *Mezibov v. Allen*, 411 F.3d 712, 721–23 (6th Cir. 2005). Furthermore, the Sixth Circuit had already held that the retaliation claim failed because there was no First Amendment-protected speech, *id.* at 720–21, so the entire discussion Loftus cited is dicta.

As to the third part of *Aref*'s three-part test, Loftus also contests the existence of any causal link between Fishman's speech and the bar complaint. To establish that link, Fishman can show that the retaliatory action was motivated by "subjective animus" and that it was "objectively unreasonable." *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019). Fishman has alleged sufficient facts to meet both prongs. Loftus' bar complaint included allegations related to child abuse, while failing to mention that the police investigation had already concluded that there was no evidence to support that allegation. *See Compl.* ¶¶ 162–64, 175. In light of Loftus' undisputed awareness after the conclusion of the *Terry* stop that there was no evidence to suggest Fishman had engaged in child abuse, his inclusion of allegations of that misconduct in the bar complaint suggest both that Loftus was motivated by "subjective animus" and that the inclusion of that charge was "objectively unreasonable."

If Loftus could identify any "nonretaliatory grounds" for filing the bar complaint, Fishman's claims would fail. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford–El v. Britton*, 523 U.S. 574, 593 (1998)). He cannot. Rather than attempt to identify any such nonretaliatory grounds, Loftus offers a lengthy description of the contents of the body-worn camera footage and argues that "No amount of discovery can disprove the reasonableness of [his] belief" that Fishman was improperly attempting to influence the officers by identifying himself as a DOJ attorney. Mot. to Dismiss at 24–26. But that misstates the standard. And, in any event, even if Loftus subjectively believed that Fishman acted improperly by making that truthful statement, that does not explain why Loftus filed a bar complaint that included allegations of child abuse that Loftus *knew* to be unfounded at the time he filed his complaint. *See* Compl. ¶¶ 175–77.

Finally, Loftus argues that Fishman's suit is barred by the *Noerr-Pennington* doctrine, which holds that persons who petition the Government for redress of their grievances are immune from liability for such activity under the First Amendment. *See Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 89–90 (D.C. Cir. 2015) (Kavanaugh, J.). Our Circuit Court has not addressed whether government entities can qualify as "persons" to whom *Noerr-Pennington* immunity applies. It does not. While at least one other circuit has held that the doctrine can protect speech by government actors, *see* Opp. at 32–33, the underlying logic of the exception suggests that "*Noerr-Pennington* protection does not apply to the government, of course, since it is impossible for the government to petition itself within the meaning of the First Amendment." *Video Int'l Prod., Inc., v. Warner-Amex Cable Commcn's Corp.*, 858 F.2d 1075, 1086 (5th Cir. 1988); *cf. City of*

*Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379–80 (1991) ("The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government. [The *Noerr-Pennington*] doctrine, like *Parker,* rests ultimately upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'"). Fishman's retaliation claim is not barred by the *Noerr-Pennington* doctrine.

### B.    Loftus did not violate a clearly established right

Although Loftus violated Fishman's First Amendment rights by filing a retaliatory bar complaint, Fishman's related § 1983 claim must be dismissed because Fishman has not identified any binding precedent to establish that filing such a complaint would violate a clearly established right. *See Lash*, 786 F.3d at 7. And while Fishman has cited cases from other circuits for the proposition that "filing bad-faith complaints of misconduct in retaliation for protected speech is unconstitutional," none of those cases relate to the filing of a bar complaint. *See Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (alterations omitted), and citing *Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016)) (adverse employment action); *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003) (complaint letter to billboard company); *Goldstein v. Galvin*, 719 F.3d 16, 30–31 (1st Cir. 2013) (retaliatory prosecution); *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (on-air disclosure of employee disciplinary history); *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006) (instruction to public employees not to speak with reporters); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999)) (urging of government and congressional investigations).

Nor did Fishman cite any Supreme Court or D.C. Circuit cases for even the more general proposition that such bad-faith complaints violate a clearly established right in the first instance.  As such, even though Loftus violated Fishman's First Amendment rights by filing the bar complaint, Loftus is entitled to qualified immunity because that right was not clearly established on April 29, 2020. *See Reichle*, 566 U.S. at 665.

### III.    Claims under District law

Fishman also brings three claims under D.C. law: a claim for trespass for Officer Jaeger's entry into his home (Count V); a claim for false arrest for restraining his physical liberty without basis (Count VI); and a claim for negligence alleging a breach of  a supposed duty for the officers to communicate amongst themselves and secure Fishman's release after dispelling the reasonable suspicion underlying the *Terry* stop.  (Count VII). The District is named as a defendant on all three claims under the doctrine of respondeat superior.  As Fishman concedes, the trespass claim rises and falls with the corresponding § 1983 claims against Jaeger, so that claim is dismissed for the reasons outlined previously. Fishman's negligence claim must also be dismissed for failing to identify an applicable duty.  But Fishman may proceed on his false imprisonment claim.

