**Exhibit E**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**

```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3  _____

 4  JARED FISHMAN,

 5          Plaintiff,

 6     v.                                Case No:

 7  DISTRICT OF COLUMBIA, PATRICK        1:21-cv-01847-RJL

 8  LOFTUS, MARCK JAEGER, JEREMY

 9  BRADY, MICHAEL TONG, &

10  CHRISTOPHER TODARO,

11          Defendants.

12  _____

13                   VIDEOTAPED DEPOSITION

14  _____

15

16  WITNESS:              SERGEANT ADAM BRAY

17  DATE:                 Thursday, September 7th, 2023

18  START TIME:           10:00 a.m., EST

19  END TIME:             1:35 p.m., EST

20  REMOTE LOCATION:      Remote Legal platform

21  REPORTER:             Evie Heffner, CER-2084

22  JOB NO.:              19224

23

24

25
```

1        (Video playback.)
2   BY MR. ROSEN:
3        Q    Okay.  So can you, Sergeant, just start by
4   identifying the person you're speaking with here?
5        A    That sounds like Officer Jaeger.  That sounds
6   like his voice.
7        Q    Okay.  And I realize there's some sort of --
8   kind of crosstalk with the radio here in what I just
9   played.
10            But Officer Jaeger is sort of essentially, I
11  believe, recounting to you the -- sort of part of the
12  initial encounter that he had with Mr. Fishman on Mr.
13  Fishman's front steps; does that -- does that sound
14  accurate to you?
15       A    Yes.  Yes.
16       Q    Okay.  And at this point, what crime or crimes
17  do you have reasonable suspicion of?
18       A    The same.  There's -- nothing has changed.
19       Q    Okay.  Great.  Okay.
20            MR. ROSEN:  I'm going to keep playing.
21       (Video playback.)
22  BY MR. ROSEN:
23       Q    Okay.  So I hear you ask Officer Jaeger,
24  "What's the issue?"  Can you explain just what you
25  meant, specifically by that question?

```
 1      A    That he said that there's -- I -- the -- I --
 2  when he's talking about, he had to step back and people
 3  are mad, who's mad; why -- why is someone mad?
 4      Q    Okay.
 5      A    Is it -- is it the -- the -- the suspect who's
 6  upset?  Is it the victim who's upset; that -- that what
 7  are we -- what are we dealing with?
 8      Q    Okay.  And again, I know there's some --
 9  there's some fuzziness on the audio that we have, but
10  can you tell me the gist of what you heard Officer
11  Jaeger say in response to your question of what's the
12  issue?
13      A    The -- something about the -- the wife is
14  upset the -- he wasn't talking.  But you -- you -- you
15  can play it again.
16           I mean to the -- the effect that she's not
17  talking or he's not talking, or -- I'm just trying to
18  figure out what is going on.  I mean, I'm -- I can't
19  really see from where I'm at what -- what has -- what am
20  I looking into?  What am I walking into, in essence?
21      Q    Okay.  Great.  And then for what it's worth,
22  I'm going to be asking this next question a couple of
23  times, and I know you just answered it.
24           But if you'll indulge me at this point, what
25  crime or crimes do you have reasonable suspicion of?
```

```
 1      A     The same.  I mean, kidnapping.
 2      Q     Okay.  Great.  Okay.
 3            MR. ROSEN:  So I'm going to play just for
 4   a couple more seconds here.
 5            (Video playback.)
 6   BY MR. ROSEN:
 7      Q     Okay.  I hear you ask where the kid is.
 8      A     Mm-hmm.
 9      Q     I presume that here you mean the child who
10   would have been the victim of the -- of the alleged
11   kidnapping; is that correct?
12      A     Yes.
13      Q     Okay.  And what did you, in the moment, hear
14   Officer Jaeger say in response to that?
15      A     Well, when he said the kid was inside or that
16   -- he says he definitely thinks that it could be the kid
17   of the man that -- or the father or the person, the
18   suspect.
19      Q     Yeah, I guess --
20      A     Yeah, that -- that's what he said.
21      Q     That he -- yeah.  Yeah.
22      A     I definitely -- yeah, I think it could be the
23   kid of the -- of the father or something like that.
24      Q     Okay.  Okay.  So at this point, is it -- is it
25   accurate to say that what you've heard from Jaeger is
```

1  scene than what she seems right there.

