**Exhibit F**

**Defendant Officer Todaro's Opposition to
Plaintiff's Partial Motion for Summary Judgment**






UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JARED FISHMAN,

    Plaintiff,

-v-    1:21-cv-01847-RJL

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

    Defendants.

_____

**DEPOSITION OF**

**PATRICK LOFTUS**

**TAKEN ON**
**THURSDAY, SEPTEMBER 28, 2023**
**11:38 A.M.**

**ATTORNEY GENERAL OFFICE**
**400 SIXTH STREET NORTHWEST**
**WASHINGTON, DISTRICT OF COLUMBIA, 20001**

### 50

1  And did you think that was important at
2  the time?
3  A. Well, he didn't say it might be an
4  aftercare situation. I think he said so it's not an
5  after -- since there is no school, it's likely not
6  an aftercare situation. Like an after school -- I
7  think that's what -- I think that's what I heard.
8  Q. That was your understanding?
9  A. Right. Just now, I think that's what he
10 just said. I don't know if you want to rewind it
11 again.
12 Q. Sure. Yeah, yeah. Let's watch it again.
13 A. Just to make sure.
14 Q. Absolutely.
15    I'm going to go back ten seconds.
16    (Video plays)
17 A. So it's not -- so it wouldn't be an
18 aftercare situation.
19 BY MR. GERSTEIN:
20 Q. Did that lead you to believe that the
21 incident was not a kidnapping?
22    MS. MULLEN: Objection as to the form of
23 the question.
24    You can answer.
25    THE WITNESS: No, I don't think so.

### 51

1  BY MR. GERSTEIN:
2  Q. Okay.
3     Did you think it was an important
4  observation?
5     MS. MULLEN: Objection as to form.
6     You can answer.
7     THE WITNESS: I'm just thinking back to
8  that day. Not really.
9  BY MR. GERSTEIN:
10 Q. Okay.
11    I'm going to play it for seven more
12 seconds.
13    (Video plays)
14    I'm going to go back. I didn't need to
15 stop there. Forgive me.
16    MR. GERSTEIN: For the record, I'm
17 rewinding to minute five, second 50 and I'm going to
18 play again.
19    (Video plays)
20 BY MR. GERSTEIN:
21 Q. I'm just going to keep playing. I
22 actually didn't need to ask you a question there.
23 This is -- I'm at minute six, second 19 and I'm
24 going to keep playing until minute six, second 41.
25    (Video plays)

### 52

1  BY MR. GERSTEIN:
2  Q. Okay. In the video we just watched you
3  answered a call on a cellular telephone. Do you
4  remember who called you?
5  A. It sounds like -- well, he's now a
6  sergeant, but Officer Welch, at the time.
7  Q. I'm having trouble reading my notes here.
8     Okay.
9     I'm going to play a little bit more of
10 your conversation with Welch, but I'm going to go
11 back ten seconds, just so we don't lose anything.
12    MS. MULLEN: I don't see any Officer
13 Welch.
14    MR. GERSTEIN: I'm sorry, what?
15    MS. MULLEN: Go ahead.
16    MR. GERSTEIN: I believe he's speaking to
17 now sergeant, then Officer Welch. Dubary Welch.
18    MS. MULLEN: Okay. I thought you meant
19 you can hear it.
20    MR. GERSTEIN: Yeah, you can -- well, if
21 you can hear it, you can hear it, but --
22    (Video plays)
23    MR. GERSTEIN: I have stopped the video at
24 minute seven, second 11.
25 BY MR. GERSTEIN:

### 53

1  Q. At this point, do you think that the
2  person being detained is the father of the girl?
3  A. Potentially. But that still doesn't
4  negate parental kidnapping or child abuse.
5  Q. At this point, what crime or crimes did
6  you believe you had reasonable suspicion of?
7     MS. MULLEN: Objection as to form.
8     You can answer.
9     THE WITNESS: If it is the father, then
10 we're dealing with parental kidnapping or child
11 abuse. If it's not the father, then just a standard
12 kidnapping.
13 BY MR. GERSTEIN:
14 Q. Okay.
15    I'm going to play to the end of the video.
16    (Video plays)
17    MR. GERSTEIN: I'm stopping at minute
18 seven, second 30.
19 BY MR. GERSTEIN:
20 Q. And in this video, I believe Loveday asked
21 you whether the mother might be separated and then
22 suggested that as a result, this might be a youth
23 division case. Could you help me understand what
24 that means?
25 A. So the youth and family services division

### 58

1  Q. I need to go back further. My apologies.
2  I'm going back to minute three, second 25.
3     (Video plays?)
4  BY MR. GERSTEIN:
5  Q. Okay.
6     What, in your understanding, were you
7  saying in this portion of the video we just watched?
8  A. Essentially, if this had been a
9  misunderstanding where it was a father and a
10 daughter, that the parents would be appreciative
11 that the police actually, you know -- had this been
12 a legitimate kidnapping, found the people involved
13 -- had this been a kidnapping by a stranger and
14 found the little girl, and it raises suspicions that
15 there could be more going on, especially in the
16 realms of child abuse and perhaps something inside
17 that home, that they aren't being forthcoming and
18 cooperative.
19 Q. Thank you.
20    I'll play for about 30 more seconds
21 starting at minute three, seconds 43.
22    (Video plays.)
23    MR. GERSTEIN: Back on the record. I
24 stopped, for the record, at minute four, second 15
25 where I believe you say that it was weird that Mr.

