# DEFENDANTS'MOTION FOR SUMMARY JUDGMENT
# EXHIBIT 9

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3    _____
 4    JARED FISHMAN,
 5         Plaintiff,
 6         v.            Case No:
 7    DISTRICT OF COLUMBIA,       1:21-cv-01847-RJL
 8    PATRICK LOFTUS, MARCK JAEGER,
 9    JEREMY BRADY, MICHAEL TONG, &
10    CHRISTOPHER TODARO,
11         Defendants.
12    _____
13            VIDEOTAPED DEPOSITION
14    _____
15
16    WITNESS:     MICHAEL TONG
17    DATE:        Wednesday, August 16, 2023
18    START TIME:  11:31 a.m., ET
19    END TIME:    2:33 p.m., ET
20    REMOTE LOCATION:   Remote Legal platform
21    REPORTER:    Shenay Crawford, CDR-1966
22    JOB NO.:     18111
23
24
25
```

Page 2

```
 1              A P P E A R A N C E S
 2
 3    GERSTEIN HARROW, LLP
 4    810 7th Street Northeast
 5    Suite 301
 6    Washington, D.C. 20002
 7    By:  CHARLES GERSTEIN, ESQUIRE
 8         EMILY GERRICK, ESQUIRE
 9         SAMUEL ROSEN, ESQUIRE
10         charlie@gerstein-harrow.com
11         emily@gerstein-harrow.com
12         sam@gerstein-harrow.com
13    Appearing for Plaintiff
14
15    OFFICE OF THE ATTORNEY GENERAL
16    FOR THE DISTRICT OF COLUMBIA
17    400 6th Street NW
18    Washington, D.C. 20001
19    By:  AMANDA TORRES, ESQUIRE
20         MARTHA MULLEN, ESQUIRE
21         manda.torres@dc.gov
22         martha.mullen@dc.gov
23    Appearing for Defendants
24
25
```

Page 3

```
 1              APPEARANCES
 2              (CONT'D)
 3
 4    ALSO PRESENT:
 5       Amanda Ricker, Notary Public
```

Page 4

```
 1             I N D E X  O F  T E S T I M O N Y
 2
 3    EXAMINATION OF MICHAEL TONG:           PAGE
 4      By Mr. Gerstein                       8
```

Page 21

 1  in accordance with general order SPT30202, request an
 2  official to respond to the scene, notify SDD, and upon
 3  approval of the SDD watch commander, obtains central
 4  Complaint Numbers, prepare a PD form 251, and a PD form
 5  252."
 6       Let me just ask that a little bit more
 7  clearly.
 8       Do you believe you did all of those things,
 9  you and the other officers who responded on February
10  17th, 2020?
11       MS. TORRES:  Objection as to his
12  knowledge of what the other officers did.
13       THE WITNESS:  So it should be noted that
14  I was an assisting officer.  I was not the primary unit
15  or first responding unit, which is what you're referring
16  to.
17       MR. GERSTEIN:  Okay.  Okay.  Moving on.
18  All right, and let me -- one moment, please.  Going to
19  my --
20  BY MR. GERSTEIN:
21   Q   Do you know what a welfare check is, Officer
22  Tong?
23   A   Do I know what a welfare check is?  Yes, in
24  the context of MPD.
25   Q   Okay.  And are you aware that there's a

Page 22

 1  general order governing welfare checks?
 2   A   Correct.  There's well -- there's a general
 3  order regarding welfare checks of adults and juveniles.
 4   Q   And did you review either of both of those
 5  documents in preposit (sic) -- in preparation for your
 6  deposition today?
 7   A   It -- it's one document, but, yes, I -- I have
 8  general knowledge of the general order and reviewed it
 9  prior to today.
10       MR. GERSTEIN:  Okay.  I am going to --
11  hold, one moment -- going to share what, Ms. Court
12  Reporter, I'd like marked as Exhibit B, please.
13       Okay.  Counsel, can you see the document
14  on your screen?
15       MS. TORRES:  Yes.  Thank you.
16       MR. GERSTEIN:  Thank you.
17       Ms. Court Reporter, this is Exhibit B.
18       (Exhibit B marked for identification.)
19  BY MR. GERSTEIN:
20   Q   Officer Tong, have you ever seen this document
21  before?
22   A   Yes, I have.
23   Q   And this is the general order governing --
24  well, excuse me.
25       This is the general order governing welfare

Page 23

 1  checks; is that correct?
 2   A   Correct.
 3   Q   Okay.  For a typical welfare check, do you
 4  need to have people in handcuffs?
 5   A   I think it's that circumstantial and I think
 6  it depends on the -- and, therefore, I can't make a
 7  general conclusion.
 8   Q   So have you put people in handcuffs during a
 9  welfare check before?
10   A   During a welfare check?  Wait a second, wait.
11       I can recall specific -- instances where I've
12  gone to -- excuse me.  Yes, I've gone to -- called for
13  service for a welfare check, and, yes, I've placed
14  people in handcuffs.
15  BY MR. GERSTEIN:
16   Q   I'm going to direct your attention to page 2
17  of this document where there are two examples.  Could
18  you take a moment to read Example 1 and Example 2?
