# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## EXHIBIT 11

```
 1                UNITED STATES DISTWRICT COURT

 2                  FOR THE DISTRICT OF COLUMBIA

 3    _____

 4    JARED FISHMAN,

 5           Plaintiff,

 6       v.                              Case No:

 7    DISTRICT OF COLUMBIA,              1:21-cv-01847-RJL

 8    PATRICK LOFTUS, MARCK JAEGER,

 9    JEREMY BRADY, MICHAEL TONG, &

10    CHRISTOPHER TODARO

11           Defendants.

12    _____

13                    VIDEOTAPED DEPOSITION

14    _____

15

16    WITNESS:            CHRISTOPHER JOHN TODARO

17    DATE:               Thursday, August 24, 2023

18    START TIME:         11:34 a.m., EST

19    END TIME:            2:19 p.m., EST

20    REMOTE LOCATION:    Remote Legal platform

21    REPORTER:           Shenay Crawford, CDR-1966

22    JOB NO.:            19062

23

24

25
```

```
 1    from other witnesses, where is it advisable to put them?
 2                MS. MULLEN:  Objection as to form.
 3                You can answer.
 4                THE WITNESS:  I don't understand the
 5    question.
 6    BY MS. GERRICK:
 7       Q    So let's say that you have someone detained
 8    for questioning pursuant to a Terry stop, and there are
 9    other witnesses around, and you want to separate them.
10    Where would you generally -- what are places that you
11    could put the witness while you --
12       A    Oh.
13                MS. MULLEN:  I --
14                MS. GERRICK:  -- questioning them?
15                MS. MULLEN:  I'm objecting to the form.
16                But go ahead, Sergeant.
17                THE WITNESS:  Yes, ma'am.  You want to
18    separate all parties to -- to hear each story
19    individually so there's no -- how do I say it?  No
20    influence on one person's story or another.
21                So, we generally separate them, going
22    into a different room, go down the block.  Just remove
23    them from eyesight is the -- is the goal.
24    BY MS. GERRICK:
25       Q    All right.  Thank you.  And I've heard that
```

```
 1      Q    Great.  And did you have reasonable suspicion
 2   to believe that a kidnapping had occurred as you
 3   approached the house?
 4      A    Yes.
 5           MS. MULLEN:  I'm sorry.  I didn't hear
 6   the question.  I know he's already answered.
 7           MS. GERRICK:  I just asked if he had
 8   reasonable suspicion to believe that a kidnapping has
 9   occurred -- had occurred when he approached Mr.
10   Fishman's house on that day.
11           MS. MULLEN:  Thank you for repeating it.
12   I appreciate that.
13           MS. GERRICK:  No problem.
14   BY MS. GERRICK:
15      Q    And as you're approaching the house, what have
16   you been told about the situation?
17      A    There was a witness that saw a -- an adult
18   male matching description given, which I don't remember
19   from that day, to be honest.  And it was a child --
20   small child was thrown into a green Audi SUV.
21           The license plate, D.C. license plate, was
22   seen by the -- the witness and was run through our
23   system and showed the registration was registered to an
24   owner who lived at the O Street location in Georgetown.
25           So, when I pulled into the block and saw the
```

```
 1   BY MS. GERRICK:
 2       Q    What was your -- what was your impression of
 3   what was -- what she was reacting to?
 4       A    I'm not sure what the little girl was -- why
 5   she was acting the way she was, but she was visibly
 6   upset about what was happening.
 7       Q    Great.  Thank you.  And at this point, what
 8   crime or crimes did you have reasonable suspicion of?
 9       A    At this point, reasonable suspicion that a
10   kidnapping potentially occurred.
11       Q    Great.  Thank you.  All right.  So that was
12   minute 4:10.  I'm going to keep playing for about seven
13   more seconds.
14       (Video played.)
15   BY MS. GERRICK:
16       Q    Great.  And so I'm stopping at minute 4:17.
17   Can you describe what's happening here?
18       A    Still the little child -- little girl is very
19   hysterical as well.  Then I was pretty shocked at this
20   point because the older daughter came up and started
21   saying things that, you know, we didn't even talk to her
22   about.  So, she was talking about an incident that
23   happened that, you know, we didn't even talk about yet.
24   So, I was a little shocked and kind of overwhelmed at
25   this point.
```

```
 1   told her what I remembered off the top of my head from
 2   the call.
 3       Q   Perfect.  Thank you.  And again, same question
 4   again.  At this point, what crime or crimes did you have
 5   reasonable suspicion of?
 6       A   A potential kidnapping.
 7       Q   Great.  Thank you.  All right.  I'll play
 8   again.  We're at 4:31.
 9           (Video played.)
10   BY MS. GERRICK:
11       Q   Great.  So, we're at 4:53.  Can you describe
12   what's happening here?
13       A   The older daughter is telling me what
14   transpired before we -- we got to the house.
15       Q   Okay.  Thank you.  And does this explanation
16   seem plausible to you?
17       A   I don't understand the question.
18       Q   Sorry.  So does her explanation, does it seem
19   weird to you, or does it raise any red flags, or does it
20   seem like perfectly plausible and that makes sense?
21       A   Her explanation makes sense, but definitely
22   it's one side of the story.  So, we still have to
23   continue investigating.
24       Q   Okay.  Thank you.  And is her explanation here
25   consistent with what you know about what the 9-1-1
```

```
 1   BY MS. GERRICK:
 2        Q    Can you get it working again?  Can you try
 3   saying something?
 4        A    Oh, I apologize.  So, when the supervisor
 5   arrived on scene, you know, with our -- with our general
 6   orders, with a serious incident like this, a supervisor
 7   has to respond to the scene and conduct their
 8   investigation to, you know, give the best direction on
 9   what we should do -- to the officers.
10        Q    Thank you.  So, is it the case then that Mr.
11   Fishman couldn't get out of the handcuffs until a
12   sergeant had arrived?
13        A    Not necessarily, no.  The reason he stayed in
14   handcuffs was due to the fact that he tried to flee when
15   we first arrived on scene.  So whenever that happens,
16   you -- we tend to, as officers, try and eliminate any
17   other, you know, incidents, whether it's fleeing, or,
18   you know, fighting, or anything like that by keeping the
19   suspect in handcuffs.
20        Q    Great.  Thank you.  And would you have been
21   able to finish the investigation or stop detaining him
22   regardless of the handcuffs without a sergeant there, or
23   does a sergeant have to come and make the determination?
24        A    He could --
25                 MS. MULLEN:  Objection to the form of the
```

1    Q    All right. So, I'm stopping at 25:12. Do you
2    know why Sergeant Brady is asking for ID here?
3    A    I don't know why. I -- I would think to
4    verify, you know, who he is from what the people at the
5    house are saying, and/or maybe to know who he's talking
6    to.
7    Q    Thank you. And it's been, I think, over 20
8    minutes at this point. Is it surprising to you that no
9    one's asked him for the ID yet?
10   A    Officer Tong had gotten his information prior
11   when he was interviewing the suspect. So, I'm not sure
12   why exactly Sergeant Brady is asking for the ID now.
13   Q    Great. Thank you. I'm going to go ahead and
14   press play.
15       (Video played.)
16   BY MS. GERRICK:
17   Q    So I'm stopping at minute 26. Can you
18   describe what's happening here?
19   A    Sergeant Brady is conducting his own
20   investigation since he just, you know, you may have seen
21   not that long ago talking to all parties. And he's
22   explaining to the suspect here, you know, why exactly
23   we're here and why he's in handcuffs. And then the
24   suspect thought it was pretty humorous that we -- we
25   were investigating the kidnapping.