**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 12**

### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   _____
 4   JARED FISHMAN,
 5        Plaintiff,
 6   v.            Case No:
 7   DISTRICT OF COLUMBIA,      1:21-cv-01847-RJL
 8   PATRICK LOFTUS, MARCK JAEGER,
 9   JEREMY BRADY, MICHAEL TONG, &
10   CHRISTOPHER TODARO,
11        Defendants.
12   _____
13           VIDEOTAPED DEPOSITION
14   _____
15
16   WITNESS:      MARCK JAEGER
17   DATE:         Monday, August 28th, 2023
18   START TIME:   1:44 p.m., ET
19   END TIME:     4:21 p.m., ET
20   REMOTE LOCATION:   Remote Legal platform
21   REPORTER:     Shenay Crawford, CDR-1966
22   JOB NO.:      18135
23
24
25
```

### Page 2

```
 1                A P P E A R A N C E S
 2
 3   GERSTEIN HARROW
 4   810 7th Street Northeast
 5   Suite 301
 6   Washington, D.C. 20002
 7   By:  EMILY GERRICK, ESQUIRE
 8        SAM ROSEN, ESQUIRE
 9        emily@gerstein-harrow.com
10        sam@gerstein-harrow.com
11   Appearing for Plaintiff
12
13   OFFICE OF ATTORNEY GENERAL FOR THE
14   DISTRICT OF COLOMBIA
15   400 6th Street Northwest
16   Washington D.C. 20001
17   By:  MARTHA MULLEN, ESQUIRE
18        martha.mullen@dc.gov
19   Appearing for Defendants
20
21
22
23
24
25
```

### Page 3

```
 1
 2           I N D E X  O F  T E S T I M O N Y
 3
 4   EXAMINATION OF MARCK JAEGER:            PAGE
 5     By Ms. Gerrick                          7
```

### Page 4

