**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**EXHIBIT 13**

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   _____
 4   JARED FISHMAN,
 5        Plaintiff,
 6        v.             Case No:
 7   DISTRICT OF COLUMBIA, PATRICK    1:21-cv-01847-RJL
 8   LOFTUS, MARCK JAEGER, JEREMY
 9   BRADY, MICHAEL TONG, &
10   CHRISTOPHER TODARO,
11        Defendants.
12   _____
13              VIDEOTAPED DEPOSITION
14   _____
15
16   WITNESS:      SERGEANT ADAM BRAY
17   DATE:         Thursday, September 7th, 2023
18   START TIME:   10:00 a.m., EST
19   END TIME:     1:35 p.m., EST
20   REMOTE LOCATION:   Remote Legal platform
21   REPORTER:     Evie Heffner, CER-2084
22   JOB NO.:      19224
23
24
25
```

**Page 2**

```
 1              APPEARANCES
 2
 3   GERSTEIN HARROW, LLP
 4   810 7th Street Northeast
 5   Suite 301
 6   Washington, District of Columbia 20002
 7   By:  SAM ROSEN, ESQUIRE
 8        EMILY GERRICK, ESQUIRE
 9        sam@gerstein-harrow.com
10        emily@gerstein-harrow.com
11   Appearing for Plaintiff
12
13   OFFICE OF THE ATTORNEY GENERAL
14   400 6th Street Northwest
15   Washington, District of Columbia 20001
16   By:  AMANDA TORRES, ESQUIRE
17        Amanda.torres@dc.gov
18   Appearing for Defendants
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF TESTIMONY
 2
 3   EXAMINATION OF ADAM BRAY:              PAGE
 4        By Mr. Rosen                      7
```

**Page 4**

```
 1              INDEX OF EXHIBITS
 2              (available for download)
 3
 4   EXHIBIT   DESCRIPTION                  PAGE
 5   A         Sergeant Bray Video file     11
 6   B         Memo Investigation Report    116
```

Page 17

1    He was -- he was, like, very upset that we
2 would, you know, he kind of scoffed, or he was mad that
3 we would even insinuate that it was a kidnapping, but,
4 you know, that's what we got the call for.
5    At that point, I don't think -- I didn't
6 believe he was a -- a danger to flee anymore, so I asked
7 him -- I told the officers to take him out of handcuffs.
8 We made that -- the walk around the bush or the block,
9 went back to the house.  There was officers there at
10 that point talking to the wife and the -- either the
11 child or the children.  I don't remember how -- if both
12 kids were there.
13    The officer kind of gave me the signal, or I
14 asked him, or somebody asked him, are the kids okay?
15 The kids were okay, not injured.  They were kind of
16 corroborating his story that, yeah, they're my kids;
17 that's my wife, and he was let go at that point.
18    We collect -- made sure we had all the
19 information we needed for the report.  We determined
20 what the report would be at that point; obviously not a
21 kidnapping.  He was advised by my lieutenant, the -- I
22 believe he was the watch commander that day, what it
23 was.  He was told he'd be notified by different agencies
24 in reference to this at a later date, but that he was
25 free to go, and that was it.

Page 18

1    That was the end of the scene.  And we -- we
2 cleared it.  We left.
3    Q   Okay.  Great.
4    A   End of the session.
5    Q   Thank you so much.  So I guess with that was -
6 - that was really helpful.  Thank you.  I just have a
7 couple of other initial questions and then -- and then
8 essentially, we'll go through the -- the footage of the
9 -- of the events you just described and may be kind of
10 fill in a couple of details and I'll ask some follow-
11 ups.
12    So when your body worn starts, you're already
13 at the scene.  And so I'm wondering, when you first
14 learned about the situation with Mr. Fishman, you know,
15 that must have been before you started driving over
16 there, of course.  So I'm wondering what was -- what was
17 relayed to you either before you started driving over or
18 as you were driving over.
19    You know, when you get there, what do you --
20 what do you know about the situation?
21    A   I don't remember if somebody called me.  I
22 also did not look at my camera footage that is redacted.
