**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 14**

Page 1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3        _____

4    JARED FISHMAN,

5           Plaintiff,

6        v.              Case No:

7    DISTRICT OF COLUMBIA,      1:21-cv-01847-RJL

8    PATRICK LOFTUS, MARCK

9    JAEGER, JEREMY BRADY,

10   MICHAEL TONG,

11   & CHRISTOPHER TODARO,

12          Defendants.

13       _____

14          VIDEOTAPED DEPOSITION

15       _____

16

17   WITNESS:      JABARI WELCH

18   DATE:        Wednesday, September 20, 2023

19   START TIME:  10:07 a.m., ET

20   END TIME:    2:14 p.m., ET

21   REMOTE LOCATION:  Remote Legal platform

22   REPORTER:     Kimberly Costanza, CDR-1835

23   JOB NO.:     19548

24

25

Page 2

1            A P P E A R A N C E S

2

3    GERSTEIN HARROW LLP

4    810 7th Street Northeast

5    Suite 301

6    Washington, DC 20002

7    By:  SAM ROSEN, ESQUIRE

8        sam@gerstein-harrow.com

9    By:  EMILY GERRICK, ESQUIRE

10       emily@gerstein-harrow.com

11   Appearing for Plaintiff

12

13   DEPARTMENT OF ATTORNEY GENERAL

14   Office of the Attorney General

15   for the District of Columbia

16   400 6th Street Northwest

17   Washington, DC 20001-0189

18   By:  AMANDA TORRES, ESQUIRE

19       amanda.torres@dc.gov

20   Appearing for Defendants

21

22

23

24

25

Page 3

1        I N D E X O F T E S T I M O N Y

2

3    EXAMINATION OF JABARI WELCH:         PAGE

4    By Mr. Rosen                7

5    By Mr. Torres              120

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1        I N D E X O F E X H I B I T S

2         (available for download)

3

4    EXHIBIT  DESCRIPTION              PAGE

5    A      Sgt. Welch's body-worn camera footage    13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1  to college?

2      A   I attended the University of Texas at Austin.

3      Q   Okay.  How long have you been a police officer

4  -- or how long have you been in law enforcement?  Excuse

5  me.

6      A   I've been with the Metropolitan Police

7  Department for five years -- a little over five years.

8      Q   Okay.  And have you been in law enforcement

9  anywhere else or your whole law enforcement career has

10  been at MPD?

11      A   My law enforcement career has been at MPD, and

12  I also interned for a law enforcement agency in Austin

13  while I was in college.

14      Q   Okay.  And between college and your time at

15  MPD, did you -- did you work anywhere else or in any

16  other kind of job?

17      A   Yes.

18      Q   Okay.  And where was that?

19      A   Non-law enforcement related?

20      Q   Yes.

21      A   I worked for Travis County.

22      Q   Okay.  Great.  And as of February 17th, 2020,

23  what training did you have regarding kidnapping

24  investigations?

25      A   Training pursuant to our -- our policies and

Page 10

1  procedures at the Metropolitan Police Department.

2      Q   Okay.  So is it fair to characterize that as

3  your training being all of the training that someone at

4  MPD at your rank would receive?

5      A   Yes.

6      Q   And sort of, no more, no less,

7  essentially?

8      A   Yes, sir.

9      Q   Okay.  I have a few questions for you about

10  Terry stops.  First, what is your personal understanding

11  of the definition of a Terry stop?

12      A   When you have reasonable suspicion that a

13  crime has been committed, is being committed, or is

14  about to be committed.

15      Q   Okay.  So a stop -- a stop is made pursuant to

16  that reasonable suspicion?

17      A   Yes.

18      Q   Okay.  And what is your personal understanding

19  of the standard for when a Terry stop must be concluded?

20      A   It -- it depends on the scene.  It -- it would

21  depend.  But for a stop, you would need to have

22  reasonable suspicion and --

23      Q   And so --

24      A   -- it -- it would depend on the scene.

25      Q   Okay.  So totally, take the point that, you

Page 11

1  know, there are a lot of different sort of ways that

2  this could come up.  Is it -- I took you just to be

3  saying at the very end of your answer that continuing a

4  Terry stop requires reasonable suspicion that a crime is

5  -- has been committed or is about to be committed.  Is

6  that a fair, sort of, recap of what you were suggesting?

7      A   I'm sorry.  Can you repeat the question?

8      Q   Sure.  Sure.  My original question was what it

9  was -- what is your personal understanding of the

10  standard for when you need to release someone from a

11  Terry stop?  Yeah.  So that was -- that was the original

12  question.

13      A   Yes.  So it would be sort of scene-by-scene

14  and based on the investigation.  When a Terry stop would

15  be stopped is when the officers on the scene have all of

16  the information that they need for their investigation.

17      Q   Okay.  Are you aware of any MPD policy that

18  says that officers require approval of a superior in

19  order to release someone from a Terry stop?

20      A   Can -- can you repeat the question?

21      Q   Sure.  Is there -- is there or are you aware

22  of any policy at MPD that says that officers require the

23  approval or presence of a supervisor in order to

24  conclude a Terry stop?

25      A   I -- I would have to review the -- the general

Page 12

1  order.

