**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
EXHIBIT 15**



- COURT REPORTING
- LEGAL VIDEOGRAPHY
- VIDEOCONFERENCING
- TRIAL PRESENTATION
- MOCK JURY SERVICES
- LEGAL TRANSCRIPTION
- COPYING AND SCANNING
- LANGUAGE INTERPRETERS







(800) 528-3335
NAEGELIUSA.COM

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JARED FISHMAN,

    Plaintiff,

-v-                                        1:21-cv-01847-RJL

DISTRICT OF COLUMBIA,
PATRICK LOFTUS, MARCK JAEGER,
JEREMY BRADY, MICHAEL TONG, &
CHRISTOPHER TODARO,

    Defendants.

_____

**DEPOSITION OF**

**PATRICK LOFTUS**

**TAKEN ON**
**THURSDAY, SEPTEMBER 28, 2023**
**11:38 A.M.**

**ATTORNEY GENERAL OFFICE**
**400 SIXTH STREET NORTHWEST**
**WASHINGTON, DISTRICT OF COLUMBIA, 20001**

**Page 22**

1    (Whereupon, Exhibit B was marked for
2  identification.)
3  BY MR. GERSTEIN:
4    Q.  I am going to play this for about two
5  minutes, I think, before I stop it the first time.
6    (Video plays)
7    MR. GERSTEIN:  For the record, that
8  stopped at minute two.
9  BY MR. GERSTEIN:
10    Q.  Lieutenant Loftus, do you remember the
11  call you received that prompted you to drive over to
12  the scene as depicted in this video?
13    A.  Yes, sir.
14    Q.  Do you remember what you were told on that
15  call?
16    A.  Can you be more specific?  I'm sorry.
17  Like by who?
18    Q.  I don't actually know.  So who called you
19  that caused you to drive here?
20    A.  Okay.  The 911 caller, you know, placed a
21  call as to what she observed and then we were
22  dispatched to that scene of the 911 caller by the
23  dispatcher.
24    Q.  And do you remember what the dispatcher
25  told you?

**Page 23**

1    A.  I don't remember all the transmissions,
2  but it was in reference to a kidnapping.
3    Q.  And as you were driving over in this video
4  we just watched, had you yet communicated with any
5  other police officers about the incident that was
6  reported?
7    A.  Yes.
8    Q.  And who were they?
9    A.  Well, over the radio.  I advised that I
10  was responding.  So everybody would have heard my
11  transmissions.
12    Q.  Okay.
13    And had you heard any other transmissions
14  from other officers responding to the case?
15    A.  I don't remember, you know, exactly what I
16  heard, but I was actively monitoring the radio.
17    Q.  Okay.
18    At this point in the video, stopping at
19  minute two when you've just arrived at the scene of
20  where the 911 caller was, what crimes did you
21  believe you had reasonable suspicion of?
22    A.  We were investigating a kidnapping.
23    Q.  Did you believe at that point that you had
24  reasonable suspicion of any other crimes?
25    A.  At that point, I don't remember.

**Page 24**

1    Q.  So you don't remember that you had
2  reasonable suspicion of any other crimes?
3    A.  Well, we did, but not yet, in my
4  recollection.
5    Q.  I mean at this point in the video?
6    A.  Right.  At this point, I recall
7  kidnapping.
8    Q.  Okay.
9    I am going to play for another 17 seconds.
10    (Video plays)
11  BY MR. GERSTEIN:
12    Q.  Who's Falcon?
13    A.  Falcon is our helicopter.
14    Q.  And what were you thanking Falcon for?
15    A.  I believe they were -- well, they were
16  overhead.
17    Q.  And had you called for the helicopter to
18  respond to this incident?
19    A.  No, they were already -- well, I may have.
20  I don't know.  They were already up in our area
21  looking for something else.
22    Q.  Looking for something else in an unrelated
23  case?
24    A.  Unrelated, yes.
25    Q.  Okay.