### A.    Qualified Privilege

The District moved to dismiss citing the doctrine of qualified privilege.  Mot. to Dismiss at 33.  Under D.C. law, a court should dismiss an action against a police officer on qualified-privilege grounds only if "the officer can demonstrate that (1) he or she 'believed, in good faith, that his [or her] conduct was lawful,' and (2) this 'belief was

reasonable.'" *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C. 1993), *aff'd on rehearing*, 635 A.2d 929.  Unlike qualified immunity, the standard for qualified privilege is *subjective*, meaning that the police officer's conduct is not weighed against an objective standard but requires the officer to actually hold a good faith belief in the lawfulness of his action.  *E.g. Liser v. Smith*, 254 F. Supp. 2d 89, 104 (D.D.C. 2003) ("In contrast to the subjective 'good faith' standard that governs false arrest claims under D.C. law . . ., the federal qualified immunity standard is an objective one.").  The District cannot make this showing in this case with respect to Fishman's false arrest claim, so its motion fails.

Fishman alleges that the individual officers unlawfully detained Fishman despite subjectively believing that Fishman's daughter was who she claimed to be and that, as a result, there was no basis to believe that a crime had taken place.  Compl. ¶ 215.  As the Court has already found, Fishman was unlawfully detained after the officers succeeded in interviewing Fishman's daughter to ascertain her identity for the reasons discussed above.  As to the officers' subjective beliefs at that time, Fishman cites statements by the Officers sufficient to show that, within minutes of detaining Fishman, they subjectively believed no crime had occurred.  *See* Compl. ¶¶ 79–80, 82, 86, 92, 95–97, 99, 106, 122–123, 135.  Furthermore, even if the Officers held such a belief, the same facts that dispelled their reasonable suspicion are sufficient to make such a belief unreasonable.  Because either basis would be sufficient to defeat qualified privilege, the District's motion fails as to Count VI.  *See Murphy*, 631 A.2d at 36.

**B.     Negligence**

Fishman also brings a negligence claim as an alternative basis for liability on the same facts underlying his false imprisonment claim.[2]  To establish negligence, Fishman must show that (1) the defendants owed him a duty, (2) breach of that duty, and (3) an injury proximately caused by that breach.  *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014) (citations omitted).  The failure to allege any one element is fatal to the claim.

Fishman's negligence count fails as a matter of law because he has not identified a duty for a police officer aware of exculpatory evidence to communicate that information to fellow officers.  As defendants argue, even if an officer did uncover exculpatory information that would dispel the reasonable suspicion regarding the commission of a crime, that officer has no duty to inform the separate officer who has actually detained a suspect in the course of a *Terry* stop to effectuate the suspect's release.  Mot. to Dismiss at 35.  Fishman argues that such a duty does exist, citing two decisions issued by the 7th and 9th Circuits.  *See* Opp. at 29–30 (citing *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013) *and Lee v. Gregory*, 363 F.3d 931, 935 (9th Cir. 2004).  But those cases stand for the proposition that a police officer is liable for false arrest if the officer *who made the arrest* knew that, despite the existence of a facially valid warrant, no probable cause existed to arrest a suspect.  That rule does not imply that an officer who is aware of information

---

[2] The District argues that Fishman could not prevail on both a false arrest claim and a negligence claim for the same underlying conduct, but Fishman is permitted to "state as many claims … as [he] has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).

that would dispel reasonable suspicion or probable cause with respect to a particular suspect owes a duty *to that suspect* to promptly communicate that information to other police officers.  Moreover, Fishman has not cited any case from the D.C. Court of Appeals (or our Circuit) for that proposition.  Nor has he identified any basis for the Court to find that such a duty exists here in the first instance.  Therefore, Fishman's negligence claim must also be dismissed.

## CONCLUSION

For the reasons given above, Officer Jaeger and Lieutenant Loftus are entitled to qualified immunity as to Counts I, II, and VIII.  Moreover, Fishman has failed to state a claim as to Counts V and VII.  But Fishman's allegations are sufficient to make out a claim that the Officers' illegally prolonged the *Terry* stop of Fishman or illegally arrested him without probable cause, so Defendants' Motion to Dismiss is denied as to Counts III and IV. Finally, Fishman has overcome Defendants' claim of qualified privilege as to the same conduct, so Defendants' motion is denied as to Count VI.   Accordingly, Defendants' Motion to Dismiss [Dkt. # 22] will be **GRANTED in part** and **DENIED in part**.  An Order consistent with this Memorandum Opinion will issue on this date.


RICHARD J. LEON
United States District Judge