2  Q   Okay.  That's helpful.  Thank you.

3        MR. ROSEN:  I'm going to play the footage

4  for about 40 seconds now.

5  (Video playback.)

6  BY MR. ROSEN:

7  Q   Okay.  Okay.  Sergeant, can you summarize for

8  me the relevant information that you were just -- that

9  Officer Jaeger just shared with you?

10  A   It kind of made the situation a little more

11  serious, I guess, up until that point, I didn't realize

12  that he tried to run -- like, he tried to get away.

13        But from saying that he's the biological

14  father and then that's the mother, but then saying that

15  he won't talk and then saying he tried to go into the

16  house, that -- that kind of escalates the -- the

17  severity, you know, during our little -- our preliminary

18  investigation here.

19        We have somebody who doesn't want to cooperate

20  with the police, someone who, when approached by the

21  police, tried to run inside.  We -- that -- that's

22  concerning.  So I need to determine what -- why would he

23  do that, and I believe I said that the lieutenant was

24  here, so I'm going to be telling him that.

25        But also, you hear me say that I wanted to

1  kind of verify with the people up at the top.  It's just
2  probably because the initial scene was north of that, so
3  I was -- I meant up the -- it's up a hill, so I was
4  saying up the top where Officer Vasquez and whoever else
5  was up on scene with him.  So we can try and figure out,
6  okay, what exactly is the witness up there alleging and
7  why do we have someone here who's refusing to speak to
8  the police, you know, at this point, nothing has really
9  been deescalated.
10      Q    I see.  And you -- a moment ago, you said that
11  your understanding from Officer Jaeger's description was
12  that Mr. Fishman ran into the house or attempted to run
13  into the house.
14           To the extent that you can recall this, what
15  specifically were you -- what specifically were you
16  imagining when Officer Jaeger told you that Mr. Fishman
17  tried to run into the house?
18      A    He said that he's not talking and that he
19  tried to leave, and he's definitely not free to leave.
20  I mean, we're investigating a kidnapping.
21           We have the person who matches the description
22  who won't talk to the police, he won't help us
23  understand why he might be matching the lookout of a --
24  of a kidnapping, he won't tell us anything, and when
25  approached by the police, his inclination was to not

1  cooperate and to leave and to go into his house.  That
2  ends up becoming a serious situation.
3       Q   And this -- the answer to this next question
4  may be sort of obvious to you, but what in -- what in
5  particular would you be concerned about as a member of
6  law enforcement if you heard that someone in, you know,
7  in a -- in a situation like the one that Officer Jaeger
8  encountered initially.  What would you be concerned
9  about specifically if you heard that a potential suspect
10 tried to run into the house that he had been sitting in
11 front of?
12      A   Like any situation, we have something which
13 has one level of safety.  Where we're approaching
14 someone, we see that they're there, but when you go into
15 another -- a building and you close a door, anything can
16 be in that building, including the victim of a
17 kidnapping.  Weapons could be in that building.  Other
18 people could be in that building.
19          We no longer have access to investigate.  If
20 you go into a building and you close the door and lock
21 it, that just adds one more layer or obstacle to us and
22 obstructs our ability to finish our investigation or to
23 do anything in that matter.
24          In a situation like this, when we have
25 reasonable suspicion to stop somebody, you're not free

```
 1   to leave, and going into a house and closing the door is
 2   definitely leaving.
 3       Q   Okay.  So based on what Officer Jaeger shared
 4   with you, you understood the situation to be that Mr.
 5   Fishman attempted to enter his house and close the door
 6   on Officer Jaeger?
 7       A   Based on what, yeah, Officer Jaeger said.
 8       Q   Okay.  Okay.  Thank you.
 9           MR. ROSEN:  I am going to play the video
10   now for about 20 seconds.
11       (Video playback.)
12   BY MR. ROSEN:
13       Q   Okay.  This is -- this is sort of a more
14   technical question, but I hear you say into your radio
15   that you're switching?
16       A   Mm-hmm.
17       Q   Correct me if I'm wrong, but if -- but if
18   that's correct, can you just explain what that means,
19   what you're doing, and who you're talking to there?
20       A   In general, we have three radio channels on
21   each -- well, we have channels, but each channel is
22   divided up into three bands.  Usually, we have a -- the
23   main air, if you will, the main channel, we have a
24   tactical channel and a surveillance channel.
25           Most of the police dispatching and calls for
```