### 59

1  Fishman was playing guitar on his porch.
2     MS. MULLEN: Objection as to misstating
3  what we just heard.
4     MR. GERSTEIN: I'm going back --
5     MS. MULLEN: Thank you.
6     MR. GERSTEIN: -- to make sure we're
7  getting this right. I'm starting at minute four,
8  second eight.
9  BY MR. GERSTEIN:
10 Q. Lieutenant Loftus, what, in your
11 understanding, were you saying was "very weird" in
12 the video we just saw?
13 A. I think it was about him being outside
14 playing his guitar given -- in light of all the
15 facts and circumstances.
16 Q. Could you explain why that seemed weird?
17 A. Just unexpected.
18 Q. Would you say it was suspicious?
19 A. Potentially.
20 Q. I'm going to play until 4:38.
21    (Video plays)
22    MR. GERSTEIN: For the record, I stopped
23 at minute four, second 39.
24 BY MR. GERSTEIN:
25 Q. What did you just instruct someone on the

### 60

1  radio to do in this video?
2  A. I instructed them to make a notification
3  to the youth division.
4  Q. Okay.
5     Why did you instruct them to do that?
6  A. Based on the information we had at the
7  time, that it looks like it's parental involvement.
8  We had information provided to us by that 911
9  caller, who we interviewed on the scene and in
10 person, where she used -- described the conduct as
11 child abuse. Based on, you know, everything that we
12 had at that time, we needed to make sure that the
13 parties that investigate child abuse and neglect and
14 potentially parental kidnapping are notified.
15 Q. I'm just going to play a little bit more.
16    (Video plays)
17    MR. GERSTEIN: I've stopped at minute
18 five, second seven.
19 BY MR. GERSTEIN:
20 Q. Do you remember who you were talking to on
21 your cell phone in this video?
22 A. At that point in time, I have no clue.
23 Q. Okay.
24    In the video you said you still think
25 there's something weird. Why did you still think

### 61

1  there was something weird?
2  A. I don't remember exactly, but just given
3  all the information that, you know, was previously
4  provided, what we've seen in these videos, that
5  something still wasn't lining up. Like I said, you
6  know, a normal -- if I had a kid and whatever
7  situation happened, I would be grateful the police
8  came and everything was safe. Show them my child,
9  be cooperative. You know, there's still the
10 uncooperative element that we had earlier. So it
11 still needed more investigation. Weird could be a
12 synonym for suspicious, strange, not right.
13 Q. Okay.
14    And at this point, what crime or crimes
15 did you believe you had reasonable suspicion of?
16 A. The two I told you about before, parental
17 kidnapping and/or child abuse.
18 Q. Okay. Thank you.
19 A. If it is the biological father at that
20 time. For the parental kidnapping.
21 Q. Okay.
22    I'm going to play about nine more seconds.
23    (Video plays)
24 BY MR. GERSTEIN:
25 Q. Let me just play that one more time, just



74

1  Thank you.
2  Back to the video for a second.
3  In the portion of the video we just
4  watched -- and for the record, again, I've stopped
5  at minute nine, second 28 -- you asked that a report
6  be written describing the incident that day as a
7  check on the welfare of a juvenile?
8  A. Yes.
9  Q. Okay.
10  And why did you direct that the report be
11  written that way?
12  A. We originally got the call for a
13  kidnapping. An on-scene investigation ultimately
14  determined that a kidnapping would not be the
15  appropriate classification.
16  Q. Why did you not characterize this as an
17  investigation into child abuse?
18  A. Because we didn't see any injuries. If we
19  had seen injuries, if the little girl had made
20  statements that would suggest, you know, that had
21  occurred, but like I said before, you know, our
22  ultimate goal is making sure that little girl is
23  safe and okay, and the suspect's actions on his
24  stairs and with our officers and really, frankly,
25  with his daughter were concerning.