19  Alternatively, I can read them out loud, if you'd
20  prefer.
21   A   You're talking about Regulations A and B?
22   Q   Correct.  So B, Example 1, and B, Example 2,
23  which are, "A son has been unable to reach his elderly
24  mother for two days, but she has not answered the phone
25  or responded to knocks at the door.  The son calls MPD

Page 24

 1  to perform a welfare check at his mother's residence.
 2  This is an example of a 'Check on Welfare of Adult'
 3  incident."
 4       "Example 2:  A call is received from a
 5  concerned member of the community regarding the homeless
 6  person who appears to be in distress.  A member is
 7  dispatched to respond to that location and determines
 8  the need for an ambulance from District of Columbia Fire
 9  and Emergency Medical Services."  "This is not an
10  example of a 'Check on [the] Welfare of [an] Adult'
11  incident."
12       Why do you think, in your opinion, the second
13  example is not a welfare check?
14       MS. TORRES:  I'm going to object.  You're
15  asking him to analyze this and draw a legal conclusion
16  from it.
17       THE WITNESS:  Correct.  I don't think I
18  can answer that question in the context of someone who
19  doesn't -- doesn't write policy for the police
20  department.
21       MR. GERSTEIN:  Let me rephrase a little
22  bit.
23  BY MR. GERSTEIN:
24   Q   And this document is attempting to draw a
25  distinction between these two events so that officers

## Page 29

1  reviewed in preparation for this deposition.
2          I'm clicking "Share."  I would not be
3  surprised if this takes a little while.  Okay.
4          Does everyone see a 34-minute and 25-
5  second video file on their screens?
6          (Exhibit C marked for identification.)
7          MS. TORRES:  Yes.
8          MR. GERSTEIN:  Officer Tong, do you see
9  the same?
10         THE WITNESS:  I see a video, but can't
11 see duration.
12         MR. GERSTEIN:  Okay.  I see it marked
13 Exhibit C.  Officer Tong, your video is frozen.  I'm
14 okay continuing, but if there's anything we can do to
15 improve that connection.
16         Are you all -- is everyone else seeing
17 Officer Tong frozen?
18         MS. TORRES:  Yes, I see him frozen.
19         MR. GERSTEIN:  Let's hang tight for a
20 second because I think the system may be overwhelmed by
21 the size of this video, but --
22         THE WITNESS:  I can actually still --
23         MS. TORRES:  So enough --
24         THE WITNESS:  I can actually still hear
25 everything that's going on.  If my video -- if the video

## Page 30

1  is paused, then I don't think there's anything wrong
2  with the connection.
3          MR. GERSTEIN:  Okay.  Great.  Yeah, now I
4  can see you moving as well, so I think we're in good
5  shape.
6          THE WITNESS:  Okay.  Okay.
7          MR. GERSTEIN:  So let me just ask you --
8  I'm going to play this video for you now and ask you
9  some questions as we go through it, but before we start
10 -- let me move this video to -- I am moving the video to
11 the five minute mark, and then I'm going to play it
12 until the 5 minute and 26 second mark, starting a little
13 more early.
14         I'm sorry, Officer Tong, can you hear the
15 audio as well?
16         THE WITNESS:  I hear that one second
17 snippet that -- when you -- when you play it.  Yes, I
18 can hear.
19         MR. GERSTEIN:  Great.
20         And Ms. Torres, can you hear that as
21 well?
22         MS. TORRES:  Yes, I can.  Thank you.
23         MR. GERSTEIN:  Excellent.
24     (Video playback.)
25 BY MR. GERSTEIN:

## Page 31

1     Q   Before you arrived at Mr. Fishman's front door
2  in this videotape, what crimes, if any, did you believe
3  you had reasonable suspicion of?
4     A   So like I said earlier, MPD was investigating
5  a possible kidnapping of a juvenile.
6     Q   Did you believe you had reasonable suspicion
7  of any other crimes at that time?
8     A   I believe, I have answered that question.
9     Q   I don't believe you did.  But if you could
10 answer it again, the worst-case scenario, we have two
11 answers.
12    A   Are there any objections?
13         MS. TORRES:  It's okay, Officer Tong.
14 You can -- I didn't make an objection, so you can go
15 ahead and answer.
16         THE WITNESS:  Okay.  At -- at the time,
17 MPD was only investigating, primarily, the suspected
18 kidnapping of a juvenile and no other crimes.
19 BY MR. GERSTEIN:
20    Q   I'm just going to focus for a moment to make
21 sure we're absolutely clear.
22         You said "primarily" in that sentence.  Is it
23 your testimony that you did not have reasonable
24 suspicion of any other crime before you arrived at the
25 door of Mr. Fishman's house on February 17th, 2020?

## Page 32

1     A   I can't testify to -- to that.
2     Q   Why not?
3     A   When I arrived to this scene, in particular
4  where you -- you're saying this video stopped, were
5  there any other crimes?