```
 1
 2           I N D E X  O F  E X H I B I T S
 3              (available for download)
 4   EXHIBIT   DESCRIPTION                    PAGE
 5   A    Body cam video taken by Officer      22
 6        Marck Jaeger of witness arrest
 7   B    Child Abuse and Neglect General Order 84
 8        of Mr. Fishman
 9   C    Welfare Check General Order of       93
10        Mr. Fishman
11   D    Memo Investigative report of         97
12        Mr. Fishman
```

Page 17

1 where they go over general orders and standard practices
2 for calls.
3    Q    Thank you.  And on February 17th, 2020, what
4 crime did you have reasonable suspicion to believe had
5 occurred as it related to Mr. Fishman?
6    A    We received -- received the call for
7 kidnapping.
8    Q    Right.  Thank you.  So the crime that you were
9 investigating was -- what kind of crimes were you
10 investigating on that day?
11    A    The radio sign was for kidnapping; so we're
12 investigating a kidnapping.
13    Q    Thank you.  Right.  And on February 17th,
14 2020, what experience had you had with kidnapping cases?
15    A    I'd been assigned to a -- the Georgetown area
16 at that point for a few -- for a few years, at that
17 point.  It's not a frequent call I would say, but it --
18 it happens more frequently than, I guess, someone would
19 like to think.
20    Q    So you had had experience with kidnapping
21 calls at that point?
22    A    Yes.
23    Q    Can you tell me about those experiences?
24    A    I had a person try to kidnap a little girl;
25 she was able to fight them off.  And we interviewed her,

Page 18

1 and ultimately, the person was arrested a day later, I
2 believe.
3    Q    Thank you.  And were you there when the
4 suspect was arrested in that case?
5    A    I was not.
6    Q    And did you participate in the interview of
7 the little girl?
8    A    Yes.
9    Q    Thank you.  Were there any other kidnapping
10 cases that you had experience with?
11    A    A couple calls for, like, parental kidnapping,
12 where one parent would -- would abscond with the child.
13 But there's a -- other than that, nothing.
14    Q    In the first case that you described, what
15 kind of questions did you ask the little girl?
16            MS. MULLEN:  Well, objection to the form
17 of the question.  It's also irrelevant.
18            But you can go ahead and answer it.
19            THE WITNESS:  For her, I -- my main focus
20 was -- because she was -- believe, she was about five
21 years old.  So she was -- you know, my main focus was to
22 calm her down, make sure she was okay, and slowly talk
23 to her and see if -- if she can tell me what the person
24 looked like.  Most of the investigation with that went
25 back to reviewing -- not body cameras, excuse me,

Page 19

1 surveillance cameras from up the street.  And that's
2 ultimately how the person was located.
3 BY MS. GERRICK:
4    Q    Thank you.  And was it fairly clear -- fairly
5 immediately in that case that she was not related to the
6 kidnapper?
7    A    Yes.  She said she wasn't.
8    Q    Thank you.  And in the family kidnapping
9 cases, is it fairly clear in those situations as well
10 that it's a family -- there was a family member
11 kidnapping them?
12            MS. MULLEN:  Well, objection as to -- to
13 form.
14            He said it was parental kidnapping.
15 BY MS. GERRICK:
16    Q    Yes.  Was it immediately clear that it was a
17 parental kidnapping case in those cases, or did you have
18 to do investigation to find out?
19    A    There was some investigation in those.
20    Q    Can you tell me about that?
21            MS. MULLEN:  Objection as to form.
22            What do you want to know?
23            MS. GERRICK:  Know what did the
24 investigation look like.
25 BY MS. GERRICK:

Page 20

1    Q    What did you do?
2    A    Well, by separating all the parties and
3 talking to everybody individually until we can figure
4 out what is going on at that point.
5    Q    And in those cases, is it -- what -- has it
6 been a custodial parent kidnapping the child and the --
7 and the parents are separated, or what was the -- what
8 was the relationship and family dynamics in those cases?
9    A    It -- it was different each time.  Some were
10 still married.  Some were separated.  Some were all
11 stages in-between.
12    Q    Yeah.  All right.  I am going to turn back to
13 the case on February 17th -- oh wait, I have one more
14 question.
15            Have you ever had a kidnapping case where both
16 parents were custodial parents and -- and kidnapped the
17 child together?
18            MS. MULLEN:  Objection as to the form of
19 the question.
20            You can answer it.
21            THE WITNESS:  Yes.
22 BY MS. GERRICK:
23    Q    Yes?  Who were they kidnapping the child from,
24 if they were both the custodial parents kidnapping it?
25    A    I believe they were going through a process

Page 21

1 but they were -- they were still together. They are
2 still married. They both still had custody.
3   Q   And which parent kidnapped the child?
4   A   That was the father, I believe.
5   Q   And where did the father take the child?
6   A   Out of state, against the mother's wishes.
7   Q   Right. So the mother wasn't involved in the
8 kidnapping in that case?
9   A   No.
10  Q   Have you ever had a case where both custodial
11 parents were involved in the kidnapping?
12  A   I --
13      MS. MULLEN: Are you asking him if he had
14 --
15      THE WITNESS: I don't --
16      MS. MULLEN: -- two parents who kidnapped
17 their own child?
18      MS. GERRICK: Asking a -- asking a -- as
19 a -- yeah.
20      THE WITNESS: I don't think that's
21 possible.
22      MS. GERRICK: Right. Thank you.
23      Okay. I'm going to play your body cam
24 footage in a moment, and I'll introduce it as an
25 exhibit.

Page 22

1      (Exhibit A marked for identification.)
2 BY MS. GERRICK:
3   Q   But let's see. First, before I start playing
4 it, one question; as you were approaching Mr. Fishman's
5 house, what had you been told about the situation?
6   A   Just what I heard over the radio. We -- there
7 was a call for a kidnapping. Said, an older white male
8 who's balding had grabbed a girl, threw her over his
9 shoulder, and threw her into a car, and drove off. The
10 caller gave the license plate. When the dispatcher ran
11 the license plate through our NCIC system, it came back
12 to the address of the suspect.
13  Q   Thank you. So you had all that information as
14 you were approaching the house; is that correct?
15  A   Yes.
16  Q   Thank you.
17      MS. GERRICK: All right. I'm going to
18 pull up the body cam footage. Give me a moment to do
19 that. Right. Let's see.
20      Great. Thank you.
21      And so I'm going to be playing this
22 footage, and at different points I'm going to pause and
23 ask questions. Sometimes I'm going to let it play for a
24 while; sometimes it's going to be only a few seconds in
25 between pauses.

Page 23

1 BY MS. GERRICK:
2   Q   And I want to note -- just for clarification -
3 - that when I'm asking you these questions about the
4 video, I want you to answer about what you knew at the
5 time on February 17th, 2020, at the moment in the video;
6 does that make sense?
7   A   Yep. Okay.
8   Q   Great. Thank you. All right. And I'm going
9 to fast forward a little bit because the first two
10 minutes of the video are completely redacted. There's
11 no sound or anything, and you're just driving; just FYI.
12  A   Okay.
13  Q   So I'll fast forward until the sound comes on,
14 which is at two minutes here. All right.
15      (Video played.)
16 BY MS. GERRICK:
17  Q   All right. So I'm pausing at minute 2:48 in
18 the video. Can you explain -- so can you -- can you
19 talk about what's happening here? And then I'll have a
20 few clarifying questions.
21      MS. MULLEN: Okay. And Ms. Gerrick, I'm
22 a little bit puzzled. Counts I and II have already been
23 dismissed. The Court has already found that Officer
24 Jaeger did not violate Mr. Fishman's Fourth Amendment
25 rights by entering his home or seizing him, and that

Page 24

1 included handcuffing him. So this claim is no longer a
2 live claim in the case.
3      So my question to you is, why are you
4 going to take a step-by-step questioning of this officer
5 who's already been exonerated by the Court on his
6 conduct that day?
7      The Court had the video footage as well,
8 so if you wanted to ask him questions afterwards, that
9 would make sense. But the video, everyone has it.
10 Everyone sees what's going on, and these claims -- these
11 counts have been dismissed.
12      So why are you questioning Officer Jaeger
13 on this because we are, of course, filing a motion to
14 dismiss him?
15      MS. GERRICK: So I do have reasons. I
16 want to know about his -- what he knew at certain times,
17 what he believed at certain times. I don't -- if that's
18 an objection and it's noted, I'm going to proceed,
19 though.
20      MS. MULLEN: Well, I think what you might
21 want to do is certify your questions. If I make other
22 objections, just certify them to the court and Judge
23 Leon can rule as to whether it's appropriate to depose
24 Officer Jaeger on some of your questions. So I will be
25 objecting if I think it's inappropriate.

Page 25