23    So I -- basically in reviewing for this, I
24 looked at the camera footage that you're going to show
25 me.  So you --

Page 19

1    Q   Great.
2    A   -- prior to that, if you're saying that my
3 camera wasn't on and it doesn't record anything, I don't
4 remember if I got a phone call.  I don't think I did
5 because it was kind of a fast-moving scene.
6    So the information I would have would be the
7 information I pulled off the computer in my -- my
8 cruiser or my phone, which they both have access to the
9 dispatcher's notes that the call taker or the dispatcher
10 entering as the scene unfolds.
11    There's just a line-item issue where line by
12 line with a time stamp, it'll say, this person marked on
13 scene, or this particular important information was just
14 relayed.  That -- that would be on that record.
15    I believe that most of my information on the
16 scene was -- or about the scene was relayed to me by the
17 officer when I arrived, other than just --
18    Q   Okay.
19    A   -- we're investigating a kidnapping; there's a
20 helicopter in the air; we're looking for this tag; we
21 ran the tag; it returned this address; now I'm here.
22    Q   Great.  Thank you.  And so you sort of maybe
23 just answered this, but as you're driving over to the
24 scene, what crime or crimes do you have reasonable
25 suspicion of -- as having possibly been committed?

Page 20

1    A   Definitely the kidnapping.  The abuse portion
2 of this, which I read about in the report for sure, but
3 don't remember if that was necessarily communicated
4 initially.  I don't know if I found that out then or
5 later.  It's just the kidnapping of a child.
6    Q   Great.  Okay.  Thank you.  And then last
7 question before I start the body worn.  I'm just
8 genuinely wondering; do you know why your body worn
9 starts when you're at the scene as opposed to why you're
10 driving over?
11    I -- I'm -- I just -- I -- yeah, I don't know
12 why people's cameras click on when they click on as
13 opposed to sometime before or after the point at which
14 they click on.
15    A   A lot of different reasons.  One could be as
16 simple as there's a buffering moment, so the camera's
17 always capturing the last two minutes.
18    As soon as we turn the camera on when we get -
19 - when we turn it on, it will capture the prior two
20 minutes of no sound, leading up to the point where we
21 activate the camera to record -- to actively record.
22    So you'll hear sound, but then you will also
23 capture the -- you know, I don't know if you understand
24 that or if I'm -- if I'm being redundant and telling you
25 stuff you already know.

Page 21

1   Q   No. No. I mean, this is helpful.
2   A   The reasons why -- if you're telling me the
3 camera just turned on and there's sound at the same
4 time, there was no buffer two minutes; is that what
5 you're telling me?
6   Q   For the video that we have of you, yes, that's
7 -- it's sort of -- as the -- as the visuals click on, we
8 get the audio at the same time.
9   A   Okay. Then at that point, maybe I was in the
10 bathroom, and I turned my camera off and then I didn't
11 turn it back on until I got back to the scene, or the
12 scene was unfolding really fast, and I didn't activate
13 it right away, or it was charging. And there's a lot of
14 reasons.
15      Normally when we get a call, it would be
16 turned on as soon as we are responding over and then
17 maybe activated when we get on scene or activated as
18 soon as we are -- to answer your question, though, I
19 don't know why there's no camera footage prior to
20 arriving on scene.
21   Q   Sure. Understood. No, that's helpful. Thank
22 you.
23      MR. ROSEN: Okay. I'm going to go
24 ahead and start the body worn, and I'm going to, yeah,
25 play it for about 20 seconds to start.

Page 22

1      (Video playback.)
2 BY MR. ROSEN:
3   Q   Okay. So can you, Sergeant, just start by
4 identifying the person you're speaking with here?
5   A   That sounds like Officer Jaeger. That sounds
6 like his voice.
7   Q   Okay. And I realize there's some sort of --
8 kind of crosstalk with the radio here in what I just
9 played.
10      But Officer Jaeger is sort of essentially, I
11 believe, recounting to you the -- sort of part of the
12 initial encounter that he had with Mr. Fishman on Mr.
13 Fishman's front steps; does that -- does that sound
14 accurate to you?
15   A   Yes. Yes.
16   Q   Okay. And at this point, what crime or crimes
17 do you have reasonable suspicion of?