2      Q   Okay.  I have one more question about Terry

3  stops and reasonable suspicion.  We've talked about

4  these principles, sort of, generally.  At any point on

5  February 17th, 2020, what crime or crimes did you have

6  reasonable suspicion to believe had occurred?  So in

7  other words, you know, for the -- for the entirety of

8  the -- of the incident, what are -- could you -- could

9  you list the crime or crimes that you believed you had

10  reasonable suspicion of?

11      A   A kidnapping of a juvenile.

12      Q   Okay.  A kidnapping, that's the -- that's the

13  list for the -- for the entirety of the incident?

14      A   That was -- the call for service was a

15  kidnapping.

16      Q   Okay.  Thank you.

17          MR. ROSEN:  I would like to introduce

18  Exhibit A.  Let's see if I can do this properly.  Okay.

19  Can everyone see the exhibit I just shared?

20          MS. TORRES:  Yes.

21          THE WITNESS:  Yes.

22          MR. ROSEN:  Okay.  Great.

23          If this could be marked as Exhibit A,

24  please?

25          THE REPORTER:  Okay.  Exhibit has been

## Page 61

1 scene, a check on welfare report was -- was taken.
2 Report numbers were generated for a check on welfare
3 after -- after our investigation to conclude that --
4 yeah.
5     Q   Okay.  Does MPD -- have you ever written a
6 report -- forget about MPD as a whole.  Just you
7 individually, have you ever written a report about an
8 investigation that concluded that the thing that was
9 being investigated didn't happen?
10     A   I -- I have taken a lot of reports --
11     Q   Fair enough.
12     A   -- over the years, so I wouldn't be able to
13 recall.
14     Q   In general, would it ever be the case that a
15 report would read, we got a call for x, we investigated,
16 and it turned out x hadn't happened?  Like for -- I
17 guess, I'm just purely trying to understand in -- as a -
18 - as a -- as kind of rule, I guess, as MPD policy, would
19 an MPD -- would a member of MPD ever take a report about
20 an investigation that concluded that there was no crime?
21         MS. TORRES:  Objection.
22         THE WITNESS:  And I wouldn't be able to
23 answer what -- what other members on the department
24 would do.
25 BY MR. ROSEN:

## Page 62

1     Q   Okay.  Okay.  Why did you volunteer to write
2 the report in this instance?
3     A   So Georgetown, where the 2703 O Street --
4 Georgetown was my PSA -- PSA 206 -- at the time when I
5 was an officer in the Second District.  And so it was my
6 area -- my -- my beat, so I took the report because it
7 was my beat.
8     Q   And what -- and what does PSA stand for?  I'm
9 sorry.
10     A   Yes, sir.  A police service area.
11     Q   Okay.  And so just to make sure I've got this,
12 you were the -- were you the only officer on scene on
13 this day who's -- who had that PSA?  Like, is it as
14 simple as, like, you -- this was your -- this was your
15 area, you were the only one of the people here for whom
16 that was true, and so the report was yours to write?
17     A   So -- my memory serves me correctly because it
18 was in 2020 --
19     Q   Sure, sure, sure.
20     A   -- I -- Officer Tong was not in PSA 206.  The
21 other officers -- I -- I cannot -- I cannot recall, but
22 I know it was my area of responsibility.  I was assigned
23 to PSA 206, and I decided to take the report.
24     Q   Okay.  So you decided to take the report.  Can
25 you explain why you volunteered or told Officer Tong

## Page 63

1 that you were taking the report at this moment in the
2 action?
3     A   Because it was my area of responsibility, an
4 area where I proactively patrolled, answered calls for
5 service, attended community meetings, and I decided it
6 was my -- because it was in my area that I would take
7 the report.
8     Q   And I'm sorry, I actually -- I meant to ask,
9 like, why now?  Like, you're speaking -- you're speaking
10 to Tong.  He's giving you a rundown of events from his
11 perspective as he's hearing them from Mr. Fishman and
12 maybe getting information from other sources as well.
13 And then at that point, you say, okay, I'll write the
14 report.
15        So you've explained why you decided to write
16 it.  I'm also wondering if you can speak to why you told
17 Tong at this moment, I'm going to -- I'll write the
18 report?
19     A   I -- I can't remember in that time -- exactly
20 at that time period why I -- I told him.  But it was my
21 area that I was assigned to at the time when I was
22 assigned to the Second District, and I decided to take
23 the report.  But at the time I -- I cannot recall.
24     Q   Thank you.  We're at 00:09:37.  I'm going to
25 keep going.

## Page 64

1     (Video played.)
2 BY MR. ROSEN:
3     Q   We just paused at 00:09:55.  Just before I
4 paused, you said to Officer Tong, so this is not a --
5 but then you stopped speaking, at that point.  Do you
6 remember what you were about to say?
7     A   No, sir.
8     Q   Okay.  Is it possible that you were about to
9 say that this is not a kidnapping?
10     A   I cannot -- I cannot recall.
11     Q   Okay.
12     (Video played.)
13 BY MR. ROSEN:
14     Q   Okay.  We are paused at 00:10:04.  I realize I
15 asked you this question a moment ago, but more things
16 have happened, so I'll ask another time.
17        At this point, what crime or crimes do you
18 have reasonable suspicion of?
19     A   So we were still investigating, and as Officer
20 Tong actually -- as he just noted on body-worn camera,
21 that you had kids that were kicking each other.  So
22 we're still -- we're still actively investigating the
23 scene.
24     Q   Okay.  So -- and just to make sure I
25 understand, the alleged behavior of the two girls