**Page 25**

1    And so you may have notified the
2  helicopter, but you're not sure?
3    A.  Correct.
4    I'm going to play for about 15 more
5  seconds.
6    (Video plays)
7  BY MR. GERSTEIN:
8    Q.  Okay.
9    At the point of the video I just stopped,
10  you just asked did it look like a dad with an
11  uncooperative kid.  Why did you ask that?
12    A.  Based on my experience in policing,
13  sometimes things are different than they appear,
14  really in life, but it's something we want to factor
15  in during our preliminary investigation.
16    Q.  So you thought it was possible that the
17  incident that was reported as a kidnapping might
18  have been a father with an uncooperative kid?
19    A.  Anything's possible, but when you're
20  dealing with a kidnapping or a possible kidnapping,
21  especially involving a little girl, we have to treat
22  that as seriously and that it's a legitimate
23  kidnapping until we're proven otherwise.
24    Q.  Had anyone yet mentioned to you related to
25  this incident that it might have involved a father

## 26

1  with an uncooperative kid?
2    A.  I don't believe so.
3    Q.  I'm going to play about another 40
4  seconds.
5        (Video plays)
6        MR. GERSTEIN:  We're back on the record.
7  BY MR. GERSTEIN:
8    Q.  I just stopped the video at minute three,
9  second 55.
10       After what you just watched, what did you
11 think had happened at the incident that was
12 reported?
13   A.  We have one of two situations.  Well, we
14 have a couple possible situations.  We have a
15 kidnapping, we have a parental kidnapping or we have
16 child abuse.
17   Q.  Okay.
18       I'm going to introduce what I would like
19 to mark as Exhibit 3.  Exhibit C, excuse me.
20       (Whereupon, Exhibit C was marked for
21 identification.)
22 BY MR. GERSTEIN:
23   Q.  I've just introduced Exhibit C, which for
24 the record reads:  "General order of the
25 Metropolitan Police, title Child Abuse and Neglect,

## 27

1  effective date November 18, 2010.  Series 309 number
2  06."
3        Did you review this document in
4  preparation for your deposition today?
5    A.  Yes, sir.
6    Q.  Okay.
7        And before preparing for your deposition
8  today, were you familiar with MPD's general orders
9  regarding child abuse?
10   A.  I'm generally familiar with our general
11 orders.  You know, we have thousands of pages of
12 policies, so a general working knowledge.
13   Q.  Can you define what you think child abuse
14 is?
15       MS. MULLEN:  Well, objection as to form.
16 BY MR. GERSTEIN:
17   Q.  Let me rephrase.
18       What do you think child abuse is?
19       MS. MULLEN:  Objection as to form.
20       THE WITNESS:  Based on my own
21 interpretation or can I reference the policy?
22 BY MR. GERSTEIN:
23   Q.  Either?
24   A.  Let's use the policy.
25       So abuse is classified into a couple of

## 28

1  different areas.  And I'm on Part 3 for definitions,
2  number 2.  And it says:  "Abuse:  Infliction of
3  physical or mental injury on a child that goes
4  beyond mere discipline administered by a parent or a
5  legal guardian in accordance with official D.C.
6  code.  Sexual exploitation of a child or negligent or
7  maltreatment of a child."
8    Q.  And does that definition comport with how
9  you would in your own opinion understand what child
10 abuse means?
11       MS. MULLEN:  Objection as to form.
12       You can answer.
13       THE WITNESS:  I think it's close.  I would
14 say if someone is doing something to a child,
15 whether you're the parent or a stranger, but in many
16 cases it's the parents, that inflicts injury, pain,
17 emotional distress, trauma, sexual abuse, could all
18 fall under that category.
19 BY MR. GERSTEIN:
20   Q.  On Page 2 of this document under number 2,
21 there is an all caps word written that says note and
22 next to the word note it reads:  "Whenever used in
23 reference to children, "it" -- referring to the
24 definition of abuse -- "does not include the
25 discipline administered by a parent, guardian or

## 29

1  custodian to his or her child, provided that the
2  discipline is reasonable in manner and moderate in
3  degree and otherwise does not constitute cruelty."
4        Does that definition surprise you?
5        MS. MULLEN:  Objection as to form.
6        You can answer.
7        THE WITNESS:  I would like to read it
8  again if you don't mind.
9  BY MR. GERSTEIN:
10   Q.  Sure.  Yes, of course.  Take your time.
11   A.  I think it's all about reasonableness, you
12 know -- that's the way I interpret this.  Discipline
13 should be reasonable.  And -- that's it.
14   Q.  Would you say that manhandling a child who
15 has run off by hoisting them over your shoulder and
16 putting them in the car would meet that definition
17 of abuse?
18       MS. MULLEN:  Objection to the form of this
19 entire line of questioning, but you can answer.
20       MR. GERSTEIN:  Could you wait for a
21 moment?
22       I need to ask you to stop speaking
23 objections.  You can note an objection to form, but
24 this is instructing the witness during a deposition
25 with a pending question by objecting to the line of