1  stopped by the police, and, you know, he knows what
2  potentially led up to this.  The disconnect is -- is why
3  do we have the confusion between either there was a -- a
4  kidnapping or there was not.
5              MR. ROSEN:  Okay.  Thank you.  I'm going
6  to keep playing the video.
7      (Video playback.)
8  BY MR. ROSEN:
9      Q    So did anything that you just heard from Mr.
10 Fishman change the reasonable suspicion analysis for you
11 as to what crime or crimes you might have reasonable
12 suspicion of?
13     A    No, but he is working towards it.  He's --
14 he's talking and he's corroborating what the other
15 officer said, which is positive.  That's a good move --
16 that's moving in the right direction, and he's calm and
17 we're -- we're having an exchange trying to determine
18 what's going on.
19             MR. ROSEN:  Great.  Okay.  I'm actually
20 just going to go back sort of a couple seconds and then
21 I'll hit play again.
22             THE WITNESS:  Sure.
23     (Video playback.)
24 BY MR. ROSEN:
25     Q    So in what we just watched you tell Mr.

```
 1   in front of us?
 2        Q    At the -- at the point that we just stopped
 3   all in, you still have reasonable suspicion of a -- of a
 4   possible kidnapping?
 5        A    There's still reasonable suspicion of a -- of
 6   a kidnapping.
 7        Q    Okay.  And reasonable suspicion for any other
 8   crimes?
 9        A    I mean, like I said before, I -- I don't know
10   if on my -- if -- if the -- the potential for an abuse
11   is on my mind at this point.
12        Q    Okay.  Understood.
13        A    I just know for certain that my mind right now
14   is on the kidnapping.
15             MR. ROSEN:  Okay.  Great.  Thank you.
16   I'm just going to play for about 10 seconds here.
17        (Video playback.)
18   BY MR. ROSEN:
19        Q    Okay.  I mean, so I hear Mr. Fishman say to
20   you that the children in question are his, and then I
21   hear him say, "They've probably told you that."  Does
22   that -- does that match with what you heard in the
23   moment?
24        A    Yes.
25        Q    I'm happy to read --
```

1          (Video playback.)

2    BY MR. ROSEN:

3          Q    What do you make of this?

4          A    Again, it -- when you're talking about like

5    moving a needle to -- to -- I mean, again, he's -- he

6    hasn't provided any ID, not necessarily that an ID would

7    determine where he worked, but he's now felt that it was

8    for some reason important to say what his job was and

9    that he investigated the police and he's a Department of

10   Justice attorney.

11              As a Department of Justice attorney, it even

12   becomes more alarming that he wouldn't sort of

13   understand how a situation like this would unfold and

14   how to keep it -- I don't know what word to use.

15              It has escalated to a certain level, I believe

16   because of -- of his unwillingness to cooperate with the

17   police as a Department of Justice attorney, and he's

18   saying this, and in real-time, I know, I'm thinking,

19   wait, well, if you're a Department of Justice attorney,

20   then you know what this is, you know, that we're just

21   trying to determine what happened in this event.  We're

22   -- that we're trying to -- you know, we're concerned

23   with the welfare of a child who's alleged to be the

24   victim of a kidnapping and all this stuff.

25              So we go from, it's -- it kind of just