75

1  Q. Okay.
2  But did you believe that you had
3  investigated the crime of child abuse during your
4  investigation on February 17, 2020?
5  A. Absolutely. We had that 911 caller who
6  said -- who we interviewed in person said it's not
7  an abduction or kidnapping, it's child abuse. We
8  absolutely were investigating that.
9  Q. And so I'm just trying to understand how
10  you classified the reports.
11  When you -- and trying to understand how
12  this ended up as a check on the welfare of a
13  juvenile despite your statement that you were
14  investigating child abuse.
15  Do you sometimes characterize an
16  investigation as a check on the welfare of a
17  juvenile because it did not result in an arrest for
18  a crime, is that the distinction?
19  A. That's likely. If we had had probable
20  cause to make an arrest for child abuse, we would
21  have done it right then and there, and it would have
22  been classified differently. But this one still
23  needed, you know, additional investigative efforts.
24  Q. And it needed additional investigative
25  efforts for the reasons you just said, is that

76

1  correct, the behavior that you just described?
2  A. Exactly, what was described by the 911
3  caller, the suspect's actions with his daughter and
4  the suspects actions with our officers.
5  Q. Okay.
6  I'll play just a little bit more and then
7  --
8  MR. GERSTEIN: Martha, I know you need to
9  go at 2:00. I think we should be safely done by
10  2:00.
11  MS. MULLEN: Well, don't rush.
12  MR. GERSTEIN: Okay. Thank you.
13  (Video plays)
14  MR. GERSTEIN: I'm sorry, I just paused
15  for a second to check my notes at 9:56, but I'm
16  going to keep playing.
17  (Video plays)
18  MR. GERSTEIN: So I'm stopping at minute
19  ten, second 18 --
20  BY MR. GERSTEIN:
21  Q. -- where you just described this incident
22  as a misunderstanding rather than a legitimate
23  kidnapping.
24  At this point in the video, did you
25  believe this was a misunderstanding?

77

1  A. That's what I just said in the video. The
2  misunderstanding as far as kidnapping versus father
3  who had custody of the daughter.
4  Q. Correct.
5  Well, let me actually just ask a more
6  general question.
7  Did you believe that the incident giving
8  rise to your investigation that day was a
9  misunderstanding?
10  A. Components of it.
11  Q. Which components?
12  A. The fact that it was not a stranger
13  kidnapping.
14  Q. Okay.
15  And at this point, did you think it might
16  still have been a parental kidnapping?
17  A. No, I think parental kidnapping could
18  likely be ruled out at this point. We're still
19  dealing with the witness's statement about child
20  abuse. While we did not see any visible injuries,
21  as the officer noted, she is wearing long sleeves
22  and legs and torso were completely covered. Given
23  the suspect's actions and behavior, it warranted
24  additional follow-up.
25  Q. Thank you.



## Page 78

1  I'm going to play until 11:05.
2  (Video plays)
3  MR. GERSTEIN: For the record and because
4  of an agreement we've had, we're not going to ask
5  questions after this point. I'm pointing to
6  opposing counsel.
7  Martha Mullen, you and I agreed by e-mail
8  because of the existence of the qualified immunity
9  dispute that we're not going to ask certain
10  questions on this deposition, so we're going to stop
11  at this point. That's 11:05.
12  I do have just one or two more questions
13  and then I can let you go.
14  BY MR. GERSTEIN:
15  Q. So having watched the videos we watched
16  today and referred to the documents that we referred
17  to today, would you do anything differently in this
18  investigation than you did on the day itself?
19  MS. MULLEN: Objection; asked and
20  answered, but you can answer again.
21  THE WITNESS: No.
22  MR. GERSTEIN: I'll pass the witness if
23  you have any questions.
24  MS. MULLEN: No.
25  Actually, I do have one question.

## Page 79

1  EXAMINATION:
2  BY MS. MULLEN:
3  Q. While you were at the scene as depicted in
4  the video, did you see that the front door to the
5  suspect's house had been, as he described, broken in
6  any fashion?
7  A. No, it appeared to be operational and
8  intact.
9  MS. MULLEN: Thanks.
10  MR. GERSTEIN: I also have no further
11  questions.
12  MS. MULLEN: He's going to waive reading.
13  Copy. Send an e-mail to the address I provided with
14  the cost.
15  (The deposition concluded at 1:39 p.m.)

## Page 80

1  CERTIFICATE
2
3  I, Kenneth Norris, do hereby certify that I reported
4  all proceedings adduced in the foregoing matter and that
5  the foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9  I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13  IN WITNESS HEREOF, I have hereunto set my hand this
14  16th day of October, 2023.
15
16
17
18
19
20  /S/ Kenneth Norris

## Page 81

1  CORRECTION SHEET
2  Deposition of: Patrick Loftus   Date: 09/28/23
3  Regarding:    Fishman vs District of Columbia
4  Reporter:    Norris
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number. If there are no changes, write "none" across
9  the page. Sign this sheet on the line provided.
10  Page   Line   Reason for Change
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24       Signature_____
25       Patrick Loftus