6     Q   Correct.
7     A   Right.  I don't know how I can answer that
8  question.  Without, you know -- I think that's a
9  question for the officers that actually stopped him,
10 whether there were more crimes committed in their
11 presence --
12    Q   Oh, let me make -- let me clarify that.
13         What I need to say is, did you believe at that
14 moment that you had reasonable suspicion in your own
15 mind of any other crimes, based on the state of the
16 evidence that you know?
17    A   Again, I don't understand the question.
18    Q   Okay.  Let me make sure I'm clarifying this.
19         Your earlier testimony was that you understand
20 how a police officer forms reasonable suspicion when
21 investigating a crime; is that correct?
22    A   You mean how officers develop reasonable
23 suspicion and conduct a stop?
24    Q   Correct.
25    A   Yes.  I believe I answered that earlier.

Page 37

1  Q  You said to Mr. Fishman, "If you want to speak
2  to a supervisor, we can speak to a supervisor later, but
3  not right now."
4     Do you recall why you said that?
5  A  If you look a couple seconds before he asked,
6  "Who's in charge here?" and that was my response to him,
7  that if he wanted to speak to a supervisor, he could.
8     MR. GERSTEIN:  I am going to continue
9  playing now.
10    (Video playback.)
11    MR. GERSTEIN:  I am stopping at 6:44.
12 BY MR. GERSTEIN:
13 Q  So in this video, you took Mr. Fishman to a
14 spot just around the corner from his house.  Why did you
15 choose that specific location?
16 A  Right.  So I walked Mr. Fishman to the corner
17 of 27th and O Street, which is, literally, like, one
18 door down.  And that just is easier to -- scene that's
19 easy to manage.  He can -- he can be attended to at the
20 corner; he can be offered medical attention, whatever
21 the need is.  And it's just easier to manage a scene
22 that way.
23 Q  Did you specifically want to separate him from
24 the other members of the people that you described -- I
25 understand -- I'm sorry.  Let me just ask this question

Page 38

1  again:  Did you specifically want to separate him from
2  other people involved in the incident that you were
3  investigating?
4  A  Such as?
5  Q  The two girls who appeared at the door of his
6  house and the woman who was with them.
7  A  Not necessarily, no.
8  Q  Okay.  So when you told Mr. Fishman that it
9  would -- that, "We're not going to do this in front of
10 your kids," why did you say that?
11 A  You -- what -- so -- I'm sorry.  Can you
12 rephrase the question, if I -- if -- about what I said?
13 Q  Sure.  So at -- I believe, it's at
14 approximately minute 5:39, you say, "No, we're not going
15 to do this in front of your kids," in response to Mr.
16 Fishman's request, "I want to do this in front of my
17 kids."
18    Why couldn't you investigate this incident in
19 front of his children?
20 A  So I -- at that time, you know, I did not know
21 whether it -- whether Mr. Fishman meant he wants to
22 argue, fight, you know, et cetera, in front of his kids.
23 I have no idea.  So the best practice is actually just
24 to move him to a separate location, and then interview
25 him there.  So he's removed from situation.

Page 39

1  Q  Okay.  So it's your testimony that you
2  interpreted this as potentially involving a fight or
3  dispute of some kind?
4  A  As I said earlier, I saw Mr. Fishman
5  struggling with MPD in front of -- on the front steps of
6  his home.
7  Q  And that's what you didn't want to happen in
8  front of his kids?
9  A  Correct.  So did -- to de-escalate the
10 situation, he was walked to the corner of the block,
11 which is literally one door down from his home.
12 Q  Okay.  And the purpose of moving him wasn't so
13 that other potential witnesses wouldn't hear what he had
14 to say.  It was instead to de-escalate the situation.
15 A  I think you're inferring that it was the only
16 -- it was the only reason that he was moved to the block
17 was to separate him.
18    And again, as a best practice, it's to de-
19 escalate the situation, to have him separated from the
20 scene, and manage it that way.
21    MR. GERSTEIN:  I am going to play the
22 tape for about another 20 seconds.  Thank you, Officer
23 Tong.
24    (Video playback.)
25 BY MR. GERSTEIN:

Page 40

1  Q  Between approximately seven minutes and eight
2  seconds into the video, and 7 minutes and 18 seconds
3  into the video, Mr. Fishman asks for explanation why
4  he's been detained in front of his house, and you
5  respond, "I don't have information to answer your
6  question."
7     Was that true?
8  A  So Mr. Fishman's question was why is he being
9  stopped?
10 Q  Correct.  I mean, to be clear, we all saw the
11 video, so let your own recollection control, but my
12 understanding is that he was asking why he was being
13 detained.  We can play it back, if that would be
14 helpful.
15 A  Yeah.  So it's MPD's policy to inform everyone
16 prior to their release.  At this point in time, the --
17 the investigation is still ongoing, so I don't know all
18 the information that has been collected on scene.
19 Q  Okay.  At this point during the videotape,
20 what kinds, if any, did you, yourself, believe you had
21 reasonable suspicion of?
22 A  So, again, Mr. -- Mr. Fishman was being
23 investigative in regards to the suspected kidnapping of
24 juvenile.
25    MR. GERSTEIN:  Okay. I'm going to