```
 1        And I suggest, we're not going to --
 2  you're not going to persuade me.  I'm not going to
 3  persuade you.  So we can just certify the question to
 4  Judge Leon.  If he rules in your favor, then we can have
 5  the officer come back.
 6        MS. GERRICK:  Okay.  So you're saying
 7  that you want to not have any questions until after Mr.
 8  Fishman has been pulled out of the house and put in
 9  handcuffs, and we can come back to ask about his state
10  of mind on a different deposition date?
11        MS. MULLEN:  Well, I don't know.  I don't
12  know what questions you're going to ask.  I anticipate
13  that you're going through facts that are already known
14  and the Court's already ruled.  The Counts I and II, I
15  believe, were dismissed.  So that's why -- it depends on
16  what you ask.
17        MS. GERRICK:  Okay.  (Indiscernible -
18  simultaneous speech)
19        MS. MULLEN:  I'm just trying -- I'm just
20  trying to save us all time.  So if I tell him -- if I
21  object, you might want to certify the question for the
22  court because then the court can rule.  Because neither
23  you nor I can make a determination as to whether the
24  question is appropriate.  You, of course, will believe
25  that it is.  We, of course, will believe that it's not,
```

Page 26

```
 1  given that the Court dismissed the claims against this
 2  defendant.
 3        MS. GERRICK:  All right.  Do you want to
 4  just proceed and then if I ask a question, you can
 5  object and instruct him not to answer?
 6        MS. MULLEN:  Yes.
 7        MS. GERRICK:  Great.  Okay.  So that was
 8  minute 2:48, and he's not reached the house yet.  And I
 9  believe -- so the reason I was asking, there were some
10  questions about -- I believe, I hear some other folks on
11  the radio saying they want to get a unit down there --
12  another unit down there and something about eyes on
13  something.  But we can rewind and replay that.  So let
14  me go ahead and do that.  I'm going to rewind to 2:28.
15  Let's see if --
16        (Video played.)
17  BY MS. GERRICK:
18     Q   All right.  Can you describe what's happening
19  at this point in the video?
20     A   So I'm walking up to the suspect's house.
21  Person on the radio, that is the helicopter saying that
22  they're watching the situation because the call is for a
23  kidnapping.  It's a very serious crime.  So we have a --
24     Q   And --
25     A   -- we have a helicopter up looking at --
```

Page 27

```
 1  looking for the location and the possible
 2  (indiscernible).
 3     Q   Okay.  Thank you.  And are you approaching
 4  alone?
 5     A   Yes.
 6     Q   And is there a reason that you're approaching
 7  alone versus waiting for another unit to get there?
 8     A   I just saw what a -- who I believed to be a
 9  kidnapping suspect at that time.  I would feel more
10  comfortable if I went up there and could possibly make
11  sure the situation doesn't escalate.  He doesn't flee.
12  He doesn't do anything.  And knowing where I'm at
13  downtown, an officer can get there with lights and
14  sirens in less than a minute.  So I felt it was -- it
15  was okay for me to go by myself.
16     Q   Thank you.  And so -- were you worried about
17  your safety approaching alone?
18     A   A little bit.  Yeah, if I'm going up to a
19  person who possibly just kidnapped a child.
20     Q   Thank you.  All right.  I'm going to go --
21  that was minute 2:48.  I'm going to go ahead and press
22  play.
23        (Video played.)
24  BY MS. GERRICK:
25     Q   All right.  So I'm pausing at minute 3:58
```

Page 28

```
 1  here, and can you describe what's happening at this
 2  point in the video?
 3        MS. MULLEN:  Objection to the question.
 4        Court's already ruled on this aspect of
 5  what's going on.  And the -- it's very obvious by just
 6  looking at the tape what's happening.  So I don't know
 7  what purpose your questions serve.
 8        MS. GERRICK:  Okay.
 9        MS. MULLEN:  This claim has been
10  dismissed.
11        MS. GERRICK:  Okay.  Are you instructing
12  him not to answer this question?
13        MS. MULLEN:  Yeah.
14  BY MS. GERRICK:
15     Q   I would like to ask questions about your
16  conversation with him at this point.  Are you --
17        MS. MULLEN:  It's on the videotape --
18        MS. GERRICK:  Okay.  You're going to
19  object to --
20        MS. MULLEN:  -- which the Court has ruled
21  on this.  This conversation with Mr. Fishman is on
22  videotape, and the Court has already found that his
23  conduct did not violate your client's Fourth Amendment
24  rights.
25        So what probative value is there -- and
```