18   A   The same. There's -- nothing has changed.
19   Q   Okay. Great. Okay.
20      MR. ROSEN: I'm going to keep playing.
21      (Video playback.)
22 BY MR. ROSEN:
23   Q   Okay. So I hear you ask Officer Jaeger,
24 "What's the issue?" Can you explain just what you
25 meant, specifically by that question?

Page 23

1   A   That he said that there's -- I -- the -- I --
2 when he's talking about, he had to step back and people
3 are mad, who's mad; why -- why is someone mad?
4   Q   Okay.
5   A   Is it -- is it the -- the -- the suspect who's
6 upset? Is it the victim who's upset; that -- that what
7 are we -- what are we dealing with?
8   Q   Okay. And again, I know there's some --
9 there's some fuzziness on the audio that we have, but
10 can you tell me the gist of what you heard Officer
11 Jaeger say in response to your question of what's the
12 issue?
13   A   The -- something about the -- the wife is
14 upset the -- he wasn't talking. But you -- you -- you
15 can play it again.
16      I mean to the -- the effect that she's not
17 talking or he's not talking, or -- I'm just trying to
18 figure out what is going on. I mean, I'm -- I can't
19 really see from where I'm at what -- what has -- what am
20 I looking into? What am I walking into, in essence?
21   Q   Okay. Great. And then for what it's worth,
22 I'm going to be asking this next question a couple of
23 times, and I know you just answered it.
24      But if you'll indulge me at this point, what
25 crime or crimes do you have reasonable suspicion of?

Page 24

1   A   The same. I mean, kidnapping.
2   Q   Okay. Great. Okay.
3      MR. ROSEN: So I'm going to play just for
4 a couple more seconds here.
5      (Video playback.)
6 BY MR. ROSEN:
7   Q   Okay. I hear you ask where the kid is.
8   A   Mm-hmm.
9   Q   I presume that here you mean the child who
10 would have been the victim of the -- of the alleged
11 kidnapping; is that correct?
12   A   Yes.
13   Q   Okay. And what did you, in the moment, hear
14 Officer Jaeger say in response to that?
15   A   Well, when he said the kid was inside or that
16 -- he says he definitely thinks that it could be the kid
17 of the man that -- or the father or the person, the
18 suspect.
19   Q   Yeah, I guess --
20   A   Yeah, that -- that's what he said.
21   Q   That he -- yeah. Yeah.
22   A   I definitely -- yeah, I think it could be the
23 kid of the -- of the father or something like that.
24   Q   Okay. Okay. So at this point, is it -- is it
25 accurate to say that what you've heard from Jaeger is

Page 25

1  that Mr. Fishman is not cooperating; the child is in the
2  house, and the child appears to be Mr. Fishman's
3  daughter?
4      Is that -- is it -- is it accurate to say that
5  -- that you've now, at the point that we're watching,
6  you've -- Jaeger has relayed those three things to you?
7      A   Yeah.  That's what Jaeger believes is the --
8  is what's going on.  That's what his perception of the
9  scene as it's unfolding is, and he's telling me what he
10 believes had -- what he believes is -- he's witnessed.
11     Q   Okay.  And at this point, has your -- has your
12 assessment of the reasonable suspicion question changed?
13     A   That the individual should have --
14     Q   In other words --
15     A   -- stopped?
16     Q   Oh.
17     A   I'm sorry, go ahead.
18     Q   Yeah.  I'm -- no, I'm sorry to interrupt.
19         At the point that we just stopped the video
20 at, what crime or crimes do you have reasonable
21 suspicion of?
22     A   The -- nothing has changed.  Same.
23     Q   Okay.  Great.  Thank you.  All right.
24         MR. ROSEN:  I'm going to play for about
25 30 seconds here.

Page 26

1         (Video playback.)
2  BY MR. ROSEN:
3      Q   Okay.  I hear you ask what Vasquez is saying.
4  Can you tell me who Vasquez is?
5      A   Officer Robert Vasquez.
6      Q   And why are you asking about him and wanting
7  to know what he is saying?