30

1  question. None of that was objectionable to begin
2  with, but regardless --
3        MS. MULLEN: It's all highly
4  objectionable.
5        MR. GERSTEIN: On what grounds?
6        MS. MULLEN: You're asking -- it's so
7  obvious, your theory. And --
8        MR. GERSTEIN: That's not objectionable,
9  Martha, that's lawyer talk. So please stop using
10 that in this deposition.
11       MS. MULLEN: It is not good lawyering to
12 ask questions out of context and asking this officer
13 to voice his opinion about written policies.
14       MR. GERSTEIN: Martha, do you believe that
15 bad lawyering is objectionable during a deposition?
16 It's my deposition. I'll ask the questions and if
17 they're objectionable, you can note them for the
18 record, right?
19       MS. MULLEN: You're right, I would say bad
20 lawyering is not objectionable, but I do find the
21 line of questioning objectionable, so I object to
22 the form of that question.
23       MR. GERSTEIN: Okay. I'm neither going to
24 rephrase it nor withdraw it. Could you please
25 answer? I'll repeat it though.

31

1  BY MR. GERSTEIN:
2     Q. Would you say that manhandling a child who
3  has run off by hoisting them over your shoulder and
4  putting them in a car would meet that definition of
5  abuse?
6        MS. MULLEN: Objection to the form of the
7  question and the hypothetical.
8        THE WITNESS: I think manhandle is a broad
9  term, so I would need more specifics.
10 BY MR. GERSTEIN:
11    Q. So it possibly might meet that definition
12 depending on those specifics?
13    A. For child abuse?
14    Q. Correct.
15    A. Manhandle, absolutely, depending on what
16 those specific situations are.
17       MR. GERSTEIN: So I'm going to note for
18 the record that counsel believes hypotheticals to be
19 objectionable, is that correct?
20       MS. MULLEN: No, I'm objecting to the
21 hypothetical that you provided him.
22       MR. GERSTEIN: What about that, what's
23 objectionable?
24       MS. MULLEN: It's objectionable because
25 you're giving -- as a hypothetical, you're

32

1  describing -- we should excuse the -- you need to
2  leave.
3        THE WITNESS: Okay.
4        MS. MULLEN: I can't do this in front of
5  you.
6        THE WITNESS: I'll just step outside.
7        MS. MULLEN: Okay.
8        MR. GERSTEIN: Why? Do you want to go off
9  the record?
10       MS. MULLEN: Yes -- I don't -- we can stay
11 on the record. That's fine. I don't think
12 Lieutenant Loftus should be here when I have this
13 exchange with you.
14       MR. GERSTEIN: Okay.
15       THE WITNESS: I'll just be right outside
16 the door. Just let me know when --
17       MS. MULLEN: Yes.
18       MR. GERSTEIN: For the record, Lieutenant
19 Loftus is leaving and I presume will be out of
20 earshot.
21       THE WITNESS: Yes, I will. Come and get
22 me when you guys are ready.
23       MR. GERSTEIN: We'll stay on the record.
24       MS. MULLEN: A citizen made a report and
25 gave a description. That triggered an

33

1  investigation. You are asking the officer to give an
2  opinion based on the description that was given
3  before the investigation was even completed. It's
4  totally wrong. You're trying to fit -- we had two --
5  yes, look at your watch. That's always the polite
6  thing to do. We had two good samaritans who
7  witnessed something that they believed to be wrong
8  and they made a 911 call. That's how serious of an
9  impact it was on them.
10       So asking this officer if at the point
11 when he's first learning about what these witnesses
12 saw, whether that in and of itself could be child
13 abuse is not only irrelevant, but you're asking him
14 to say oh -- and he's told you it could be, it could
15 not be. It always depends on the situation. There
16 were multiple officers investigating this. They
17 took it very seriously and they gained information
18 as they went long.
19       So I don't know why you're persisting in
20 asking him if based on what the witness saw --
21 you're asking him what's your opinion. At that
22 point in time, did you think it was child abuse?
23 Policing and police practices are collecting
24 information as you go along. You don't immediately
25 form an opinion. You gather information. That's