8      A   I believe he's up at the original scene where
9  the caller -- the initial reporting person who called
10 911, I believe he's up there --
11     Q   Okay.
12     A   -- and I'm wanting to know what -- what a
13 little bit more specifically he now has.  I mean, he's
14 been up there for a minute.  I guess so.
15     Q   Sure.  Okay.  So does that mean that, I guess,
16 at some point as you're driving over or before your
17 video starts and you're speaking to Officer Jaeger, you
18 learned at least the identity of one of the officers who
19 was -- who was at the other scene with the person who
20 placed the 911 call?
21     A   That -- yeah, that's fair to -- to assess.
22 Yeah.  I -- I must have found that out somehow.
23     Q   Okay.  Okay.  Do you happen to remember
24 whether you knew who else was there from MPD, if anyone?
25     A   At this point in real-time, I don't know if I

Page 27

1  knew -- I know that eventually, because I've watched
2  this, you know --
3      Q   Sure.
4      A   -- in preparation for this, I do end up
5  speaking to a sergeant who has information about that up
6  there.
7      Q   Okay.
8      A   So I must have known eventually who that --
9  how I knew that he was up there.
10     Q   Great.  Okay.  Thank you.
11         MR. ROSEN:  I'm going to play for another
12 little bit here.
13         (Video playback.)
14 BY MR. ROSEN:
15     Q   Okay.  So I hear you say that this looks like
16 her mother.  Who are you -- who are you talking about
17 here?
18     A   There's a person over there that's not a
19 police officer next to the officer in a high visibility
20 vest.  She's wearing maybe purple or -- or red or
21 something like that.  My camera's pointing right at her.
22         So I'm assuming I'm looking at her and I'm
23 asking him who that is; is that -- and then I -- he's
24 answering that he thinks it's probably the mother.
25     Q   Okay.

Page 28

1         MR. ROSEN:  So let me just -- if it's all
2  right, I'm going to go back and replay just maybe the
3  last five or six seconds that we just watched if that's
4  all right.
5         (Video playback.)
6  BY MR. ROSEN:
7      Q   Okay.  So -- so you say this looks like her
8  mother.  What -- what informed your hunch or your
9  conclusion that the woman that you see in the -- in the
10 purple or the red at the top of the stairs is the
11 child's mother?
12     A   That was a question --
13     Q   Okay.
14     A   -- that I'm asking him, like, "This looks like
15 her mother?"  That -- that's a -- maybe my tone wasn't
16 correct, but --
17     Q   No.  No.  I see.
18     A   Because I'm seeing a person standing there and
19 I'm saying to him this looks like her mother; like, what
20 do you think?
21     Q   Okay.  Okay.
22     A   I think he might answer something there.  I'm
23 not --
24     Q   Yeah, I -- happy to -- happy to revisit that
25 if -- if he -- if he -- actually let's -- it's all

Page 41

1 please?
2  A  The driver is Lieutenant Loftus.
3  Q  Okay.
4  A  He used to be a lieutenant at the Second
5 District where I work. The female, I have no idea who
6 that is. Never --
7  Q  Okay.
8  A  -- met her. I don't -- I don't know her at
9 all.
10  Q  No problem. Okay.
11      MR. ROSEN: I'm going to play for about
12 20 seconds.
13      (Video playback.)
14 BY MR. ROSEN:
15  Q  Okay. This is not the most important question
16 in the world, but I'm wondering if you remember what you
17 grabbed from your car there.
18  A  You're reading my mind. I don't know.
19  Q  Okay.
20  A  I was wondering what I went into the car for.
21 I may -- maybe my other -- I have two phones. Maybe my
22 other phone, maybe my keys. I heard keys jingling
23 there. Maybe I jumped out of the car and forgot the
24 keys.
25      I don't think it was anything of consequence,

Page 42

1 to be honest.
2  Q  Okay. Sounds good.
3      MR. ROSEN: I'm going to play for about
4 30 seconds here.
5      (Video playback.)
6 BY MR. ROSEN:
7  Q  Okay. It sounds like you laugh just a bit at
8 Lieutenant Loftus's description, and I'm wondering why
9 that is.
10  A  I don't know why I did that. I'm wondering
11 too. I don't know if it was just the totality of how
12 the scene is unfolding.