54

1  -- and the name has evolved, but youth division,
2  youth family services vision -- they investigate
3  child abuse and neglect.  Basically, anytime that we
4  have a juvenile victim, they would be the ones to
5  conduct those investigations.
6    Q.  And what, in your understanding, is the
7  relationship between whether the parents are
8  separated and whether this is a youth division case?
9    A.  I'm not sure about whether separated or
10 not, but it's a different -- there is a kidnapping
11 squad of detectives.  Say it's like a stranger,
12 there is a kidnapping squad of detectives that would
13 handle that. I've never had it -- well, I imagine
14 that youth and family services division, because
15 they investigate essentially all cases where
16 children are victims, would handle a parental
17 kidnapping case.  Or child abuse as well.  That all
18 falls under their purview.
19   Q.  Thank you.
20      I'm going to introduce another video that
21 we will mark as Exhibit D, I believe we were up to?
22      MS. MULLEN:  I think that's right.
23      (Whereupon, Exhibit D was marked for
24 identification.)
25      MR. GERSTEIN:  And I will represent to

55

1  your lawyer, Lieutenant Loftus, that this is a video
2  that was produced to us during discovery and it is
3  also from your body-worn camera footage when you
4  arrived at Jared Fishman's house on February 17,
5  2020.
6      THE WITNESS:  Can we take a break in a few
7  minutes or --
8      MS. MULLEN:  Do you want --
9      MR. GERSTEIN:  Do you want it now?
10     THE WITNESS:  This might be a good time,
11 just to hit the restroom.
12     MS. MULLEN:  Yes.
13     MR. GERSTEIN:  Off the record.
14     (Whereupon, a recess ensued)
15     MR. GERSTEIN:  Back on the record.
16 BY MR. GERSTEIN:
17   Q.  Okay.
18      I'm going to play the video I just
19 described in the record.
20     (Video plays)
21     MR. GERSTEIN:  Just to save us three
22 minutes.  Nothing happens here.  I'm going to -- I
23 think there is somebody over there.  Okay.  I'm
24 stopping at minute two and playing at -- well, I'm
25 playing at minute two, excuse me.

56

1     (Video plays)
2     MR. GERSTEIN:  Back on the record.
3     MR. GERSTEIN:  I stopped at minute three,
4  second 11.
5  BY MR. GERSTEIN:
6    Q.  You're speaking to someone in this video.
7  Do you know who that is?
8    A.  Right there?
9    Q.  Yes.
10   A.  Yes, that's Sergeant Bray.
11   Q.  Sergeant Bray just said that another
12 officer had told him that the two people with the
13 girl in this investigation were the biological
14 mother and father of the girl, is that correct?
15   A.  I believe that's what they said.
16   Q.  Okay.
17      At this point, what crime or crimes do you
18 believe you had reasonable suspicion of?
19     MS. MULLEN:  Objection as to form.
20     You can answer.
21     THE WITNESS:  If it is the biological
22 parents, then we still have the issue of either
23 parental kidnapping that I previously described or
24 child abuse.
25 BY MR. GERSTEIN:

57

1    Q.  And you believed you had reasonable
2  suspicion of both of those crimes at this point?
3    A.  Yes.  One or the other.  We had reasonable
4  suspicion to have that fact that a crime had
5  occurred. We're still figuring out what exactly.
6    Q.  I'm going to play for 32 seconds.
7      (Video plays)
8      MR. GERSTEIN:  Okay, I stopped at minute
9  three, second 43.
10 BY MR. GERSTEIN:
11   Q.  I believe you just said that it concerned
12 you that the parents of the girl in the
13 investigation had not been immediately cooperative,
14 is that correct?
15     MS. MULLEN:  Well, objection as to the
16 form of the question.
17     You can answer.
18 BY MR. GERSTEIN:
19   Q.  Let me rephrase.  What is your
20 understanding of what you just said in the video?  I
21 can replay it if you want.
22   A.  Can you replay it?
23   Q.  Sure.
24     (Video plays)
25   A.  Do you need to go back further?