13      It just seems like it's getting -- I mean,
14 from getting there and being told that it's a mother
15 there and a father to then finding out that the person
16 didn't want to speak and he tried to leave, to then
17 being told that this person was picked up and thrown in
18 the car, it's a -- I don't know if it's just a police
19 response or me as a sergeant just dealing with another
20 potentially really bad scene. I can't explain exactly
21 why -- why I did that.
22  Q  Understood. Okay.
23      MR. ROSEN: I'm going to play a little
24 bit of a longer stretch here, about under a minute.
25      (Video playback.)

Page 43

1 BY MR. ROSEN:
2  Q  Actually, I know I said I was going to play a
3 minute; there's one thing I'm going to ask here and then
4 I'll hit play again.
5      At this point, what crime or crimes do you
6 have reasonable suspicion of?
7  A  Nothing has -- nothing has changed.
8  Q  Okay. So kidnapping?
9  A  Yes, sir.
10  Q  And no other crimes?
11  A  In -- I don't know. In retrospect, I'm
12 hearing that this person was thrown into a car, but I
13 can't tell you for certain if it's because now,
14 understanding the totality of all the circumstances
15 after reading the report, which was completed
16 afterwards, and then I've read, or if it's this time
17 right now, but the throwing a kid in the car could
18 potentially be construed as a -- as a crime too
19 depending on the -- what the investigation, what to
20 tell.
21  Q  Okay.
22  A  But I can tell you for certain that I was
23 still operating under the suspicion that there could
24 potentially be a kidnapping.
25  Q  Okay. And now with the added detail about the

Page 44

1 alleged throwing into the car, if I'm -- if I'm
2 understanding you correctly, you're saying that that
3 might be something additional, sort of distinct from the
4 kidnapping, but you're not sure yet; is that a -- is
5 that a fair description of what you sort of just said to
6 me?
7  A  What I'm saying -- well, what I'm saying is --
8 is that after reviewing the report as it's written now,
9 which it hadn't been written at that time --
10  Q  Sure.
11  A  -- it could be construed that that could
12 potentially be abuse of a child which would then require
13 further investigation.
14      I can't say specifically, or for certain what
15 was on my mind at that point, if I acknowledge what he
16 said, as you're telling me that this kid was abused, or
17 if that's me knowing now after reading the report, but
18 regardless, the throwing of a kid in the car would be an
19 element of a potential kidnapping, and that's what I'm
20 definitely still concerned with.
21  Q  Okay. Great.
22      (Video playback.)
23  Q  So here it sounds like you and Lieutenant
24 Loftus are planning your next steps. I'm --
25  A  Sure.

Page 61

1  that would just be one more level of -- of assurance
2  that, you know, you're saying your name is John -- John
3  Smith, and John Smith is a dad, John Smith is a picture
4  that's you -- it just helps.
5          MR. ROSEN:  Sure, totally.  Okay.  I'm
6  going to keep going here.
7      (Video Playback.)
8  BY MR. ROSEN:
9     Q   Okay.  So I hear Mr. Fishman telling you that
10 he does not give you authorization to go into his
11 pockets, and I'm wondering what you made of that
12 response by Mr. Fishman in the moment.
13    A   Again, it's just another situation where I'm
14 trying to determine who he is, and I'm trying to give
15 him the opportunity to, like, say who he is and if he
16 provides your ID, it makes it just easier, and I'm
17 asking him, and then he's saying, "Again, I don't give
18 you authorization."
19       It's just one more time that unfortunately, he's
20 just not cooperating and making it more difficult and
21 kind of, to be honest, like dragging the scene out a
22 little bit longer than it needs to be.
23    Q   And could you just expand maybe a bit on that
24 last thing you said about sort of dragging things out
25 longer than it needs to be?  Why was that your -- one of

Page 62

1  -- sort of one of your reactions, or one of your
2  thoughts in the moment?
3     A   Well, initially when we first started watching
4  the video, I got on scene, and then Officer Jaeger's
5  telling me that it looks like it's the dad, it looks
6  like it's the mom or, and I'm saying, is that the mom --
7  you know, all the stuff we've already established.
8         And we -- Officer Jaeger's already gone
9  through the motions of approaching him, and then he
10 doesn't want to be talked to.  He's not cooperative
11 there, and then that leads to him wanting to leave, but
12 he's not -- he stopped at that point.  We're
13 investigating.  He's not free to leave.  That made the
14 situation -- that escalated the situation further.
15        And then even now when I'm -- when he stopped and
16 I'm asking for his ID, and he -- he's saying where his
17 ID is, he's still not cooperating, and all this stuff
18 just keeps making -- I don't want to say with red flags
19 or situations where as an investigating officer, you're
20 trying to determine what exactly we have here and why do
21 we have somebody who's not wanting to cooperate,
22 especially in a sense where it's in reference to or
23 associated with a crime that serious.
24    Q   Okay.  And at this point, what crime or crimes
25 do you have reasonable suspicion of?

Page 63

1     A   The same.  It's -- it's a situation where
2  we're still trying to determine if there was a
3  kidnapping of some sort that was committed.
4         MR. ROSEN:  Okay.  Going to play again.
5     (Video playback.)
6  BY MR. ROSEN:
7     Q   Okay.  Before I hit play again.  I hear you
8  say to Mr. Fishman that there's some sort of disconnect.
9  Can you just expand on that a little bit and describe
10 what you meant specifically by the disconnect?
11    A   Sure.  Disconnect being -- there's developing
12 two sides of this here.  The side of a misunderstanding
13 of what somebody up at 36th Street said they saw and
14 what we determine -- what we may have now and what could
15 be potentially, you know, with the confusion in the side
16 -- and getting us to this point, being a -- it could be
17 a kidnapping or not.
18       The disconnect being, okay, I have somebody that
19 seems to be a parent.  All things are starting to point
20 to you are the parent, but for some reason, you're not
21 willing to cooperate and we can't determine what
22 happened and what's going on.  Even then I said, what is
23 your understanding?  What's happened?
24       And even then, it's like, what point?  And it's --
25 a reasonable person would expect a guy that is in -- is

Page 64

1  stopped by the police, and, you know, he knows what
2  potentially led up to this.  The disconnect is -- is why
3  do we have the confusion between either there was a -- a
4  kidnapping or there was not.
5         MR. ROSEN:  Okay.  Thank you.  I'm going
6  to keep playing the video.
7     (Video playback.)
8  BY MR. ROSEN:
9     Q   So did anything that you just heard from Mr.
10 Fishman change the reasonable suspicion analysis for you
11 as to what crime or crimes you might have reasonable
12 suspicion of?
13    A   No, but he is working towards it.  He's --
14 he's talking and he's corroborating what the other
15 officer said, which is positive.  That's a good move --
16 that's moving in the right direction, and he's calm and
17 we're -- we're having an exchange trying to determine
18 what's going on.
19        MR. ROSEN:  Great.  Okay.  I'm actually
20 just going to go back sort of a couple seconds and then
21 I'll hit play again.
22        THE WITNESS:  Sure.
23    (Video playback.)
24 BY MR. ROSEN:
25    Q   So in what we just watched you tell Mr.

Page 81

1  subject as he's -- as he's becoming.  He's explaining
2  that he's -- and I said something there it's like an
3  intrafamilial, you know, inter-family incident, which is
4  what it's starting to seem at this point.
5       He's continuing to describe what happened,
6  he's continuing to provide details as to what transpired
7  before he grabbed his -- his, you know, alleged kid, all
8  that stuff.  That's why I'm hearing him say this, a
9  little bit of frustrating because he is talking over me.
10 Not to the -- not to any extreme level.
11    Q   Okay.  Just to follow up on something you
12 said, you just said something to the effect of there
13 being a kind of transition regarding Mr. Fishman from
14 suspect to subject.  Could you -- could you expand on
15 that a bit?
16    A   That's what happens.  I mean, that's what
17 we're going towards, that's the -- in an ideal situation
18 you know, when you're dealing with people and you're not
19 -- an ideal situation is that there's no crime that was
20 committed, there's no victim, there's no victimization,
21 there's no suspect, you know, you want there to be a
22 subject, not a suspect.
23       And so that's the transition.  The transition
24 is when you finally cooperate and you finally provide
25 details and you finally answer the questions that are

Page 82

1  pertinent to that specific investigation, you can remain
2  a suspect at that point and then -- then we start to
3  enter into probable cause or we can have somebody become
4  a subject.
5       So what I'm saying is, is that, you know, I
6  know the ending of this, I mean, I know the ending of
7  this story.  As we're doing this, I've seen it before so
8  I'm just kind of narrating it for you.  You said as he's
9  talking and you know, I'm not specifically in my mind at
10 that point but as me looking at me, that's the direction
11 we're going, is to get him from being that suspect of a
12 kidnapping case to the subject of an unfortunate
13 misunderstanding.
14    Q   Sure, that's helpful, thank you.  And then
15 this is my last follow-up here.  You a moment ago,
16 mentioned the "pain in the ass" comment that I believe
17 Mr. Fishman makes twice.  I'm wondering what you made of
18 that in the moment as far as your investigation is
19 concerned?  If you made anything of it?
20    A   Yeah, it is strange -- it's not completely
21 unheard of but it is definitely not normal that when you
22 have a reasonable person who is -- in understanding the
23 gravity of the situation you're dealing with the police
24 they're trying to determine what -- what happened and to
25 refer to your child as a pain in the ass, to refer to

Page 83

1  one of them like my good kid, it does start to -- it
2  does make you wonder you know, well what is -- what is
3  this a little bit.
4       But I mean it's just a -- again with the
5  nature of police work is that you're always listening to
6  what people are saying and, in a situation, when you're
7  dealing with a reasonable adult, a reasonable father who
8  understands what the situation is.  And is -- is
9  concurrently working towards a resolution with you, it
10 does seem strange that you would refer to your child as
11 a pain in the ass when it's been -- that's just, you
12 know, it is -- it was a little minor -- it was alarming,
13 but it wasn't anything that was trying to stop me from
14 thinking that it was a kidnapping.
15       I'm sorry, stop -- push me toward thinking it
16 was a kidnapping.
17    Q   Understood.  Okay.  And I know this is
18 probably the 15th time that I've asked this, at this
19 point, what crime or crimes did you have reasonable
20 suspicion of?
21    A   Sometime herein now, sometimes either in a few
22 seconds or in a minute or -- I'm making a determination
23 that though he's still not free to go, I don't -- I'm
24 not determining him to be a risk of being a fleeing
25 felon anymore.  So I'm going to be determining it's time

Page 84

1  to take him out of handcuffs.
2     Q   Okay.  And just -- that's helpful.  And just
3  to make sure that I understand, is the distinction that
4  you're drawing that the decision to take him out of
5  handcuffs goes to the question of flight but that taking
6  him out of handcuffs doesn't necessarily conclude the
7  Terry stop, or am I misunderstanding --
8     A   The Terry stop -- the Terry stop means you're
9  not free to go.  Just because you're not free to go
10 doesn't mean you're necessarily always placed in
11 handcuffs.  Handcuffs can be used when there's a -- when
12 there's a situation where officers' safety or the safety
13 of the public is -- is a concern or the fact that you
14 have a potential for someone to flee is concerned.
15       There's like a totality of circumstances that
16 would lead to someone being placed in handcuffs.  People
17 are stopped in reference to a Terry stop, in reference
18 to reasonable suspicion of a crime being committed,
19 they're not always put in handcuffs but what's -- what's
20 always certain is they're not free to leave.  They're
21 stopped.
22    Q   Okay.  So and I apologize for sort of drilling
23 down on this.  Essentially, there are, as I -- as I take
24 you to be saying it now, there are kind of two distinct
25 moments in sort of what we're about to watch on the --

Page 85

1  on your body worn.  The first is the moment at which you
2  determine that Mr. Fishman is no longer a flight risk
3  and so you have him removed from handcuffs.  And then
4  there's a second distinct moment sometime after that
5  where the Terry stop concludes.  And at that point, he's
6  free to go.  But those are the two distinct moment that
7  happens sequentially.
8      A    I would agree.
9           MR. ROSEN:  Okay.  I am going to just go
10 back a bit and then -- and then I'll stop totally after
11 that.  Sorry about this, okay.  Got the error message,
12 sorry about this, let's do this again.
13          THE WITNESS:  May I use the restroom for
14 just two minutes.  I don't want to make it --
15          MR. ROSEN:  Yeah, no let's -- I mean,
16 let's -- no --
17          THE WITNESS:  -- to be a problem.
18          MR. ROSEN:  That's totally fine with me.
19 Should we go off the record for maybe five minutes?
20          MS. TORRES:  Sure, that works.
21          MR. ROSEN:  Okay.  Great.
22          THE REPORTER:  Okay.  The time is 12:18
23 p.m. Eastern Time, and we are off the record.
24     (Off the record.)
25          THE REPORTER:  We're back on the record.

Page 86

1  The time is 12:24 p.m., Eastern Time.
2           MR. ROSEN:  Okay.  So I think we are at
3  11:38 in Sergeant Bray's body worn but I'm getting the
4  error message so I'm going to close out the exhibit and
5  then re-open it and it will be the same, the Exhibit A.
6  Okay.  Does everyone see the body worn?  Are we back?
7  Okay.  Great.
8           So we stopped at 11:38 in the -- in the
9  video and I'm going to play -- I'm going to play it for
10 30 or 40 seconds.
11     (Video playback.)
12 BY MR. ROSEN:
13     Q    Does or did, in the moment, did Mr. Fishman's
14 explanation and version of events seem truthful to you?
15     A    Truthful?
16     Q    Yes.
17     A    Yeah, yes.  His -- I don't remember thinking
18 that he was being untruthful.
19     Q    Okay.  And at this point, what crime or crimes
20 did you have reasonable suspicion of?
21     A    At this point I -- I think, I mean -- I mean
22 without knowing how much time is about to transpire I
23 think I'm -- I'm believing that unless I hear something
24 different when we talk because I do need to talk to
25 them, I mean he's not free to leave but I'm moving

Page 87

1  towards thinking that this was a -- a misunderstanding,
2  but we need to go and determine that from the other
3  officers.  I'm not the only one conducting the
4  investigation.
5           So eventually we're going to move over to talk
6  to them but he's -- he's, in your words "moving my
7  needle" towards the -- the good sign -- the positive
8  sign.
9           MR. ROSEN:  I'm just going to play just
10 for a couple of seconds here.
11     (Video playback.)
12 BY MR. ROSEN:
13     Q    Can you just explain first, why you asked Mr.
14 Fishman if he had anything on him that could be, you
15 know, used as a weapon or that could hurt someone?
16     A    I don't -- I don't want him to use a weapon or
17 hurt somebody.
18     Q    Sure.
19     A    I mean he's wearing -- I mean he's wearing
20 like a decent amount of clothes there, he could hide all
21 kinds of crazy stuff in there, I guess if he really
22 wanted to.
23     Q    Sure.  And did Mr. Fishman's answer seem
24 truthful to you?
25     A    Yes.

Page 88

1      (Video playback.)
2  MR. ROSEN:
3      Q    Okay.  Could you explain or walk through why
4  you decided to uncuff or have one of the officers uncuff
5  Mr. Fishman at this point?
6      A    It's the same as what we discussed earlier.
7  So I -- I asked him if he was -- it's, you know, the
8  stop and frisk part of it, if I was being even more
9  cautious, I would have frisked him myself, but I didn't
10 but the question of do you have a weapon he said, "No."
11          I'm not in my mind at that moment but if I was
12 to try and understand or give you a reasonable idea, my
13 perception would be Officer Todaro and Almanzar, or
14 Officer Jaegar, or Officer Welch, or whoever is on the
15 scene or whoever actually placed in the handcuffs, which
16 I don't know, would have patted him down.  Me asking
17 again is just another layer of security.
18          Sometimes people will admit to saying
19 something as crazy as, "Yeah I have a gun" or "Yeah, I
20 have a knife" that was missed by an officer and so that
21 was asked, he replied negative.  I don't -- he was calm
22 at this point, he had given -- he had cooperated finely
23 at this point.
24          I told him that I was going to talk to the
25 kids or at least at that point, I think I thought I was